IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MELANIE YOUNG AND ASHLEY FALGOUT**　　　　　　　　　　　　　　　　**PLAINTIFFS**

**v.**　　　　　　　　　　**CIVIL ACTION NO.: 3:24-cv-615-CWR-ASH**

**MISSISSIPPI DEPARTMENT OF**　　　　　　　　　　　　　　　　**DEFENDANT**
**CHILD PROTECTION SERVICES**

## AFFIDAVIT OF ASHLEY FALGOUT

1. My name is Ashley Falgout. I am over the age of eighteen years old. I state the following based upon my own personal knowledge and am competent to testify as to these matters.

2. Melanie Young was hired on October 1, 2020, as a Special Projects Officer IV (Education Liaison) at the Mississippi Department of Child Protection Services (MDCPS).

3. I was hired on July 1, 2009, as a Program Administrator of Independent Living at the Mississippi Department of Child Protection Services (MDCPS) and in this role directly dealt with the administration and oversight of the Chafee Grant.

4. I was promoted in August 2015 to Division Director II and then on October 1, 2020, I was promoted by Davenport to the position of Bureau Director II.

5. In this new role, my immediate supervisor was Deputy Director of Permanency Marcus Davenport. I also supervised 17 staff members located across the state of Mississippi, which often pulled me away from my desk to attend staff meetings, IEP meetings, MDCPS county staff training, community partner meetings, court, staff

supervision, data meetings, contact provider meetings, federal reporter meetings, and conduct service provider recruitment, amongst other things.

6.    I co-developed the Youth Transition Support Services (YTSS) program in 2017, which made me responsible for overseeing the development and implementation of MDCPS' National Youth in Transition Database reporting system and MDCPS' Chafee Grant Program.

7.    In 2018, the YTSS program was moved under the Permanency Unit.

8.    In June 2020, I was named the Interim Bureau Director over the YTSS program and directly dealt with the Chafee Grant and MDCPS compliance with the grant. Additionally, both Melanie and I were responsible for the statewide implementation and supervision of services under Title IV-E and the Chafee Grant.

9.    In July 2020, Mr. Davenport called a YTSS unit meeting in at which time he addressed me and others and stated, "Your work is garbage, and y'all need to do better."

10.   In October 2020, Mr. Davenport initiated a personal relationship with me that consisted of lunches, dinners, phone conversations, and FaceTime conversations.

11.   In early 2021, Melanie Young, Special Projects Officer IV (Education Liaison) at the Mississippi Department of Child Protection Services (MDCPS), discovered that MDCPS officials were routinely signing the Individualized Education Plans (IEPs) for children in foster care as special education decision makers covered by the Individuals with Disabilities Education Act (IDEA). IEPs are legally binding documents that are developed for each public-school child who requires special education services.

12. According to the IDEA, only the legal parent or guardian of IDEA children is permitted to sign IEPs for purposes of special education decision-making. The State of Mississippi, through its agencies, has entered into numerous federal grants with the United States Department of Health and Human Services that require the Defendant to comply with the IDEA, including the Chafee Grant.

13. Though technically MDCPS serves as the parent for children who are wards of the State, there are regulations that prohibit the agency from serving in the role of a parent when it concerns IEPs.

14. This ongoing legal violation impacted many of the children/youth under the charge of MDCPS and their biological parents.

15. In fact, since we have complained about the issue, MDCPS claims that they have fixed the Foster Care Policy to conform with the law. However, the 2025 Foster Care Policy still states that "if no community person is appropriate, the ASWS may appoint the COR Worker or the COS (if applicable) as the surrogate parent, with approval of the assigned RD." This policy is the same as it was before we raised the issue.

16. On February 8, 2021, Melanie and I met with Mr. Davenport to address the above-mentioned legal violation being perpetrated against MDCPS children/youth and their biological parents.

17. On April 1, 2021, Melanie Young was promoted to the position of Division Director II by Marcus Davenport.

18. At that time, Melanie continued in her role as Education Liaison but also took on this new position as Division Director.

19. In this new role, Melanie's immediate supervisor was myself because I was the Bureau Director II.

20. On May 5, 2021, Melanie emailed Strategy and Policy Attorney Kimberly Gore. In that email, among many questions, Melanie inquired of Ms. Gore, "In terms of special education, can MDCPS legally serve as the [Individuals with Disabilities Education Act] (IDEA) parent?"

21. When Ms. Gore responded, the response to that question was the following: "No."

22. The definition of parent under 20 U.S.C. § 1401(23)(B) specifically excludes the State. 20 U.S.C. § 1415(b)(2)(A) also provides that the surrogate parent "shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child." MDCPS cannot act as the surrogate parent because it is the agency responsible for the care of the child.

23. On May 19, 2021, I emailed Deputy Commissioner of Child Welfare Kimberly Wheaton (i.e., Mr. Davenport's direct report) to express my concerns.

24. Given the response both Melanie and I received from the legal department (i.e., Ms. Gore and others), it was clear that MDCPS officials were not legally allowed to serve as IDEA parents.

25. Both Melanie and I then began reaching out to Ms. Wheaton so that MDCPS could appropriately revise its policy and practice.

4

26. On June 3, 2021, Melanie and I met with Mr. Davenport to discuss education concerns, including false IEP submissions under AFCARS and also the NYTD.

27. At that meeting, Melanie provided Mr. Davenport with a document entitled YTSS Education Plan.

28. On that document, the second item stated: "IDEA Parent." We MUST have a special education decision maker for each child requiring special education and related services. MDCPS/MDCPS employees CAN NOT serve in this role per federal law. Therefore, until this is addressed the validity of each child/youth's IEP is compromised, the services they are to receive may be interrupted, MDCPS employees' ability to effectively advocate on behalf child/youth is diminished, and the Agency is positioned to experience legal repercussions."

29. Melanie then presented this document to Mr. Davenport as part of a plan on how to move forward addressing the education-related issues.

30. Melanie presented this and other items to Mr. Davenport in the hopes of moving forward with a revision of policy (i.e., to comply with federal law and federal block grants) and practical change.

31. The following concerns about not following Title IV-E and The Chafee Grant requirements were presented to Mr. Davenport:

- Not enrolling children/youth in school in accordance with federal and state compulsory school laws

- Not creating educational plans for children/ youth as required by the Every Student Succeeds Act ("ESSA"), Fostering Connections Act, Title IV-E, and the Chafee Grant
- Not creating Transitional Living Plans for youth age 17 and older per Title IV-E and the Chafee Grant
- Not providing housing support for youth age 18 and older per Title IV-E and the Chafee Grant
- MDCPS employees signing IEPs for youth in foster care as the Special Education Decision Maker/Surrogate and denying them the legal protections for students with disabilities under IDEA
- Not coordinating with MDE or the local school districts to ensure the educational stability mandated by ESSA and Fostering Connections, as well as Title IV-E and the Chafee Grant.
- Not allowing youth to remain in their school of origin as ordered by ESSA
- Not allowing biological parents/guardians to participate in the educational decisions for youth in foster care as stated in IDEA and ESSA
- Not collecting educational data required by ACF, Title IV-E, NYTD and the Chafee Grant
- Reporting fraudulent data to the federal government surrounding services provided under the Chafee Grant
- Denying children and youth FAPE as guaranteed by IDEA

32. In response, however, Mr. Davenport gave no clear resolution, feedback, or guidance on how to proceed with this issue.

33. Rather than supporting Melanie in this endeavor, Mr. Davenport responded, "Education isn't a priority for me." The State of Mississippi through its state agencies have continued to violate the federal grant agreements it entered into by failing to provide a Special Education Decision Maker/Surrogate Parent for IEP meetings so that children in its care can have independent representation pursuant to federal law.

34. We both then attempted to explain to Mr. Davenport that we had addressed the matter via email with MDCPS's legal department (i.e., Ms. Gore, Anna Claire Steel) and then we had further addressed the matter with Ms. Wheaton.

35. When we asked Mr. Davenport how these issues of federal law and agency policy/practice were to be resolved, Mr. Davenport directed them to "Continue doing like we have always done, because there haven't been any problems - per Kimberly Wheaton".

36. Both Melanie and I requested that this directive be given to us in writing, but Mr. Davenport denied this request and told Melanie that she did not have the agency's best interest in mind.

37. We then stated to Mr. Davenport that we refused to knowingly participate in, allow to continue, or instruct our direct reports or agency members to engage in illegal practices.

38. Mr. Davenport then directed Melanie to cease all work she was doing to coordinate between MDCPS, the Mississippi Department of Education (MDE) and the American Bar Association – Legal Center for Foster Care and Education and Casey

Family Programs (ABA). Such collaboration was required by ESSA and the Fostering Connections Act.

39. This directive barred us from effectively fulfilling our roles and responsibilities on behalf of the children/youth of MDCPS.

40. Following these events (in early June 2021), my personal relationship with Mr. Davenport began to change.

41. Mr. Davenport discontinued all personal engagements with me, and he limited his interaction to only formal professional engagement.

42. Beginning around this time, Mr. Davenport told me, on several occasions, either directly or by inference, that Commissioner Andrea Sanders wanted me fired from MDCPS.

43. Mr. Davenport portrayed himself to me as attempting to protect me from those who wanted me removed.

44. These statements conflicted with Ms. Sanders' direct interactions with me, wherein Ms. Sanders consistently expressed positive approval towards my job performance. In fact, the unscored job performance reviews indicate when I transitioned to a different position and the report indicated where it was left open to be reviewed the following year.

45. Increasingly, Mr. Davenport began interfering in my work duties.

46. Unbeknownst to me, Mr. Davenport met with service providers and community partners, with whom I had long-standing professional relationships, and attempted to undermine my position and professional credibility.

47. Mr. Davenport began directly contacting my staff and division directors (i.e., bypassing me) and questioning them about routine work matters.

48. My staff began contacting me, expressing confusion as to why Mr. Davenport was questioning them.

49. I addressed this confusion to Mr. Davenport, who merely responded, "It's my right."

50. Mr. Davenport negotiated service contracts to be paid out of the Independent Living – John H. Chafee Foster Care Independence Program budget without me or Melanie's knowledge, consent, or input.

51. Mr. Davenport increasingly micromanaged my work duties and schedule. He prohibited me from communicating with other departments and he often instructed personnel in other departments to communicate directly with him, i.e., not with me.

52. On several occasions, I attempted to address the way Mr. Davenport was interfering with my ability to fulfill my role as a Bureau Director.

53. I asked that Mr. Davenport put my job description/requirements in writing.

54. Mr. Davenport responded that he would provide me with a performance review, but I never received it.

55. Mr. Davenport's interference with my work significantly interfered with any productive work in the YTSS program.

56. Mr. Davenport effectively blocked this program, resulting in children and youth being denied services.

57. In July 2021, I met with Ms. Wheaton to discuss my concerns about how Mr. Davenport was interfering with my ability to perform my job.

58. Ms. Wheaton responded that she would address the matter with Mr. Davenport.

59. Also, around the first week of July 2021, both me and Melanie were called to Mr. Davenport's office.

60. At that time, Ms. Davenport informed both of us that YTSS Federal Reporting designee and Education Liaison Cynthia Moore-Hardy had raised some concerns to him that he felt needed to be addressed.

61. Prior to Melanie being hired, Ms. Moore-Hardy worked in the position of Education Liaison, but was reassigned to the position of Federal Reporting by Marcus Davenport. In the position of Federal Reporting, part of Ms. Moore-Hardy's job duties were to gather information needed to finalize and submit IEP/IDEA reports, which, in turn, affected how the grants would be distributed for the following fiscal year.

62. It is noteworthy that Ms. Moore-Hardy was a direct report to Melanie and as recently as April 2021 Melanie had confronted Ms. Moore-Hardy regarding issues of insubordination and inadequate work performance at the request of Marcus Davenport.

63. Between April and July 2021, Melanie had discussed Ms. Moore-Hardy's problematic work performance with Mr. Davenport.

64. Mr. Davenport had directed Melanie to submit documentation to him, and also stated that Ms. Moore-Hardy should be terminated.

65. Near that same time, Ms. Moore-Hardy filed a complaint to Human Resources regarding a hostile work environment, spearheaded by Melanie. However, Ms. Moore-Hardy at the time worked remotely up until the middle of the Summer of

10

2021 due to the Covid-19 pandemic. A mere few weeks after Ms. Moore-Hardy's full-time return, she filed the hostile work environment complaint against Melanie.

66. Neither Melanie nor I knew about the hostile work environment investigation until we sat in depositions for this case.

67. In the second week of July 2021, however, Mr. Davenport radically shifted his position.

68. Mr. Davenport called a meeting with me, Melanie, and Ms. Moore-Hardy, in which Ms. Moore-Hardy verbalized allegations against Melanie.

69. When Melanie attempted to speak up to defend herself, Mr. Davenport berated her and alleged that as a Division Director she was not allowed to respond.

70. Mr. Davenport then turned to me and stated that I had failed by allowing Melanie to defend herself.

71. I responded to Mr. Davenport, stating that he was wrong and was handling the entire situation inappropriately.

72. On July 30, 2021, Human Resources investigator Jason Hulitt conducted an interview with Melanie shortly after he was hired.

73. To my knowledge, Mr. Hulitt's position as Investigator did not exist prior to when he was hired in June 2021.

74. Prior to the interview, Mr. Hulitt told Melanie that he was going to conduct an employee engagement interview.

75. When the interview occurred, however, the aggressively interrogating nature of the interview was surprising to Melanie.

76. In this interview, Mr. Hulitt asked Melanie about her relationship with me,

11

her direct reports, and Mr. Davenport (i.e., did Melanie have a relationship with me outside of work? how long had Melanie known me? What was her relationship like with Mr. Davenport? how did she get along with her direct reports? etc.).

77. Mr. Hulitt asked Melanie how long she had been with the agency, how long she had been a Division Director, and what made her qualified to hold her position.

78. Mr. Hulitt also asked Melanie about the unit she oversaw, its role and responsibilities.

79. Mr. Hulitt insinuated that Melanie's professional and educational background were inadequate to qualify her for the position she held.

80. In August 2021, Mr. Hulitt met with me, as well, for an employee engagement interview.

81. During this interview, Mr. Hulitt asked me general questions, work-related questions, questions about my unit, and other topics.

82. I explained to Mr. Hulitt about how Mr. Davenport had interfered with my ability to perform my job and how myself as well as the unit was affected by the behavior.

83. Both employee engagement interviews with me and Melanie were recorded by Mr. Hulitt, using his state issued cell phone.

84. Beginning in August 2021, Mr. Davenport discontinued all communication with Melanie.

85. On September 14, 2021, by noon lunchtime, both myself and Melanie were terminated, allegedly due to "falsification of time records."

86. Though my time record was allegedly falsified, I was paid for all of the time recorded, including my unused time as well as the days that were allegedly fraudulent recorded. Additionally, when I worked, sometimes I would not be in my office as I was occasionally allowed to work from home if approved or I would conduct confidential calls in other areas of the state office such as the conference room for confidentiality purposes. At other times, I would have my office door shut and locked when confidential calls were made in order to maintain confidentiality requirements under the IDEA, HIPPA, and Title IV-E.

87. Of the alleged days that were fraud, I was present at work and internal documents and delivery receipts are proving that I was present.

88. Around Summer 2021, Davenport implemented calendar sharing among the staff in his unit; in turn, staff members were required to share their calendars with direct supervisors. Such implementation was not MDCPS policy or practice and was instead used as a mechanism for planning and scheduling. On the morning of September 14, 2021, Davenport called me into his office to inquire about my time card and calendar discrepancies for September 1-3, 2021. I told Davenport that I was in the office on September 1, worked remotely on September 2 because the scheduled meeting in Tupelo on that day had been cancelled, and was present in my office on September 3.

89. In his questioning, Mr. Davenport then told me he would look at the camera footage to see if I was telling the truth and had proceeded to ask me which doorways I arrived and left work on those days. To my knowledge, this footage was not

relayed to Mr. Hulitt for investigation purposes and I was never asked about these discrepancies by Hulitt before I was terminated.

90. Both myself and Melanie were salaried employees of MDCPS.

91. Our time sheets merely consisted of the dates and the hours they worked on those dates.

92. Following this vague allegation by MDCPS, no explanation as to how the time sheets were allegedly 'falsified' was given. In fact, I was paid my full salary for the time period as well as payment for my unused personal leave.

93. Both of us filed appeals with the Mississippi State Personnel Board.

94. Plaintiffs will lose, at a minimum, approximately $60,000 of income in pay plus benefits per year.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the above and foregoing is true and correct as therein stated.

Further Affiant saith not.


Executed, this the 27th day of October, 2025.


_____
ASHLEY FALGOUT