IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MELANIE YOUNG AND ASHLEY**            **PLAINTIFFS**
**FALGOUT**

v.            **CIVIL ACTION NO.: 3:24-cv-615-CWR-ASH**

**MISSISSIPPI DEPARTMENT OF**            **DEFENDANT**
**CHILD PROTECTION SERVICES**

### AFFIDAVIT OF MELANIE YOUNG

1. My name is Melanie Young. I am over the age of eighteen years old. I state the following based upon my own personal knowledge and am competent to testify as to these matters.

2. I was hired on October 1, 2020, by Mr. Davenport as a Special Projects Officer IV (Education Liaison) at the Mississippi Department of Child Protection Services (MDCPS).

3. Ashley Falgout was hired on July 1, 2009, as a Program Administrator of Independent Living at the Mississippi Department of Child Protection Services (MDCPS) and in this role directly dealt with the administration and oversight of the Chafee Grant.

4. Ashley was promoted in August 2015 to Division Director II and then on October 1, 2020, she was promoted by Marcus Davenport to the position of Bureau Director II.

5. In this new role, Ashley's immediate supervisor was Deputy Director of Permanency Marcus Davenport.

6. In June 2020, Ashley was named the Interim Bureau Director over the YTSS program.

7. In July 2020, Mr. Davenport called a YTSS unit meeting at which time he addressed Ashley and others and stated, "Your work is garbage, and y'all need to do better."

8. In early 2021, I was working as the Special Projects Officer IV (Education Liaison) and also the Division Director II (Education Director) at the Mississippi Department of Child Protection Services (MDCPS). This dual role often took me away from my desk to attend staff meetings, IEP meetings, MDCPS county staff training, community provider meetings, federal reporter meetings, and conduct service provider recruitment, amongst other things. While serving in this dual role, I discovered that MDCPS officials were routinely signing the Individualized Educations Plans (IEPs) for children in foster care as special education decision makers covered by the Individuals with Disabilities and Education Act (IDEA). IEPs are legally binding documents that are developed for each public-school child who requires special education services.

9. According to the IDEA, only the legal parent or guardian of IDEA children are permitted to sign IEPs for purposes of special education decision making. The State of Mississippi through its agencies have entered into numerous federal grants with the United States Department of Human Services, which require Defendant to comply with the IDEA, one of which being the Chafee Grant.

10. Though technically MDCPS serves as the parent for children who are wards of the State, there are regulations that prohibit the agency from serving in the role of a parent when concerning IEPs.

11. This ongoing legal violation impacted many of the children/youth under the charge of MDCPS and their biological parents.

12. In fact, since we have complained about the issue, MDCPS claims that they have fixed the Foster Care Policy to conform with the law. However, the 2025 Foster Care Policy still states that "if no community person is appropriate, the ASWS may appoint the COR Worker or the COS (if applicable) as the surrogate parent, with approval of the assigned RD." This policy is the same as it was before we raised the issue.

13. On February 8, 2021, both myself and Ashley met with Mr. Davenport to address the above-mentioned legal violation being perpetrated against MDCPS children/youth and their biological parents.

14. On April 1, 2021, I was promoted to the position of Division Director II by Marcus Davenport.

15. At that time, I continued in my role as Education Liaison but also took on this new position as Division Director.

16. In this new role, my immediate supervisor was Bureau Director II, Ashley Falgout. In this role, both Ashley and I were responsible for the statewide implementation and supervision of services under Title IV-E and the Chafee Grant.

17. On May 5, 2021, I emailed Strategy and Policy Attorney Kimberly Gore.

In that email, among many questions, Claimant inquired of Ms. Gore, "In terms of special education, can MDCPS legally serve as the [Individuals with Disabilities Education Act] (IDEA) parent?"

18. When Ms. Gore responded, the response to that question was the following: "No."

19. The definition of parent under 20 U.S.C. § 1401(23)(B) specifically excludes the State. 20 U.S.C. § 1415(b)(2)(A) also provides that the surrogate parent "shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child." MDCPS cannot act as the surrogate parent because it is the agency responsible for in the care of the child.

20. On May 19, 2021, Ashley Falgout emailed Deputy Commissioner of Child Welfare Kimberly Wheaton (i.e., Mr. Davenport's direct report) to express her concerns.

21. Given the response we both received from the legal department (i.e., Ms. Gore and others), it was clear that MDCPS officials were not legally allowed to serve as IDEA parents.

22. Soon thereafter, we both began reaching out to Ms. Wheaton so that MDCPS could appropriately revise its policy and practice.

23. On June 3, 2021, both Ashley and I met with Mr. Davenport to discuss education concerns, including false IEP submissions under AFCARS and also the NYTD.

24. At that meeting, I provided Mr. Davenport with a document entitled YTSS Education Plan.

25. On that document, the second item stated: "IDEA Parent" We MUST have a special education decision maker for each child requiring special education and related services. MDCPS/MDCPS employees CAN NOT serve in this role per federal

4

law. Therefore, until this is addressed the validity of each child/youth's IEP is compromised, the services they are to receive may be interrupted, MDCPS employees' ability to effectively advocate on behalf child/youth is diminished, and the Agency is positioned to experience legal repercussions."

26.  I presented this document to Mr. Davenport as part of a plan on how to move forward addressing the education-related issues.

27.  I presented this and other items to Mr. Davenport in the hopes of moving forward with a revision of policy (i.e., to comply with federal law and federal block grants) and practical change.

28.  The following concerns about not following Title IV-E and the Chafee Grant requirements were presented to Mr. Davenport:

- Not enrolling children/youth in school in accordance with federal and state compulsory school laws

- Not creating educational plans for children/ youth as required by the Every Student Succeeds Act ("ESSA"), Fostering Connections Act, Title IV-E, and the Chafee Grant

- Not creating Transitional Living Plans for youth age 17 and older per Title IV-E and the Chafee Grant

- Not providing housing support for youth age 18 and older per Title IV-E and the Chafee Grant

- MDCPS employees signing IEPs for youth in foster care as the Special Education Decision Maker/Surrogate and denying them the legal protections for students with disabilities under IDEA

- Not coordinating with MDE or the local school districts to ensure the educational stability mandated by ESSA and Fostering Connections, as well as Title IV-E and the Chafee Grant.
- Not allowing youth to remain in their school of origin as ordered by ESSA
- Not allowing biological parents/guardians to participate in the educational decisions for youth in foster care as stated in IDEA and ESSA
- Not collecting educational data required by ACF, Title IV-E, NYTD and the Chafee Grant
- Reporting fraudulent data to the federal government surrounding services provided under the Chafee Grant
- Denying children and youth FAPE as guaranteed by IDEA

28. In response, however, Mr. Davenport gave no clear resolution, feedback, or guidance on how to proceed with this issue.

29. Rather than supporting me in this endeavor, Mr. Davenport responded, "Education isn't a priority for me." The State of Mississippi through its state agencies have continued to violate the federal grant agreements it entered into by failing to provide a Special Education Decision Maker/Surrogate Parent for IEP meetings so that children in its care can have independent representation pursuant to federal law.

29. Both Ashley and I attempted to explain to Mr. Davenport that we had addressed the matter via email with MDCPS's legal department (i.e., Ms. Gore, Anna Claire Steel), and then we had further addressed the matter with Ms. Wheaton.

30. When we asked Mr. Davenport how these issues of federal law and agency policy/practice were to be resolved, Mr. Davenport directed us to "Continue

6

doing like we have always done, because there haven't been any problems - per Kimberly Wheaton".

31. We requested this directive be given to us in writing, but Mr. Davenport denied this request and told me that I did not have the agency's best interest in mind.

32. We then stated to Mr. Davenport that we refused to knowingly participate, allow to continue, or instruct our direct reports or agency members to engage in illegal practices.

33. Mr. Davenport then directed me to cease all work I was doing to coordinate between MDCPS, the Mississippi Department of Education (MDE) and the American Bar Association – Legal Center for Foster Care and Education and Casey Family Programs (ABA). Such collaboration was required by ESSA and the Fostering Connections Act.

34. This directive barred both me and Ashley from effectively fulfilling our roles and responsibilities on behalf of the children/youth of MDCPS.

35. Mr. Davenport discontinued all personal engagements with Plaintiff Falgout, and he limited his interaction to only formal professional engagement.

36. Beginning around this time, Mr. Davenport told Plaintiff Falgout, on several occasions, either directly or by inference, that Commissioner Andrea Sanders wanted Plaintiff Falgout gone from MDCPS.

37. Mr. Davenport portrayed himself to Ashley as attempting to protect her from those who wanted her removed.

38. These statements conflicted with Ms. Sanders' direct interactions with Ashley, wherein Ms. Sanders consistently expressed positive approval regarding Ashley's job performance.

39. Furthermore, I never received any negative performance reviews or write-ups during my employment with Defendant.

40. Increasingly, Mr. Davenport began interfering in Ashley's work duties.

41. Unbeknownst to Ashley, Mr. Davenport met with service providers and community partners, with whom Ashley had long standing professional relationships, and attempted to undermine Ashley's position and professional credibility.

42. Mr. Davenport began directly contacting Ashley's staff and division directors (i.e., bypassing her) and questioning them about routine work matters.

43. Ashley's staff began contacting her, expressing confusion as to why Mr. Davenport was questioning them.

44. Ashley addressed this confusion to Mr. Davenport, who merely responded, "It's my right."

45. Mr. Davenport negotiated service contracts to be paid out of the Independent Living – John H. Chafee Foster Care Independence Program budget without me or Ashley's knowledge, consent, or input.

46. Mr. Davenport increasingly micromanaged Ashley's work duties and schedule. He prohibited her from communicating with other departments and he often instructed personnel in other departments to communicate directly with him, i.e., not with her.

47. On several occasions, Ashley attempted to address the way Mr. Davenport was interfering with her ability to fulfill her role as a Bureau Director.

48. Ashley asked that Mr. Davenport put her job description/requirements in writing.

49. Mr. Davenport responded that he would provide Ashley with a performance review, but she never received it.

50. Mr. Davenport's interference with Ashley's work significantly interfered with any productive work in the YTSS program.

51. Mr. Davenport effectively blocked this program, resulting in children and youth being denied services.

52. In July 2021, Ashley met with Ms. Wheaton to discuss her concerns about how Mr. Davenport was interfering with her ability to perform her job.

53. Ms. Wheaton responded that she would address the matter with Mr. Davenport.

54. Also, around the first week of July 2021, me and Ashley were called to Mr. Davenport's office.

55. At that time, Ms. Davenport informed me and Ashley that YTSS Federal Reporting designee and Education Liaison Cynthia Moore-Hardy had raised some concerns to him that he felt needed to be addressed.

56. It is noteworthy that Ms. Moore-Hardy was a direct report to me and as recently as April 2021 I had confronted Ms. Moore-Hardy regarding issues of insubordination and inadequate work performance at the request of Davenport.

57. Between April and July 2021, I had discussed Ms. Moore-Hardy's problematic work performance with Mr. Davenport.

58. Mr. Davenport had directed me to submit documentation to Human Resources and had, on one occasion, stated that Ms. Moore-Hardy should be terminated. Such documentation included papers regarding meetings, email correspondence, and any documentation regarding issues I had with Mrs. Moore-Hardy. Davenport told me that he would send all the documentation to HR.

59. Near that same time, Ms. Moore-Hardy filed a complaint to Human Resources regarding a hostile work environment, allegedly citing me as the culprit. However, Ms. Moore-Hardy at the time worked remotely up until the middle of the Summer of 2021 due to the Covid-19 pandemic. A mere few weeks after Ms. Moore-Hardy's full-time return, she filed the hostile work environment complaint against me.

60. Neither Ashley nor I knew about the hostile work environment investigation until we sat in depositions for this case.

61. In the second week of July 2021, however, Mr. Davenport radically shifted his position.

62. Mr. Davenport called a meeting with me, Ashley, and Ms. Moore-Hardy, in which Ms. Moore-Hardy verbalized allegations against me.

63. When I attempted to speak up to defend myself, Mr. Davenport berated me and alleged that as a Division Director I was not allowed to respond.

64. Mr. Davenport then turned to Ashley and stated that she had failed by allowing me to defend herself.

10

65. Ashley responded to Mr. Davenport, stating that he was wrong and was handling the entire situation inappropriately.

66. On July 30, 2021, Director of Human Resources Jason Hulitt conducted an interview with me.

67. Prior to the interview, Mr. Hulitt told me that he was going to conduct an employee engagement interview.

68. When the interview occurred, however, the aggressively interrogating nature of the interview was surprising to me.

69. In this interview, Mr. Hulitt asked me about my relationship with Ashley Falgout, my direct reports, and Mr. Davenport (i.e., did I have a relationship with Ashley outside of work? how long have I known Ashley? What was my relationship like with Mr. Davenport? how did I get along with her direct reports? etc.).

70. Mr. Hulitt asked me how long I had been with the agency, how long I had been a Division Director, and what made me qualified to hold my position.

71. Mr. Hulitt asked me about the unit I oversaw, including its role and responsibilities.

72. Mr. Hulitt insinuated that my professional and educational background was inadequate to qualify me for the position I held.

73. In August 2021, Mr. Hulitt met with Ashley, as well, for an employee engagement interview.

74. During this interview, Mr. Hulitt asked Ashley general questions, work-related questions, questions about her unit, and other topics.

75. Ashley explained to Mr. Hulitt about how Mr. Davenport had interfered with her ability to perform her job and how both she and the unit were affected.

76. Both employee engagement interviews with me and Ashley were recorded by Mr. Hulitt, using his state-issued cell phone.

77. Beginning in August 2021, Mr. Davenport discontinued all communication with me.

78. On September 14, 2021, both Ashley and I were terminated around lunchtime/noon, allegedly due to "falsification of time records."

79. My replacement was Ms. Moore-Hardy.

80. Though my time record was allegedly falsified, I was paid for all of the time recorded, including my unused time as well as the days that were allegedly fraudulently recorded. Additionally, when I worked, sometimes I would not be in my office as I was occasionally allowed to work from home if approved or I would conduct confidential calls in other areas of the state office such as the conference room for confidentiality purposes. At other times, I would have my office door shut and locked when confidential calls were made in order to maintain confidentiality requirements under the IDEA, HIPPA, and Title IV-E.

81. Around Summer 2021, Davenport implemented calendar sharing among the staff in his unit; in turn, staff members were required to share their calendars with direct supervisors. Such implementation was not MDCPS policy or practice and was instead used as a mechanism for planning and scheduling. However, I was never asked by Mr. Davenport or Mr. Hulitt about my alleged whereabouts on the days that were in question for the alleged time fraud.

82. Both myself and Ashley were salaried employees of MDCPS.

83. Our time sheets merely consisted of the dates and the hours we worked on those dates.

84. For the three days I was allegedly absent, two of the days had been approved by my supervisor, Ashley, for me to work remotely. I was physically in the state office on the other day.

85. When I worked remotely on these days, I received phone calls from caseworkers, had an emergency IEP phone call meeting with a kid, and also called into a leadership meeting.

86. Following this vague allegation by MDCPS, no explanation as to how the time sheets were allegedly 'falsified' was given. In fact, I was paid my full salary for the time period as well as payment for my unused personal leave.

87. Both Ashley and I filed appeals with the Mississippi State Personnel Board.

88. Both Ashley and I will lose, at a minimum, approximately $60,000 of income in pay plus benefits per year.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the above and foregoing is true and correct as therein stated.

Further Affiant saith not.


Executed, this the 27th day of October, 2025.

_____
MELANIE YOUNG