1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

Melanie Young and Ashley Falgout,            Case No.: 3:24-cv-615-CWR-ASH

       Plaintiff(s),

       vs.

Mississippi Department of Child
Protection Services,

       Defendant(s).

Deposition of Jason Hulitt

Tuesday, August 12, 2025, 1:00 PM

REPORTED BY: Kay-dene Jones

PAGES 1-119

Exhibit "G" at 000001

APPEARANCES

For the Plaintiff(s):


    WATSON & NORRIS, PLLC

    4209 Lakeland Drive, # 365

    Flowood, Mississippi 39232-9212

    (601) 968-0000

    nick@watsonnorris.com

    jane@watsonnorris.com

    BY:  NICK NORRIS, ESQ.

    BY:  JANE ASHLEY WATSON, ESQ.


For the Defendant(s):


    ATTORNEY GENERAL OF MISSISSIPPI

    550 High St

    Jackson, MS 39201

    (601) 359-3680

    will.ivison@ago.ms.gov

    BY:  WILL IVISON, ESQ.


Also present:

    JASON HULITT, Witness

    MELANIE YOUNG

    ASHLEY FALGOUT

Exhibit "G" at 000002

INDEX

Deposition of Jason Hulitt                                      Page No.

Direct examination of Jason Hulitt by MR. NORRIS .................... 6

Cross examination of Jason Hulitt by MR. IVISON .................... 30

Redirect examination of Jason Hulitt by MR. NORRIS .................... 36

Certificate of Oath and True Testimony ............................ 43

Errata Sheet ....................................................... 44

Transcript Index ................................................... 45

Exhibit 1........................................................... 54

Exhibit 2........................................................... 73

Exhibit "G" at 000003

1          **THE REPORTER:**  Good afternoon. We are now on the record. Today

2     is Tuesday. It is August 12th, 2025. The time is 1:01 p.m. CDT. We

3     are present to record the Deposition in the case of Melanie Young

4     and Ashley Falgout versus Mississippi Department of Child Protection

5     Services. Court case number 3:24-CV-615-CWR-ASH on behalf of Watson

6     & Norris, PLLC. My name is Kay-dene Jones, a CT Notary Public, and I

7     will be the Digital Reporter for today's Deposition. I'm located in

8     Hartford, Connecticut, and I work with Filevine Depositions, 1260

9     East Stringham Avenue, Suite 600, Salt Lake City, Utah 84106. Could

10    the Counsel for the Plaintiff identify themselves and spell their

11    last name for the record?

12         **MR. NORRIS:**  I am Nick Norris. My last name is spelled

13    N-O-R-R-I-S. I'm Counsel for Plaintiff, and I'll let Jane introduce

14    herself.

15         **THE REPORTER:**  Thank you.

16         **MS. ASHLEY WATSON:**  I'm Jane Watson, last name, W-A-T-S-O-N,

17    and I'm Counsel for Plaintiff.

18         **THE REPORTER:**  Thank you. Can the Counsel for the Defense

19    identify themselves and spell their last name for the record?

20         **MR. IVISON:**  Yes. It's Will Ivison, I-V-I-S-O-N, Counsel for

21    the Defendant, MDCPS or Mississippi Department of Child Protection

22    Services.

23         **THE REPORTER:**  Thank you. Do all parties stipulate to me

24    conducting this oath and affirmation remotely in the role as a

25    Digital Reporter, understanding we're not physically present with

Exhibit "G" at 000004

1    each other and may be located in different jurisdictions?

2          MR. NORRIS:  Yes.

3          MR. IVISON:  That's fine.

4          THE REPORTER:  Would the Witness please identify themselves and

5    spell their last name for the record?

6          THE WITNESS:  I go first, I guess. Jason Hulitt, Investigator

7    for Mississippi Department of Child Protective Services. Last name,

8    H-U-L-I-T-T.

9          THE REPORTER:  Thank you, Mr. Hulitt. Could you please hold a

10    valid government photo identification up to the screen just to

11    verify your identity?

12          THE WITNESS:  Yeah, I'm trying--

13          THE REPORTER:  Can you just remove the blur and then you could

14    put it back? Can you remove the blur, Mr. Hulitt?

15          THE WITNESS:  Uh, let me-- I'm not all that computer savvy,

16    give me a second here to figure that out. What is it under? Do you

17    know?

18          THE REPORTER:  It should be under Virtual Backgrounds, Options.

19          MS. ASHLEY WATSON:  You might could left-click on your box,

20    like where you see yourself on the camera.

21          THE WITNESS:  I'm trying to do that now.

22          MS. ASHLEY WATSON:  There might be a checkmark where you can

23    uncheck where it says blur my background. If you left click on your

24    box.

25          THE WITNESS:  Yeah.

Exhibit "G" at 000005

1        **THE REPORTER:**  Are you using a laptop or an iPad?

2        **THE WITNESS:**  It's a computer. It's a desktop.

3        **THE REPORTER:**  Okay.

4        **MR. NORRIS:**  On the video button on the bottom left, there's a

5    little up arrow on it.

6        **THE WITNESS:**  Okay.

7        **MR. NORRIS:**  When you click that--

8        **THE WITNESS:**  Got it.

9        **MR. NORRIS:**  That should do it.

10       **THE WITNESS:**  Okay.

11       **THE REPORTER:**  Just hold it a little bit closer, please. I can

12   see that. Witness has provided a Mississippi driver's license that's

13   valid. And could you please read the ID number for me, Mr. Hulitt?

14       **THE WITNESS:**  800358809.

15       **THE REPORTER:**  That's 800358809, correct?

16       **THE WITNESS:**  That's correct.

17       **THE REPORTER:**  Thank you. Mr. Hulitt, can you please raise your

18   right hand? Do you swear or affirm to tell the truth, the whole

19   truth, and nothing but the truth during this Deposition?

20       **THE WITNESS:**  Yes, I do.

21       **THE REPORTER:**  Thank you. All right, Counsel, whenever you're

22   ready, you may proceed with questioning.

23       (DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS)

24    **Q.**    Mr. Hulitt, I'm Nick Norris. I'm one of the attorneys for Melanie

25   Young and Ashley Falgout. We're here today to take your Deposition to find out

Exhibit "G" at 000006

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                              7

1    what you know about the case. And I guess before we get started, you had your

2    background on blur. Do you want to change that back?

3         A.    Yeah.

4         Q.    I don't know what all you have in your office you may not want us

5    all to see. All right. But as I mentioned, we're here today to take your

6    Deposition to find out what you know about the case. This is not intended to

7    be a marathon session. I don't think this will last long, but if at any point

8    you need to take a break, let me know.

9         A.    Gotcha.

10        Q.    We'll have you answer the question on the table and we'll take

11   that break, okay?

12        A.    Okay.

13        Q.    Likewise, it's not intended to be a trick question session. If at

14   any point you don't understand a question that I'm asking, please let me know.

15   Don't feel dumb. Sometimes lawyers, we use legal terms, and not everybody in

16   the world knows them. So if you don't understand something, just let me know,

17   and I'll rephrase as many times as necessary, okay?

18        A.    Okay, thanks.

19        Q.    Also, I try to ask everybody these first three questions. Please

20   don't be offended, but I try to ask everybody. Have you ever been convicted of

21   a crime other than minor traffic violations?

22        A.    No.

23        Q.    Have you ever filed a lawsuit or been sued yourself, individually?

24        A.    No.

25        Q.    Have you ever filed for bankruptcy?

Exhibit "G" at 000007

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                                    8

1          **A.**     No.

2          **Q.**     Thank you. You're doing great. Make sure you keep everything

3     verbal. Nodding head and everything, we've got it on video, but we have to

4     make a transcript of this at some point and having it verbal makes sure the

5     transcript is accurate. Who is your current employer?

6          **A.**     Mississippi Department of Child Protection Services.

7          **Q.**     How long have you been employed with the Defendant?

8          **A.**     Since July 2021. July the 16th, 2021.

9          **Q.**     What is your current job title today?

10         **A.**     Investigator, Internal Investigator.

11         **Q.**     Okay.

12         **A.**     I have several titles, actually, but that's-- that's the main one.

13         **Q.**     That's the primary?

14         **A.**     Yeah.

15         **Q.**     I'm sure you do a lot of things for the agency.

16         **A.**     Right.

17         **Q.**     Are you in the HR department?

18         **A.**     No. Um, the Office of the Inspector General, um, we're outside the

19     HR, but I work with HR.

20         **Q.**     Is that kind of affiliated with the Attorney General's Office?

21         **A.**     No, that's just the name that another one of our units have here

22     at the agency. It's-- it's task--

23         **Q.**     Okay.

24         **A.**     I'm under-- I'm-- I'm-- I'm just one of the, uh, departments

25     that's under the OIG. Uh, there are several other ones under it as well.

Exhibit "G" at 000008

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                          9

1        Q.    Now, have you held that same investigator title the entire time

2    you've been employed with the agency?

3        A.    Yes, sir. I have.

4        Q.    Now, prior to getting hired at the agency, um, where did you work?

5        A.    I worked for the Clinton, Mississippi Police Department.

6        Q.    Okay.

7        A.    I was a sergeant with the traffic division there.

8        Q.    How many years did you work at the Clinton Police Department?

9        A.    Fourteen years.

10       Q.    Prior to working for the Clinton Police Department, where did you

11   work?

12       A.    Um, UMC. I was a police officer at UMC, the hospital.

13       Q.    University of Mississippi Medical Center?

14       A.    Yes.

15       Q.    Do you have any degrees or certifications?

16       A.    Certifications? No, no. I have a high school degree. But--

17       Q.    What are you-- sure.

18       A.    Graduated high school.

19       Q.    What are your certifications in?

20       A.    Um, Supervisor Level 1 and 2. Um, hostage negotiations. Uh,

21   several others. Um, I have to get my folder out to remember them all.

22       Q.    This particular case deals with some investigations you were doing

23   regarding Melanie Young and Ashley Falgout. My understanding is there were two

24   different investigations going on, that somehow were kind of related, but two

25   different investigations; is that right?

Exhibit "G" at 000009

1          A.     There were two investigations that had occurred on those two

2     individuals, yes.

3          Q.     I think one of them was for a hostile work environment; is that

4     right?

5          A.     Yes. Let me-- do you mind if I take a look at my--

6          Q.     No, go ahead. Yeah, if you've got it.

7          A.     Just to give you the exact title of it.

8          Q.     Yes, sir.

9          A.     Yeah, one was host-- uh, hostile work environment violation of

10    ethics. And the second was violation of ethics.

11         Q.     The second one that was violation of ethics, my understanding is

12    that one dealt with, um, absences where Ms. Falgout and Ms. Young were

13    claiming they were at work. And the agency, in its investigation, concluded

14    that they were not actually working when they said they were?

15         A.     Yes, sir. Using fraudulent time. They was-- they-- they had put

16    fraudulent time on their time clock.

17         Q.     Earlier, you were looking at your computer. I think you have it

18    where you can pull those up?

19         A.     Yes, sir.

20         Q.     Can you pull up that second violation of ethics?

21         A.     Yes.

22         Q.     Is this in a Microsoft Word file?

23         A.     Word documents.

24         Q.     Okay.

25         A.     And again, I'm not computer savvy, but I go-- I type mine in Word

1     docs.

2          Q.     Got it. What we've been kind of curious at some point is how these

3     things were created, when they were edited. We got the native format on our

4     side. In your Word document at the top, if you go to File and go to Info, do

5     you see what I'm talking about?

6          A.     Yes.

7          Q.     On the right side of that screen, you'll see something called

8     Related Dates?

9          A.     On my right side, it shows Open in Desktop, Protect Document, and

10    Version History.

11         Q.     When you click Version History, what does it do?

12         A.     Uh, it goes over to the Version History, and it says 32 minutes

13    ago, current version, Jason Hulitt. And then--

14         Q.     Okay.

15         A.     --in the middle of my screen, it shows select the version from the

16    version history thing.

17         Q.     Okay. How many version histories are there?

18         A.     Whole version history is just one.

19         Q.     Okay.

20         A.     Thirty-two minutes ago.

21         Q.     Are there any other version histories in that?

22         A.     No.

23         Q.     When you created this file, was this on the same computer you're

24    at right now?

25         A.     No.

Exhibit "G" at 000011

1      Q.      So that's why. The reason I ask is, we got the native format of

2   this file, and it looks like it was initially created on September 14th, 2021.

3   It says it was created at 1:32 p.m., but then it also mentions the last time

4   it was modified was September 20th, 2021 at 2:51 p.m. I'll tell you what, I'm

5   going to share my screen.

6      A.      Okay.

7      Q.      So you can see exactly what I'm talking about.

8      A.      Okay.

9      Q.      Let's see. Okay. Can you see the Microsoft Word file that I've

10  pulled up?

11     A.      Can now, yes.

12     Q.      So what I'm going to do is, this is the native file that we

13  received from the Defendant. When you go to File and Info, this is what I was

14  talking about on the related dates.

15     A.      Okay.

16     Q.      It shows Jason Hulitt as the author, and last modified by Jason

17  Hulitt. And it shows when it was modified, created, and even last printed on

18  it. I guess, first, let me ask you about this creation time. Does that sound

19  about right, that you started typing this document out on September 14th

20  around 1:32?

21     A.      Uh, I can't recall. Um, I don't start my reports until I'm done

22  with the investigations. So-- and if I was done-- by looking here, the

23  investigation started on the 13th, uh, and I dated it the 14th. So I could

24  have started part of it. I can't-- I can't recall.

25     Q.      The reason I ask is, there's some parts of this, it looks like it

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                    13

1    was created, and then there was some additional evidence that you got and

2    added to it. Particularly in this report, it references an email from Ms.

3    Lambert, and if this document had started to be created at 1:32, if it was

4    finished at 1:32, there wouldn't be anything added to it. But my understanding

5    is Ms. Lambert sent you an email about 4:30 that same day on it. And that's

6    what I was trying to get at is to see what all has been added. What was the

7    original that you typed out at 1:32, and what was added, when it was added,

8    that type of thing.

9        **A.**    Well, I can't recall what was added, 'cause like I said, I know I

10   didn't finish the report in one day, 'cause I had many other things to do. So

11   I may--

12       **Q.**    Okay.

13       **A.**    --sit down for a little while, type a little bit, go do other

14   things, come back. But the original report is what you-- is what we did it,

15   and I did it in Word. And that's-- that's the original report. I have no

16   other-- well, I have a new format that I do it in now, but then, this was like

17   my first report. So only thing I did, I just opened up Word, typed it in

18   there, and that was it.

19       **Q.**    One thing I'd ask you to do once we get through with the

20   Deposition, is go back and go to your computer and open up this report, where

21   you saw that version history, and if it shows additional versions of it, if

22   you would get a copy of that to Mr. Ivison? That's what we've been looking for

23   is kind of the original version and any other versions along the way. I know

24   you're not going be able to access it at your computer that you're at right

25   now, but if you still have the same computer that you were dealing with when

Filevine                         www.filevine.com

Exhibit "G" at 000013

1      you wrote the report, those versions should show up on that one.

2           **A.**     I don't have that computer anymore.

3           **Q.**     Oh, okay.

4           **A.**     That was a laptop. I've gone through three laptops since then.

5           **Q.**     These things get backed up through OneDrive; do you still use

6      OneDrive?

7           **A.**     I just started using OneDrive. I didn't know much about OneDrive.

8      Like--

9           **Q.**     Okay.

10          **A.**     --I said, again, not-- not a computer pro. You know, I could put

11     it in here--

12          **Q.**     No, that's fine.

13          **A.**     --all day and-- and write a report, but computer pro is not me.

14     I'm learning though.

15          **Q.**     But you were not using OneDrive back in 2021?

16          **A.**     No, I started-- well, I started-- at 2021, I didn't really use

17     OneDrive at all. I didn't really know what it was there for. I probably

18     started using OneDrive saving-- I know I just backed all my stuff up to

19     OneDrive a couple of weeks ago. So I wasn't-- I just used my desktop 'cause it

20     was easy for me to see and get to.

21          **Q.**     Well, I wanted to ask you about that, because in this report it

22     mentions audio recordings that you made. So you interviewed several people,

23     right?

24          **A.**     Right.

25          **Q.**     Particularly, you mentioned, I'm highlighting here, that you're

Exhibit "G" at 000014

1    gonna hold it in OneDrive.

2         **A.**     Right.

3         **Q.**     So you were using OneDrive back in 2021?

4         **A.**     For my recordings, absolutely, yes.

5         **Q.**     Okay.

6         **A.**     But I saved my reports on my desktop, so I could get to them and

7    see 'em.

8         **Q.**     When you do your reports-- and you said you were saving them on

9    your desktop.

10        **A.**     Yes.

11        **Q.**     So when you finished them, were they being printed out and given

12   to somebody, or?

13        **A.**     Yes. At that time, when I got done with all of them, I would print

14   them out-- or I may even-- I can't recall exactly what I did with this one. I

15   don't know if I printed it out or emailed it to Shannon. I did one or the

16   other. I know sometimes I-- I send her a-- a case file of things over the

17   email it if it'll all fit, and if it can't, then I print it out and I walk it

18   down to her. Probably then, because it'd been my first report, I probably

19   walked this one to her, but I--

20        **Q.**     Okay.

21        **A.**     --can't really recall. So that's it. Was either--

22        **Q.**     Okay.

23        **A.**     --walked it to her or emailed it to her, one or the other.

24        **Q.**     Let me go back and share my screen one more time. Where I was

25   showing you that file info, one of the things that shows is when it was last

Exhibit "G" at 000015

1    printed.

2         **A.**    Okay.

3         **Q.**    On September 20, '21, 2:36. Does that sound about right? Looks

4    like it was last modified that same day. That's when you last modified,

5    finished the report, printed it, and took it to Shannon?

6         **A.**    I can't recall.

7         **Q.**    Let me ask you this. Earlier you were talking about printing it

8    and taking it to Shannon. Would there have been another reason you have

9    printed another version of it out?

10        **A.**    No, no. That's the only reason.

11        **Q.**    So if it says printed here, that may be when you printed it and

12   gave it to Shannon?

13        **A.**    Not gonna say I gave it to her. I probably printed it out. I can't

14   tell you exactly when I walked it-- or walked it up there to her 'cause she

15   was on the ninth floor then, so I-- I can't say if I actually gave it to her

16   on-- on September 20th at 2:36 or--

17        **Q.**    Okay.

18        **A.**    --the day after or whatever.

19        **Q.**    So it may have been printed at that time, but you just don't know

20   when you gave it to her?

21        **A.**    Absolutely. There you go.

22        **Q.**    Got it. That makes sense. I know you did a lot of interviews for

23   both of the investigations, and I got a lot of audios from those. We're not

24   going to go through all that. But I wanted to ask you about the audio

25   interviews. Were there some audio interviews that were for the hostile work

Exhibit "G" at 000016

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                    17

1    environment investigation, and then were there some interviews for just the

2    violation of ethics, and then maybe some interviews that did both, type of

3    thing?

4         **A.**    I don't know about both, but it could have been both. But I know

5    it was a lot of-- from both investigations, the, uh, ethics and the, uh,

6    hostile work, yes.

7         **Q.**    None of them are really dated as to when they were done, and

8    there's nothing I've seen on the recordings that identify when the

9    conversations happened. Is there any way to specify when those interviews were

10   done?

11        **A.**    Sure. We can look at the report on, like, if you wanna-- like the,

12   um, hostile work environment. Cynthia was on it.

13        **Q.**    Okay.

14        **A.**    I dated it when I interviewed her, so that's gonna be the date of

15   that recording.

16        **Q.**    Okay.

17        **A.**    And then just like this-- like this report states here, the

18   Natasha Hope, 07.26.2021, that's gonna be the date of her recording.

19        **Q.**    Got it.

20        **A.**    So the dates that I've documented in the report are gonna be the

21   dates of the recordings.

22        **Q.**    Great. On the workplace-- let me pull it up. I'm sorry, I should

23   have already had it.

24              **THE REPORTER:**  Mr. Norris, the report.

25              **MR. NORRIS:**  Yes?

Exhibit "G" at 000017

1          **THE REPORTER:**  Is that an exhibit? Or would you like to mark it

2      as an exhibit?

3          **MR. NORRIS:**  Yeah, I'll make this Violation of Ethics Report I

4      showed, we'll make that Exhibit 1.

5          **MR. IVISON:**  Nick, what Bates stamp?

6          **MR. NORRIS:**  Bates number?

7          **MR. IVISON:**  Yeah.

8          **MR. NORRIS:**  That is MDCPS 706 to 708.

9          **MR. IVISON:**  Okay. I just--

10         **MR. NORRIS:**  What I showed him on the screen is not the Bates

11     stamp because it's the native Word file, but that's what it is--

12         **MR. IVISON:**  Yeah.

13         **MR. NORRIS:**  --in the Bates stamped stuff.

14         **MR. IVISON:**  I'll just say, that's just the Word document

15     portion of it. It doesn't have all the exhibits that it refers to in

16     there.

17         **MR. NORRIS:**  Yeah.

18         **MR. IVISON:**  I can add that later on if you want me to, but I

19     wanted to make that clear.

20         **MR. NORRIS:**  Yeah, and I don't mind making all the exhibits, to

21     that report as part of this Exhibit 1 if you'd like. When we send it

22     to the Reporter, we can work that out. That's not a problem at all.

23         **MR. IVISON:**  Okay. Well, the full report, I guess, would be 706

24     through 723.

25         **MR. NORRIS:**  That's fine, yeah.

Exhibit "G" at 000018

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                                    19

1              **MR. IVISON:**  Okay.

2              **MR. NORRIS:**  We can do that. We can put that all in as Exhibit

3          1.

4              **MR. IVISON:**  Okay. Sorry, keep going.

5              **MR. NORRIS:**  Yeah, not a problem.

6              (CONTINUING DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS)

7      **Q.**    So the other report that you did, do you have that pulled up, Mr.

8   Hulitt?

9      **A.**    Yeah, I have both of them pulled up.

10     **Q.**    Okay.

11     **A.**    Are you talking to me or?

12     **Q.**    Yeah, I was talking to you.

13     **A.**    Okay. Yes.

14     **Q.**    Can you tell me when you finished the report on the hostile work

15  environment investigation?

16     **A.**    I can't advise. Like I said, I-- I'm-- I'm doing so many things

17  that's all over the-- all over the place. I may start on one day, have to

18  stop, do something else, and so I can't advise when I completed the report.

19     **Q.**    I have the native file on that one too. Let me show you that.

20  Okay, can you see my screen?

21     **A.**    I can't-- okay. Now I can.

22     **Q.**    Okay. Um, there's not a date of the report like there was on the

23  other ones, but I do see interviews for Cynthia Hardy and a few other people,

24  and you have those dated on it. But when I go to file and info, it gives me a

25  creation date of July 26th and a last modified date of August 27th, which

Exhibit "G" at 000019

1    would be, I guess, when you finished your investigation. Does that sound about

2    right?

3        A.    I can't recall. This-- if it indicates there, but I can't-- I

4    cannot remember when I ended this thing and printed it off and took it to

5    Shannon.

6        Q.    This one does not have a printed date on it, a last printed, like

7    the other one. Do you know if you printed this one and gave it to Shannon?

8        A.    I can't recall.

9        Q.    Ms. Young and Ms. Falgout were terminated on September 14th, 2021.

10   Does that sound about right?

11       A.    Give me the date again?

12       Q.    September 14th, 2021.

13            **THE REPORTER:**  Mr. Norris, was that Exhibit 2?

14            (CONTINUING DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS)

15       A.    Yeah, I-- I can't really advise the date that that-- that they was

16   terminated. They should have the paperwork indicating that, though.

17       Q.    Yeah, we'll make the other investigation that we just referenced

18   Exhibit 2. Prior to Ms. Young and Ms. Falgout's termination, had you finished

19   your investigation regarding the hostile work environment investigation?

20       A.    Yes, I had completed that one.

21       Q.    Do you know if you had given it to Shannon prior to their

22   termination?

23       A.    I can't recall if I give-- gave her paper copies or emailed it to

24   her, but I'm sure she probably was briefed on this investigation.

25       Q.    Whether you gave her the full report, you likely at least told her

Exhibit "G" at 000020

1    what the investigation entailed and the result was, prior to the termination?

2        **A.**    Yes, we talked about it. Yes.

3        **Q.**    With regard to the violation of ethics with regard to the

4    absences, that second one, it doesn't look like you finished that

5    investigation prior to their termination; is that right?

6        **A.**    No. Um, I got all the main factors of the report with the-- I did

7    a majority of the investigation. Only thing I did, I followed back up with

8    Natasha and, um, Virginia after they were terminated.

9        **Q.**    Virginia Lambert?

10       **A.**    Yes.

11       **Q.**    Now, I know you got an email after your first interview with Ms.

12   Lambert.

13       **A.**    Right.

14       **Q.**    There's another recording that we got from Ms. Lambert. Do you

15   know how soon that second recording was made with that email?

16       **A.**    No, I can't recall. I'm-- I'm not gonna even just make up

17   something on that. I have no clue.

18       **Q.**    Okay. The recording just kind of said we talked a day or so ago,

19   so I couldn't really tell.

20       **A.**    Did it indicate where?

21       **Q.**    Where it was?

22       **A.**    Inside, where we were talking? Yes, inside the interview, does it

23   indicate where we were located?

24       **Q.**    No. I mean, it sounds like you weren't on the phone. It sounds

25   like you were in person with her, but that's just my personal opinion. I don't

Exhibit "G" at 000021

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                    22

1    know that for a fact.

2        A.    Well, I-- I followed up with her, Natasha. I traveled to North

3    Mississippi. I had to go to Tupelo for some other things. And while I was

4    there, I met with those two as well to follow up with them, see was there

5    anything else that they needed to talk to us about that could have been going

6    on in the building, any other problems that we could get-- tried to get

7    squared away from their unit.

8        Q.    This violation of ethics regarding absences. I've got some

9    recordings that you produced, or the agency has produced, where you had

10   interviews with Ms. Falgout and Ms. Young. Um, did you talk to Ms. Falgout and

11   Ms. Young about this second report, it's Exhibit 1, with regard to the

12   violation of ethics and absences?

13       A.    Uh, let me-- you mind if I refer back to my report?

14       Q.    Yes, sir.

15       A.    From the looks of the report, I had Marcus to call a meeting with

16   them. I can't recall if I questioned them about anything. Where I think I

17   allowed, uh, Marcus Davenport to do the talking and I may have did some

18   talking, but it was-- from what the report indicates, um, by me pro-- by me

19   reading it real quick, um, I-- I-- I had Marcus to call-- call another meeting

20   with them about this and talk to them about it.

21       Q.    I saw that in the report, but I didn't see any reference to it

22   being recorded kind of like your other conversations were. I was curious if

23   you knew if Marcus actually spoke to Ms. Falgout and if it was recorded?

24       A.    You know, I don't know 'cause I-- I-- again, I don't wanna say I

25   wasn't there because it doesn't indicate that I was there, but I don't know.

Exhibit "G" at 000022

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                                23

1    I-- I cannot recall on that. I don't want to speak on any of that.

2        Q.    I also saw a reference to you looked at her card history report.

3    What is that referring to?

4        A.    Uh, the time sheets, if that's-- if-- if that's what-- you like--

5    we have, uh-- okay. That might be the door swipe that Marcus indicated he

6    pulled. I didn't pull it. Marcus Davenport pulled the door swipes.

7        Q.    So to get inside the agency, did they have to swipe a card to get

8    inside?

9        A.    They supposed to, but we do have individuals that will hold the

10   door open for you. And so, uh, in that case, sometimes we would re-- we would

11   go to the camera system to see what door they used or if they came in that

12   door to see if-- but during this time, I was-- I was green here. I was new at

13   this. Didn't know all the ins and outs about it. So I don't think we've looked

14   at the camera system on this. Or maybe when we did try to look at the camera

15   system, it didn't go back that far. It was a very old system that we had at

16   that time.

17       Q.    My understanding is the employees also, to use their computers,

18   they have to log in to it?

19       A.    Yes, they have to log into it. They do.

20       Q.    Had Ms. Falgout been there, or Young, either one, would there be

21   records on the server about when they logged in on their computer?

22       A.    I don't think the com-- our computer system record like that,

23   'cause I think I recall talking with our IT about someone else, and even them,

24   you know, if we log in on these computers, is there a way that they can look

25   at and tell. 'Cause a lot of our workers worked outside this office, these

Exhibit "G" at 000023

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                          24

1    computers. They use their cell phones and things of that nature, hotspots. So

2    I don't think there's a way that they could track if this-- this-- if their

3    computer system-- they probably can now. Back then, they couldn't.

4        Q.    With that particular investigation on absences, did you have any

5    understanding whether Falgout and Young worked outside the office?

6        A.    Was I-- did I have-- did I know that they could work outside the

7    office?

8        Q.    Right.

9        A.    Yes. Um, their supervisor advised, you know, 'cause they can

10   work-- they could telework from home. Um, all employees sometimes can do it,

11   depending on the supervisor, if they could work from home or not. If I

12   remember correctly, really, I think Marcus did allow them from here and there

13   to work from home, but that's something you have to ask him for sure about.

14   So, um, I-- I-- but I know we have access to work from home if our supervisor

15   allows it.

16       Q.    My understanding is from the report, there was issues about Ms.

17   Falgout and Ms. Young not being in the office, and their card history report

18   not showing them actually swiping to go in either. Were they claiming that

19   they were in the office on the relevant dates in that report?

20       A.    You mind if I refer back to my report?

21       Q.    Oh, yeah. Go back, yeah. Certainly.

22       A.    From what it looks like in this report, it is showing that they

23   were working eight hours, but their supervisor had gotten a tip that they were

24   not in the office, um, working. And so I think at that time, they would have

25   to go to him to ask if they could work from home, and he would have to okay

Exhibit "G" at 000024

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                          25

1    that. And that seems they would have to get-- get approved to work from home.

2         **Q.**     Okay.

3         **A.**     So you have to ask Marcus if he gave them the authorization work

4    from home, but during the interview, I-- if I could remember correctly, they

5    didn't have permission to work from home.

6         **Q.**     Do you know that Ms. Falgout and Ms. Young may work out in the

7    field?

8         **A.**     Yes, that's what the in-- and on another deal, that's what they

9    claiming that they were doing when we found out that they were not. And then

10   they tried to steal-- fra-- you know, defraud the State of Mississippi by

11   getting, um, travel, things of that nature there.

12        **Q.**     There's some emails and audio interviews I've seen with an

13   allegation that, I think it was Ms. Lambert and Ms. Ivory, where they had said

14   that Greg Murphy had told them to lie about Ms. Falgout meeting them at

15   Strange Brew Coffee House in Tupelo. Does that sound about right?

16        **A.**     Yes, sir.

17        **Q.**     Did Ms. Falgout ever claim that she was at Strange Brew on that

18   day?

19        **A.**     Mind if I refer back to my--

20        **Q.**     Sure. Yeah, go for it.

21        **A.**     In my report, it doesn't indicate where she said that they

22   staffed, but it-- that they-- she just stated that she staffed with two of her

23   employees up in North Mississippi so, um--

24        **Q.**     Okay.

25        **A.**     Let's see. That's a-- with the Tupelo specialist. She, uh, staffed

Exhibit "G" at 000025

1    with the Tupelo specialist. We talking about--

2         **Q.**    Okay.

3         **A.**    We talking about Ashley, right?

4         **Q.**    Yes, sir.

5         **A.**    Okay. Yes, but I can't recall. Um, it's not indicating in my

6    report if I asked her if-- where was it, was it at the office or was it at

7    Strange. So I can't-- can't answer that.

8         **Q.**    You don't remember if Ms. Falgout actually made that allegation

9    herself?

10        **A.**    I can't remember.

11        **Q.**    Most of this report seems to deal with Ms. Falgout. I think

12   there's some stuff regarding Ms. Young towards the end of it. Do you see what

13   I'm talking about?

14        **A.**    Yes.

15        **Q.**    In this, it talks about listing fraudulent hours on their time

16   sheet, and how Ms. Young's calendar was retrieved, showing that she was out of

17   office using a personal leave day on her calendar, but her time sheet

18   indicated that she worked eight hours?

19        **A.**    Yes, that's correct.

20        **Q.**    Was there any determination as to whether Ms. Young had actually

21   worked eight hours?

22        **A.**    If I remember correctly, I didn't see her on-- well, I-- I can't

23   remember if we looked at the video 'cause I don't-- can't recall if the video

24   went back that far. Um, I can't recall what-- what was the outcome of that

25   one. That was-- it's back in '21. I just cannot remember that far back.

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                                    27

1      **Q.**     How far did the video go back?

2      **A.**     I-- if I remember, that's an old system that we really didn't deal

3   with. We had another person that worked for DHS, uh, who dealt with it. If I

4   could-- I-- I can't recall. I can't remember what he said. It's not long, I

5   know that much. They didn't stay-- it was a very old system, he used to tell

6   us, and it just did not save very long.

7      **Q.**     Was it less than seven days?

8      **A.**     I can't remember. No, no.

9      **Q.**     The reason I ask is the time sheet that we're talking about is

10  September 13th, which is the day before you dated this report on September

11  14th. We're just talking about a one-day separation. That just seems kind of

12  short for a video to be deleted that quickly.

13     **A.**     Oh, well, maybe I didn't go back to the video. I can't remember. I

14  can't recall.

15     **Q.**     Well, I don't see anything in your report about looking at video

16  for anything. Had you looked at video, would you have put it in the report?

17     **A.**     Yeah, nine times out of ten, I would have.

18     **Q.**     I don't see anything in here, and maybe I'm missing it, where you

19  looked at the card swipes for Ms. Young?

20     **A.**     No, I did not. No, no.

21     **Q.**     I see, now, there is something in here about the card swipes for

22  Ms. Falgout?

23     **A.**     Marcus pulled those, yes.

24     **Q.**     I don't see anything in here about Ms. Young, where anything was

25  done to determine whether Ms. Young was actually at work or not?

Exhibit "G" at 000027

DIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                    28

1      **A.**    Uh, well, it'd probably have been better if we had done this way

2    before 2020-- I mean, after, you know, a little bit sooner, but I cannot

3    recall. I cannot recall.

4      **Q.**    Had you done something to verify Ms. Young, whether she was there

5    or not, you probably would have put it in this report just like you did all

6    the detail of Ms. Falgout, right?

7      **A.**    Yes, I would have. Yes.

8      **Q.**    I mean, 'cause you were pretty detailed in Ms. Falgout in who all

9    you talked to, recordings and things like that. But I just didn't see anything

10   with regard to Ms. Young as to how you determined that she was not being

11   truthful that she worked that day.

12     **A.**    I tell you what, let's-- let's pause for a second. Can I refer

13   back?

14     **Q.**    Sure.

15     **A.**    Pull up?

16     **Q.**    Yes, sir. Go ahead.

17     **A.**    Okay. From the looks of my report, uh, it shows I didn't do

18   anything. I guess I just went off of their timecard and the, uh, approval of

19   her supervisor, stating that she was on personal leave.

20     **Q.**    My understanding is employees like Ms. Young could put in for

21   personal leave, and then later decide not to take personal leave and work the

22   day, right?

23     **A.**    They can do that, but they should correct it on their calendar.

24   Because they--

25     **Q.**    Okay.

Filevine                          www.filevine.com

Exhibit "G" at 000028

1    A.    --share their calendar with other supervisors as well.

2    Q.    But that's not defrauding the State if they don't make it on the

3    calendar, right?

4    A.    No, the problem, as stated, is if they're not at work and stating

5    they're at work.

6    Q.    Is there anything in this report that specifies that Ms. Young was

7    actually not at work on September 13th?

8    A.    No. From what I'm looking at, it's-- there is nothing there yet.

9    There is nothing.

10    Q.    At the end where you have your conclusions, I understand the issue

11    with Ms. Falgout. But with regard to Ms. Young, is there anything in this

12    report that really explains that Ms. Young was defrauding the State of

13    Mississippi?

14    A.    Give me a few minutes here.

15    Q.    Sure, not a problem.

16    A.    I'm not seeing anything, sir.

17    Q.    At the very end of the report, I want to ask one last question of

18    you before we take a break. It says in the Findings, Young was determined to

19    have entered fraudulent hours for September 1, 2021 to September 3rd, 2021,

20    totaling 24 hours during this investigation that she claimed she worked. I

21    didn't see anything in the report that really explained how you came to that

22    finding. Do you know how you came to that finding? And I want to clarify;

23    maybe it'll help you out. On the second page of that report, there is a

24    reference to Falgout having no card activity history from September 1 to

25    September 3, 2021. I don't know if you meant to put Falgout instead of Young.

Exhibit "G" at 000029

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                                    30

1        A.      Okay. That-- that could have been a mis-- mistype there.

2        Q.      Okay.

3        A.      That could have been a mistype there.

4                MR. NORRIS:  Tell you what. If you will, let's go off the

5        record. I just need to take a break and talk to my clients, and we

6        should be about done.

7                THE WITNESS:  Okay.

8                MR. NORRIS:  Thank you.

9                THE REPORTER:  We're off the record, and the time is 1:53 p.m.

10       CDT. We are now on the record, and the time is 1:58 p.m. CDT.

11               MR. NORRIS:  Mr. Hulitt, I have no further questions. Thank you

12       for your time. Mr. Ivison may have some follow-up.

13               THE WITNESS:  Okay, thank you.

14               (CROSS EXAMINATION OF JASON HULITT BY MR. IVISON)

15       Q.      Thank you. Jason, I have a couple of questions to ask you. Before

16       you did this internal investigation for the violation of ethics, have you had

17       experience with investigating these kind of matters?

18       A.      Not these. I'm familiar with investigating loss. Um, homicides,

19       burglaries, things of that nature there. Internal investigations I-- I-- I've

20       just started doing since I've come over to MDCPS.

21       Q.      Did you know how to do it? Did you receive training on how to do

22       these types of investigations?

23       A.      No, I si-- I just trained myself. On-the-job training.

24       Q.      With your background as an investigator, did that provide you with

25       the skills necessary to perform these types of investigations?

Exhibit "G" at 000030

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                          31

```
 1        A.      Not here. No, sir.

 2        Q.      When you conducted this investigation of the violation of the

 3   ethics, did you report everything accurately in your report?

 4        A.      Yes.

 5        Q.      Is it your opinion, based on your investigation, that your

 6   conclusions were correct?

 7        A.      Yes.

 8        Q.      I'm going to share this screen with you real quick. Let's see. Can

 9   you see this?

10        A.      Yes.

11        Q.      This is the second investigation.

12        A.      Yes, sir.

13        Q.      Where it says that on 9.13.2021, that you had met with Marcus

14   Davenport about discrepancies with the timesheets, right?

15        A.      Yes.

16        Q.      During that meeting, you all went over Ms. Falgout's timesheet at

17   that time. And then it says here that Davenport stated that during the time

18   that he was out on leave, that you were advised that Ashley Falgout and

19   Melanie Young were not in the office during their scheduled work days, right?

20        A.      Yes.

21        Q.      The reason being is that several individuals would stop by their

22   office and see if they were there, and they would never get a response, right?

23        A.      That's correct.

24        Q.      And then later, down here at the bottom here, it says that Falgout

25   texted Davenport about being out of the office for personal leave, and that
```

Exhibit "G" at 000031

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                                    32

1    Young would be her point of contact. But she never came to the office, right?

2         A.    Right.

3         Q.    The day after 8.31.21 is when she never came to the office, right?

4         A.    Right.

5         Q.    At the second page here, it shows that you all looked at the

6    calendar, and Falgout said that she was out in the field on 9.02.21?

7         A.    Yes.

8         Q.    This is all during your conversation with Mr. Davenport on

9    9.13.21?

10        A.    Yes. Yes, sir.

11        Q.    That you found all of this?

12        A.    Yes.

13        Q.    Then it says that you advised Mr. Davenport to call a meeting with

14   Falgout and have her explain in detail about the staffing that she said she

15   did on the calendar, right?

16        A.    Yes, sir. Yes, sir.

17        Q.    And then it says that Davenport met with Falgout on 9.14.21 in his

18   office, at the State office in question, about her card history report. And

19   she said that she had staffed with Natasha Ivory and Virginia Lambert, right?

20        A.    Yes, sir.

21        Q.    I guess this would have been the morning of 9.14.21, would it?

22        A.    Yes.

23        Q.    Were you present for these statements made?

24        A.    I can't recall. If-- if-- if I had been there, I would have

25   recorded that. And I can't recall. But I think he met with them before he came

Exhibit "G" at 000032

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                    33

1    and brought all the paperwork to me, and what he had found out.

2         Q.    When he came to you, that was on the morning of September 14th,

3    right?

4         A.    Yes, yes.

5         Q.    You didn't have any reason to doubt what he told you was correct,

6    right?

7         A.    Absolutely not.

8         Q.    Then it says that you all-- Hulitt and Davenport, meaning you and

9    Marcus Davenport, then contacted Ivory via telephone, where she started by

10   stating that she did have a meeting at Strange Brew Coffee House in Tupelo,

11   Mississippi, and that she had a Zoom call at 1 o'clock, right?

12        A.    Yes.

13        Q.    With the Zoom call that she's referring to, is she talking about

14   some sort of made-up Zoom call with Ashley Falgout?

15        A.    I can't recall if it-- I could try to de-- back in my mind. I

16   think she was speaking of another type of Zoom call. I-- I don't know. I don't

17   know if it was with Murphy, Ashley or who was it with, honestly. I cannot

18   remember at all about that.

19        Q.    Okay. Well, then it says that she decided to change her story and

20   that-- said that she got a call from Greg Murphy telling her that if she gets

21   a call from anyone to tell them that she had staffing on that date, right?

22        A.    Right.

23        Q.    And that they did not have staffing on that date, right?

24        A.    They did not have it, no. They did not. But she--

25        Q.    My re--

Exhibit "G" at 000033

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                    34

1      **A.**      But-- but she wanted-- she, um-- the staffing never took place. It

2    was all a lie. Um, they didn't-- uh, Falgout never traveled up north. And now

3    it's coming back to me. So yes, Marcus spoke with Fal-- with, uh, Ashley

4    before he came to me. And so that's how they knew-- that's how Ashley knew to

5    call Greg to tell Greg to tell Natasha and Virginia to lie if they decide-- if

6    they get a call because Marcus was questioning her about the staffing.

7      **Q.**      So when Marcus questioned her about the staffing meeting, he told

8    her that I'm going to check in to verify, what, your story?

9      **A.**      If I remember correctly, I don't think Marcus said anything to her

10   about doing that. She just-- um, I guess she just was trying to make sure she

11   covered all her bases. I'm not really sure.

12     **Q.**      So based on this, and she said that based on your telephone

13   conversation with Ms. Ivory, which you were present for, did you conclude that

14   Ashley Falgout and or Melanie Young tried to get her to lie for them?

15     **A.**      Repeat that question one more time for me, please.

16     **Q.**      Yeah. Based on this telephone conversation with Ms. Ivory, did you

17   conclude that Ashley Falgout and or Melanie Young had contacted her to get her

18   to lie for them and cover for them?

19     **A.**      Absolutely, absolutely.

20     **Q.**      Okay. And, uh--

21     **A.**      If-- if I can-- if-- and if you listened on the audio, the young

22   lady began to say one thing, and then she just broke down and started crying,

23   like, I'm not gonna lie, I'm not gonna lose my job, then-- and then she just

24   started telling-- telling it all right then. So I had no reason not to

25   believe, um, that-- that-- that these young-- these two young ladies did what

Exhibit "G" at 000034

CROSS EXAMINATION OF JASON HULITT BY MR. IVISON                                    35

1    they did to defraud the State of Mississippi.

2         Q.    This is going to be, I think, MDCCP 719, where you get an email

3    from Natasha Ivory, September 14th, 2021 at 10:53 a.m. Right?

4         A.    Yeah, it was sent to Marcus.

5         Q.    Well, yeah. Okay. Sent to Marcus.

6         A.    Yeah, yeah, yes.

7         Q.    Right. That's her written statement about what you had just

8    described about the phone call with her, right?

9         A.    Yes, that's correct. Yes, sir.

10        Q.    So you had this information and all the other information that we

11   went over earlier, I guess, before that time right there, September 14th, 2021

12   at 10:53 a.m., right?

13        A.    You said I had it before the 14th?

14        Q.    You had all this information by that time at least, right?

15        A.    Yes, absolutely.

16        Q.    Did you tell Shannon at that time all the information that we went

17   over as a result of your investigation?

18        A.    Yes, sir. Yes, sir. I went and briefed Shannon, um, right after we

19   got done with the interviews with both parties, went and briefed Shannon on

20   what we had found out.

21        Q.    Is it your understanding that after you had told her all this

22   information, that that is when she went to--

23        A.    Her supervisor.

24        Q.    Made a decision to her supervisor to terminate them, right?

25        A.    Yes, sir. Make a decision.

Exhibit "G" at 000035

REDIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS                        36

1      Q.      And here-- I'm sorry. I'm gonna go to--

2              THE REPORTER:  Real quick, Mr. Ivison, the email from Natasha

3      Ivory that you just showed, was that an exhibit?

4              MR. IVISON:  This is gonna be part of Exhibit 1. Is that okay?

5              MR. NORRIS:  Yeah.

6              MR. IVISON:  Nick? Okay.

7              MR. NORRIS:  Yeah, we've already identified all this as Exhibit

8      1.

9              THE REPORTER:  Okay.

10             (CONTINUING CROSS EXAMINATION OF JASON HULITT BY MR. IVISON)

11     Q.      Is there anything in this investigation that you think is

12     incorrect?

13     A.      No, sir. I do not.

14     Q.      Do you believe you did everything you could to uncover the truth

15     with your investigation?

16     A.      Yes, sir, I do.

17     Q.      Is it of your opinion that they falsified time records and stole

18     time from the State of Mississippi?

19     A.      You cut out on me.

20     Q.      Is it your opinion, based on your investigation, that Melanie

21     Young and Ashley Falgout falsified time records and stole time from the State

22     of Mississippi?

23     A.      Absolutely, absolutely.

24             MR. IVISON:  That's all I have.

25             (REDIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS)

Exhibit "G" at 000036

1      Q.      Real quick, Mr. Hulitt. Earlier you were talking about having an

2  informal conclusion to your report that you shared with Shannon; is that

3  right?

4      A.      Yes, I go and share everything with Shannon, yes.

5      Q.      Did you have an informal conclusion that you had on this one?

6      A.      Meaning off the record, or, uh, what do you mean?

7      Q.      Well, before you finished your investigation, did you have a

8  conclusion that you shared with Shannon?

9      A.      Oh, I don't give conclusions. I just told-- I just give her the

10  information that I find out, and the staff-- the upper staff determined the

11  conclusions. What I did was-- the investigation wasn't the-- the investigation

12  pretty much was over. There was nothing else. The-- the question about Ashley

13  and-- and, uh, Melanie, I have gotten-- I had gotten everything I needed on

14  that, so there was no other investigation done on those two when I went to

15  Shannon.

16      Q.      Well, you hadn't talked to Ashley or Melanie about the issue,

17  right?

18      A.      I didn't.

19      Q.      And I don't see anything about Mr. Davenport talking to Ms. Young

20  about it.

21      A.      You have to check with him and-- and--

22      Q.      Okay.

23      A.      --see when he spoke with her. I can't-- I-- I wasn't there. If he

24  did speak with them, but I know he-- he spoke with one of them. That's how

25  they knew to call the two girls up in Tupelo to go ahead and get-- or call

Exhibit "G" at 000037

1    Greg and have Greg to do what he did.

2         **Q.**    I'm trying to determine when you shared some information with

3    Shannon. Did you share information with Shannon when you finished the report,

4    or did you share information midway through your investigation?

5         **A.**    No. Just like I said earlier. Now, I don't do my report until

6    after the entire investigation is over. So once I found out that this-- that

7    these two young ladies had went and tried to do the-- the most worst thing

8    ever, is defraud the State of Mississippi, I went and shared that verbally

9    with Shannon. I told her exactly what I found out in the interviews, what the

10   witnesses explained and said, and all of that.

11        **Q.**    Okay.

12        **A.**    Shannon left and when and did her thing.

13        **Q.**    Tell me what you told Shannon.

14        **A.**    You want me to read the whole report to you?

15        **Q.**    You told her everything that's in that report?

16        **A.**    I went to Shannon and I showed her the time sheets. I showed

17   Shannon, um, and I verbally told her what I learned from Marcus and then what

18   I learned from the two employees about what was going on.

19        **Q.**    You're talking about the two employees, that's Ms. Ivory and Ms.

20   Lambert?

21        **A.**    Yes.

22        **Q.**    What did you tell Shannon about what you learned from Ms. Lambert?

23        **A.**    Uh, I told Ms. Lambert lied. I said Ms. Lambert stated that they

24   had a meeting, which I had already known that they did not have a meeting

25   because, uh, Ms. Natasha had already told the truth about-- that they did not

Exhibit "G" at 000038

1    have the meeting, that, uh, Greg Murphy came to her and requested that she lie

2    if she received a phone call from State Office.

3         Q.    When you told Shannon this information, is this before you got the

4    email from Ms. Lambert?

5         A.    Uh, I'd have to look back at the email. Can one of y'all put the

6    email back up?

7         Q.    I'm sure I can do that. Give me just a second. What I'm showing

8    you is Bates stamped MDCPS 00721. This is part of what we've identified as

9    Exhibit 1 in this Deposition. This is my understanding of what the email from

10   Ms. Lambert to Mr. Davenport and you was.

11        A.    Oh, I went to Shannon before 4:38 p.m. Yes.

12        Q.    At this point when you talked to Shannon, you had an understanding

13   that Ms. Falgout and Ms. Young were defrauding the State of Mississippi,

14   right?

15        A.    Right.

16        Q.    And you had an understanding that Ms. Lambert was lying?

17        A.    Right.

18        Q.    And did Ms. Lambert ever get reprimanded, counseled, or anything

19   for lying?

20        A.    I'm not sure. You have to talk to Shannon about that.

21        Q.    My understanding is she got promoted.

22        A.    She got promoted?

23        Q.    Yeah.

24        A.    Well, you'd have have to talk to someone else.

25             **MR. IVISON:**  Object to the form.

1              (CONTINUING REDIRECT EXAMINATION OF JASON HULITT BY MR. NORRIS)

2        **A.**    I don't promote.

3        **Q.**    Now, there's an issue with Greg Murphy. You earlier were asked

4    about Ashley Falgout and or Ms. Young asking these ladies to lie, right?

5        **A.**    Right.

6        **Q.**    Where in your report does it say that Ashley Falgout and or Ms.

7    Young asked these ladies to lie?

8        **A.**    You mind if I refer back to my report?

9        **Q.**    Yes, sir.

10       **A.**    While on the call with Ivory-- Ivory, she decided to change her

11   story and stated that she received a phone call-- she received a call from

12   Tupelo's division director, Gregory Murphy, stating that if she receives a

13   call from anyone asking if she had staffing on 09.02.21, to tell them that she

14   had staffing on that date. Ivory also stated that Murphy stated that if she

15   wanted, she could add the meeting to her calendar.

16       **Q.**    That specifies that Greg Murphy asked her to not tell the truth.

17   Where in the report does it say that Ms. Falgout and or Ms. Young asked either

18   one of these ladies to lie?

19       **A.**    It doesn't indicate that in the report.

20       **Q.**    On what basis were you testifying earlier that Ms. Falgout and or

21   Ms. Young asked these two, Ms. Lambert and Ms. Ivory, to lie?

22       **A.**    I don't know if I got it off the-- the statement or-- or the

23   interviews or what, but that was in '21. I can't-- I can't nail it all the way

24   back down.

25       **Q.**    We've gotten a lot of audio recordings, and we're not going to go

Exhibit "G" at 000040

1    through all of those, but you're saying it's either got to be in the statement

2    or those audio interviews?

3        A.    It should be. It-- it came from-- I don't know if I got it from--

4    I had to have got it from interviewing with Natasha.

5        Q.    That interview is recorded?

6        A.    It should be, yes. Yes, if you have them.

7        Q.    I have two recordings of it. I just want to make sure there's not

8    some other interview that's not recorded.

9        A.    No, no, that's-- that's the-- and if there's some others, check

10    with Shannon. She should have some others. Because like I said, I did speak

11    with them after about just if there was anything else they wanted, you know,

12    followed it back up with.

13            **MR. NORRIS:**  I have no further questions. Thank you for your

14        time, sir.

15            **THE WITNESS:**  Appreciate you.

16            **MR. IVISON:**  Thank you.

17            **THE REPORTER:**  Any further questions?

18            **MR. IVISON:**  No, no, no, thank you. Thank you, Jason.

19            **THE REPORTER:**  Okay, good. All right.

20            **THE WITNESS:**  Okay. I appreciate y'all. Have a good one.

21            **THE REPORTER:**  Real quick, may I please confirm if the Witness

22        will read or waive the transcript of today's Deposition if it is

23        ordered?

24            **MR. IVISON:**  We would like for him to read.

25            **THE REPORTER:**  Read? Okay. Are there any certified transcripts

Exhibit "G" at 000041

 1          or any transcript orders at this time?

 2               MR. NORRIS:  Not for Plaintiff right now.

 3               MR. IVISON:  No, we just want a digital copy. We don't need the

 4          whole recording. We just need the transcript, a digital copy of the

 5          transcript.

 6               THE REPORTER:  Digital copy. And Mr. Norris, what were you

 7          saying?

 8               MR. NORRIS:  I don't need a copy right now.

 9               THE REPORTER:  If there is nothing further, it is 2:22 p.m.

10          CDT, and we are now off the record.

Exhibit "G" at 000042

CERTIFICATE OF OATH AND TRUE TESTIMONY

    I, Kay-dene Jones, a Notary Public in and for the State of
Connecticut, County of Hartford and the officer before whom the
foregoing testimony was taken, do hereby certify that on 12th of
August, 2025, Jason Hulitt appeared before me remotely via audio and
video communication technology with the stipulation of the parties,
and Jason Hulitt was by me duly sworn and placed under oath,
affirmed that the testimony they give during the foregoing
proceeding shall be the truth, the whole truth, and nothing but the
truth.

    I, Kay-dene Jones, further certify that the foregoing transcript
is a full or complete, true, and accurate record of the testimony
given by Jason Hulitt which was taken before me electronically with
computer aided transcription.

    Produced Identification or Stipulation to Identity by the
parties: Driver's License

    I, Kay-dene Jones, further certify that I am not a relative,
employee, attorney, or counsel of any parties, nor a relative or
employee of any attorney or counsel connected with the action, nor
financially interested in the action.

    I, Kay-dene Jones, further certify that the deponent and/or the
parties requested the right to read or review and sign the record of
the testimony.

*Kay-dene Jones*
_____

Kay-dene Jones,
Digital Reporter

NOTARY PUBLIC STATE OF
Connecticut
COMMISSION NO. 168140
COMMISSION EXPIRES 12-31-2029
Signed on: 08/24/2025

ERRATA SHEET


DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS SHEET

IN RE: Melanie Young and Ashley Falgout vs. Mississippi
Department of Child Protection Services
Taken on: 12th of August, 2025

| PAGE NO. | LINE NO. | CHANGE | REASON |
|----------|----------|--------|--------|
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true and
correct, subject to any changes in form or substance entered
here.


DATE:_____      NAME:_____

Exhibit "G" at 000044

TRANSCRIPT INDEX

## Symbols

'cause  13:9, 13:10, 14:19,
  16:14, 22:24, 23:23,
  23:25, 24:9, 26:23,
  28:8
'em  15:7

## A

able  13:24
absences  10:12, 21:4,
  22:8, 22:12, 24:4
absolutely  15:4, 16:21,
  33:7, 34:19, 34:19,
  35:15, 36:23, 36:23
access  13:24, 24:14
accurate  8:5
accurately  31:3
activity  29:24
actually  12:10, 14:14,
  16:15, 22:23, 24:18,
  26:8, 26:20, 27:25,
  29:7
add  18:18, 40:15
added  13:2, 13:4, 13:6,
  13:7, 13:7, 13:9
additional  13:1, 13:21
advise  19:16, 19:18, 20:15
advised  24:9, 31:18, 32:13
affiliated  8:20
affirm  6:18
affirmation  4:24
afternoon  4:1
agency  8:15, 8:22, 9:2,
  9:4, 10:13, 22:9, 23:7
ago  11:13, 11:20, 14:19,
  21:18
ahead  10:6, 28:16, 37:25
allegation  25:13, 26:8
allow  24:12
allowed  22:17
allows  24:15
along  13:23
already  17:23, 36:7,
  38:24, 38:25
also  7:19, 12:3, 23:2,
  23:17, 40:14
another  8:21, 16:8, 16:9,
  21:14, 22:19, 25:8,
  27:3, 33:16
answer  7:10, 26:7
anymore  14:2
anyone  33:21, 40:13
anything  13:4, 22:5,
  22:16, 27:15, 27:16,
  27:18, 27:24, 27:24,
  28:9, 28:18, 29:6,
  29:11, 29:16, 29:21,
  34:9, 36:11, 37:19,
  39:18, 41:11

appreciate  41:15, 41:20
approval  28:18
approved  25:1
around  12:20
arrow  6:5
ashley  4:4, 6:25, 9:23,
  26:3, 31:18, 33:14,
  33:17, 34:3, 34:4,
  34:14, 34:17, 36:21,
  37:12, 37:16, 40:4,
  40:6
ask  7:19, 7:20, 12:1,
  12:18, 12:25, 13:19,
  14:21, 16:7, 16:24,
  24:13, 24:25, 25:3,
  27:9, 29:17, 30:15
asked  26:6, 40:3, 40:7,
  40:16, 40:17, 40:21
asking  7:14, 40:4, 40:13
attorney  8:20
attorneys  6:24
audio  14:22, 16:24, 16:25,
  25:12, 34:21, 40:25,
  41:2
audios  16:23
august  4:2, 19:25
author  12:16
authorization  25:3
avenue  4:9
away  22:7

## B

back  5:14, 7:2, 13:14,
  13:20, 14:15, 15:3,
  15:24, 21:7, 22:13,
  23:15, 24:3, 24:20,
  24:21, 25:19, 26:24,
  26:25, 26:25, 27:1,
  27:13, 28:13, 33:15,
  34:3, 39:5, 39:6, 40:8,
  40:24, 41:12
backed  14:5, 14:18
background  5:23, 7:2,
  30:24
backgrounds  5:18
bankruptcy  7:25
based  31:5, 34:12, 34:12,
  34:16, 36:20
bases  34:11
basis  40:20
bates  18:5, 18:6, 18:10,
  18:13, 39:8
began  34:22
behalf  4:5
believe  34:25, 36:14
better  28:1
bit  6:11, 13:13, 28:2
blur  5:13, 5:14, 5:23, 7:2
bottom  6:4, 31:24
box  5:19, 5:24

break  7:8, 7:11, 29:18,
  30:5
brew  25:15, 25:17, 33:10
briefed  20:24, 35:18,
  35:19
broke  34:22
brought  33:1
building  22:6
burglaries  30:19
button  6:4

## C

calendar  26:16, 26:17,
  28:23, 29:1, 29:3,
  32:6, 32:15, 40:15
call  22:15, 22:19, 22:19,
  32:13, 33:11, 33:13,
  33:14, 33:16, 33:20,
  33:21, 34:5, 34:6,
  35:8, 37:25, 37:25,
  39:2, 40:10, 40:11,
  40:11, 40:13
called  11:7
came  23:11, 29:21, 29:22,
  32:1, 32:3, 32:25,
  33:2, 34:4, 39:1, 41:3
camera  5:20, 23:11, 23:14,
  23:14
cannot  20:4, 23:1, 26:25,
  28:2, 28:3, 33:17
card  23:2, 23:7, 24:17,
  27:19, 27:21, 29:24,
  32:18
case  4:3, 4:5, 7:1, 7:6,
  9:22, 15:16, 23:10
cdt  4:2, 30:10, 30:10,
  42:10
cell  24:1
center  9:13
certainly  24:21
certifications  9:15, 9:16,
  9:19
certified  41:25
change  7:2, 33:19, 40:10
check  34:8, 37:21, 41:9
checkmark  5:22
child  4:4, 4:21, 5:7, 8:6
city  4:9
claim  25:17
claimed  29:20
claiming  10:13, 24:18,
  25:9
clear  18:19
click  5:23, 6:7, 11:11
clients  30:5
clinton  9:5, 9:8, 9:10
clock  10:16
closer  6:11
clue  21:17
coffee  25:15, 33:10

Exhibit "G" at 000045

com 23:22
come 13:14, 30:20
coming 34:3
completed 19:18, 20:20
computer 5:15, 6:2, 10:17, 10:25, 11:23, 13:20, 13:24, 13:25, 14:2, 14:10, 14:13, 23:21, 23:22, 24:3
computers 23:17, 23:24, 24:1
conclude 34:13, 34:17
concluded 10:13
conclusion 37:2, 37:5, 37:8
conclusions 29:10, 31:6, 37:9, 37:11
conducted 31:2
conducting 4:24
confirm 41:21
connecticut 4:8
contact 32:1
contacted 33:9, 34:17
conversation 32:8, 34:13, 34:16
conversations 17:9, 22:22
convicted 7:20
copies 20:23
copy 13:22, 42:3, 42:4, 42:6, 42:8
correct 6:15, 6:16, 26:19, 28:23, 31:6, 31:23, 33:5, 35:9
correctly 24:12, 25:4, 26:22, 34:9
could 4:9, 5:9, 5:13, 5:19, 6:13, 12:23, 14:10, 15:6, 17:4, 22:5, 22:6, 24:2, 24:6, 24:10, 24:11, 24:25, 25:4, 27:4, 28:20, 30:1, 30:3, 33:15, 36:14, 40:15
counsel 4:10, 4:13, 4:17, 4:18, 4:20, 6:21
counseled 39:18
couple 14:19, 30:15
court 4:5
cover 34:18
covered 34:11
created 11:3, 11:23, 12:2, 12:3, 12:17, 13:1, 13:3
creation 12:18, 19:25
crime 7:21
crying 34:22
ct 4:6
curious 11:2, 22:22
current 8:5, 8:9, 11:13
cut 36:19
cynthia 17:12, 19:23

### D

date 17:14, 17:18, 19:22, 19:25, 19:25, 20:6, 20:11, 20:15, 33:21, 33:23, 40:14
dated 12:23, 17:7, 17:14, 19:24, 27:10
dates 11:8, 12:14, 17:20, 17:21, 24:19
davenport 22:17, 23:6, 31:14, 31:17, 31:25, 32:8, 32:13, 32:17, 33:8, 33:9, 37:19, 39:10
day 13:5, 13:10, 14:13, 16:4, 16:18, 19:17, 21:18, 25:18, 26:17, 27:10, 28:11, 28:22, 32:3
days 27:7, 31:19
de 33:15
deal 25:8, 26:11, 27:2
dealing 13:25
deals 9:22
dealt 10:12, 27:3
decide 28:21, 34:5
decided 33:19, 40:10
decision 35:24, 35:25
defendant 4:21, 8:7, 12:13
defense 4:18
defraud 25:10, 35:1, 38:8
defrauding 29:2, 29:12, 39:13
degree 9:16
degrees 9:15
deleted 27:12
department 4:4, 4:21, 5:7, 8:6, 8:17, 9:5, 9:8, 9:10
departments 8:24
depending 24:11
deposition 4:3, 4:7, 6:19, 6:25, 7:6, 13:20, 39:9, 41:22
depositions 4:8
described 35:8
desktop 6:2, 11:9, 14:19, 15:6, 15:9
detail 28:6, 32:14
detailed 28:18
determination 26:20
determine 27:25, 38:2
determined 28:10, 29:18, 37:10
dhs 27:3
different 5:1, 9:24, 9:25
digital 4:7, 4:25, 42:3, 42:4, 42:6
director 40:12
discrepancies 31:14
division 9:7, 40:12
docs 11:1

document 11:4, 11:9, 12:19, 13:3, 18:14
documented 17:20
documents 10:23
done 12:21, 12:22, 15:13, 17:7, 17:10, 27:25, 28:1, 28:4, 30:6, 35:19, 37:14
door 23:5, 23:6, 23:10, 23:11, 23:12
doubt 33:5
driver's 6:12
dumb 7:15

### E

earlier 10:17, 16:7, 35:11, 37:1, 38:5, 40:3, 40:20
east 4:9
easy 14:20
edited 11:3
eight 24:23, 26:18, 26:21
either 15:21, 23:20, 24:18, 40:17, 41:1
else 19:18, 22:5, 23:23, 37:12, 39:24, 41:11
email 13:2, 13:5, 15:17, 21:11, 21:15, 35:2, 36:2, 39:4, 39:5, 39:6, 39:9
emailed 15:15, 15:23, 20:23
emails 25:12
employed 8:7, 9:2
employees 23:17, 24:10, 25:23, 28:20, 38:18, 38:19
employer 8:5
end 26:12, 29:10, 29:17
ended 20:4
entailed 21:1
entered 29:19
entire 9:1, 38:6
environment 10:9, 17:1, 17:12, 19:15, 20:19
ethics 10:10, 10:10, 10:11, 10:20, 17:2, 17:5, 18:3, 21:3, 22:8, 22:12, 30:16, 31:3
even 12:17, 15:14, 21:16, 23:23
ever 7:20, 7:23, 7:25, 25:17, 38:8, 39:18
everybody 7:15, 7:19, 7:20
everything 8:2, 8:3, 31:3, 36:14, 37:4, 37:13, 38:15
evidence 13:1
exact 10:7
exactly 12:7, 15:14, 16:14, 38:9

**exhibit** 18:1, 18:2, 18:4,
18:21, 19:2, 20:13,
20:18, 22:11, 36:3,
36:4, 36:7, 39:9
**exhibits** 18:15, 18:20
**experience** 30:17
**explain** 32:14
**explained** 29:21, 38:10
**explains** 29:12

**F**

**fact** 22:1
**factors** 21:6
**fal** 34:3
**falgout** 4:4, 6:25, 9:23,
10:12, 20:9, 22:10,
22:10, 22:23, 23:20,
24:5, 24:17, 25:6,
25:14, 25:17, 26:8,
26:11, 27:22, 28:6,
28:8, 29:11, 29:24,
29:25, 31:18, 31:24,
32:6, 32:14, 32:17,
33:14, 34:2, 34:14,
34:17, 36:21, 39:13,
40:4, 40:6, 40:17,
40:20
**falgout's** 20:18, 31:16
**falsified** 36:17, 36:21
**familiar** 30:18
**far** 23:15, 26:24, 26:25,
27:1
**feel** 7:15
**field** 25:7, 32:6
**figure** 5:16
**file** 10:22, 11:4, 11:23,
12:2, 12:9, 12:12,
12:13, 15:16, 15:25,
18:11, 19:19, 19:24
**filed** 7:23, 7:25
**filevine** 4:8
**find** 6:25, 7:6, 37:10
**finding** 29:22, 29:22
**findings** 29:18
**fine** 5:3, 14:12, 18:25
**finish** 13:10
**finished** 13:4, 15:11,
16:5, 19:14, 20:1,
20:18, 21:4, 37:7, 38:3
**first** 5:6, 7:19, 12:18,
13:17, 15:18, 21:11
**fit** 15:17
**floor** 16:15
**folder** 9:21
**follow** 22:4
**follow-up** 30:12
**followed** 21:7, 22:2, 41:12
**form** 39:25
**format** 11:3, 12:1, 13:16
**found** 25:9, 32:11, 33:1,
35:20, 38:6, 38:9
**fourteen** 9:9

**fra** 25:10
**fraudulent** 10:15, 10:16,
26:15, 29:19
**full** 18:23, 20:25

**G**

**gave** 16:12, 16:13, 16:15,
16:20, 20:7, 20:23,
20:25, 25:3
**general** 8:18
**general's** 8:20
**get** 7:1, 9:21, 13:6,
13:19, 13:22, 14:5,
14:20, 15:6, 22:6,
22:6, 23:7, 23:7, 25:1,
25:1, 31:22, 34:6,
34:14, 34:17, 35:2,
37:25, 39:18
**gets** 33:20
**getting** 9:4, 25:11
**girls** 37:25
**give** 5:16, 10:7, 20:11,
20:23, 29:14, 37:9,
37:9, 39:7
**given** 15:11, 20:21
**gives** 19:24
**go** 5:6, 10:6, 10:25, 11:4,
11:4, 12:13, 13:13,
13:20, 13:20, 15:24,
16:21, 16:24, 19:24,
22:3, 23:11, 23:15,
24:18, 24:21, 24:25,
25:20, 27:1, 27:13,
28:16, 30:4, 36:1,
37:4, 37:25, 40:25
**goes** 11:12
**going** 9:24, 12:5, 12:12,
13:24, 16:24, 19:4,
22:5, 31:8, 34:8, 35:2,
38:18, 40:25
**gone** 14:4
**gonna** 15:16, 16:13, 17:14,
17:18, 17:20, 21:16,
34:23, 34:23, 36:1,
36:4
**good** 4:1, 41:19, 41:20
**got** 6:8, 8:3, 10:6, 11:2,
11:3, 12:1, 13:1,
15:13, 16:22, 16:23,
17:19, 21:6, 21:11,
21:14, 22:8, 33:20,
35:19, 39:3, 39:21,
39:22, 40:22, 41:1,
41:3, 41:4
**gotcha** 7:9
**gotten** 24:23, 37:13,
37:13, 40:25
**government** 5:10
**graduated** 9:18
**great** 8:2, 17:22
**green** 23:12

**greg** 25:14, 33:20, 34:5,
34:5, 38:1, 38:1, 39:1,
40:3, 40:16
**gregory** 40:12
**guess** 5:6, 7:1, 12:18,
18:23, 20:1, 28:18,
32:21, 34:10, 35:11

**H**

**h-u-l-i-t-t** 5:8
**hand** 6:18
**happened** 17:9
**hardy** 19:23
**hartford** 4:8
**head** 8:3
**held** 9:1
**help** 29:23
**high** 9:16, 9:18
**highlighting** 14:25
**hired** 9:4
**histories** 11:17, 11:21
**history** 11:10, 11:11,
11:12, 11:16, 11:18,
13:21, 23:2, 24:17,
29:24, 32:18
**hold** 5:9, 6:11, 15:1, 23:9
**home** 24:10, 24:11, 24:13,
24:14, 24:25, 25:1,
25:4, 25:5
**homicides** 30:18
**honestly** 33:17
**hope** 17:18
**hospital** 9:12
**host** 10:9
**hostage** 9:20
**hostile** 10:3, 10:9, 16:25,
17:6, 17:12, 19:14,
20:19
**hotspots** 24:1
**hours** 24:23, 26:15, 26:18,
26:21, 29:19, 29:20
**house** 25:15, 33:10
**hr** 8:17, 8:19, 8:19
**hulitt** 5:6, 5:9, 5:14,
6:13, 6:17, 6:24,
11:13, 12:16, 12:17,
19:8, 30:11, 33:8, 37:1

**I**

**i-v-i-s-o-n** 4:20
**id** 6:13
**identification** 5:10
**identified** 36:7, 39:8
**identify** 4:10, 4:19, 5:4,
17:8
**identity** 5:11
**incorrect** 36:12
**indicate** 21:20, 21:23,
22:25, 25:21, 40:19
**indicated** 23:5, 26:18

Exhibit "G" at 000047

indicates 20:3, 22:18
indicating 20:16, 26:5
individually 7:23
individuals 10:2, 23:9,
    31:21
info 11:4, 12:13, 15:25,
    19:24
informal 37:2, 37:5
information 35:10, 35:10,
    35:14, 35:16, 35:22,
    37:10, 38:2, 38:3,
    38:4, 39:3
initially 12:2
ins 23:13
inside 21:22, 21:22, 23:7,
    23:8
inspector 8:18
instead 29:25
intended 7:6, 7:13
internal 8:10, 30:16,
    30:19
interview 21:11, 21:22,
    25:4, 41:5, 41:8
interviewed 14:22, 17:14
interviewing 41:4
interviews 16:22, 16:25,
    16:25, 17:1, 17:2,
    17:9, 19:23, 22:10,
    25:12, 35:19, 38:9,
    40:23, 41:2
introduce 4:13
investigating 30:17, 30:18
investigation 10:13,
    12:23, 17:1, 19:15,
    20:1, 20:17, 20:19,
    20:19, 20:24, 21:1,
    21:5, 21:7, 24:4,
    29:20, 30:16, 31:2,
    31:5, 31:11, 35:17,
    36:11, 36:15, 36:20,
    37:7, 37:11, 37:11,
    37:14, 38:4, 38:6
investigations 9:22, 9:24,
    10:1, 12:22, 16:23,
    17:5, 30:19, 30:22,
    30:25
investigator 5:6, 8:10,
    8:10, 9:1, 30:24
ipad 6:1
issue 29:10, 37:16, 40:3
issues 24:16
ivison 4:20, 13:22, 30:12,
    36:2
ivory 25:13, 32:19, 33:9,
    34:13, 34:16, 35:3,
    36:3, 38:19, 40:10,
    40:10, 40:14, 40:21

                J

jane 4:13, 4:16
jason 5:6, 11:13, 12:16,
    12:16, 30:15, 41:18

job 8:9, 34:23
jones 4:6
july 8:8, 8:8, 19:25
jurisdictions 5:1

                K

kay-dene 4:6
keep 8:2, 19:4
kind 8:20, 9:24, 11:2,
    13:23, 21:18, 22:22,
    27:11, 30:17
knew 22:23, 34:4, 34:4,
    37:25
know 5:17, 7:1, 7:4, 7:6,
    7:8, 7:14, 7:16, 13:9,
    13:23, 14:7, 14:10,
    14:17, 14:18, 15:15,
    15:16, 16:19, 16:22,
    17:4, 17:4, 20:7,
    20:21, 21:11, 21:15,
    22:1, 22:24, 22:24,
    22:25, 23:13, 23:24,
    24:6, 24:9, 24:14,
    25:6, 25:10, 27:5,
    28:2, 29:22, 29:25,
    30:21, 33:16, 33:17,
    37:24, 40:22, 41:3,
    41:11
known 38:24
knows 7:16

                L

ladies 34:25, 38:7, 40:4,
    40:7, 40:18
lady 34:22
lake 4:9
lambert 13:3, 13:5, 21:9,
    21:12, 21:14, 25:13,
    32:19, 38:20, 38:22,
    38:23, 38:23, 39:4,
    39:10, 39:16, 39:18,
    40:21
laptop 6:1, 14:4
laptops 14:4
last 4:11, 4:12, 4:16,
    4:19, 5:5, 5:7, 7:7,
    12:3, 12:16, 12:17,
    15:25, 16:4, 16:4,
    19:25, 20:6, 29:17
later 18:18, 28:21, 31:24
lawsuit 7:23
lawyers 7:15
learned 38:17, 38:18,
    38:22
learning 14:14
least 20:25, 35:14
leave 26:17, 28:19, 28:21,
    28:21, 31:18, 31:25
left 5:23, 6:4, 38:12
left-click 5:19
legal 7:15

less 27:7
let 4:13, 5:15, 7:8, 7:14,
    7:16, 10:5, 12:18,
    15:24, 16:7, 17:22,
    19:19, 22:13
let's 12:9, 25:25, 28:12,
    28:12, 30:4, 31:8
level 9:20
license 6:12
lie 25:14, 34:2, 34:5,
    34:14, 34:18, 34:23,
    39:1, 40:4, 40:7,
    40:18, 40:21
lied 38:23
like 5:20, 12:2, 12:25,
    13:9, 13:16, 14:8,
    16:4, 17:11, 17:11,
    17:17, 17:17, 18:1,
    18:21, 19:16, 19:22,
    20:6, 21:4, 21:24,
    21:25, 22:22, 23:4,
    23:22, 24:22, 28:5,
    28:9, 28:20, 34:23,
    38:5, 41:10, 41:24
likely 20:25
likewise 7:13
listened 34:21
listing 26:15
little 6:5, 6:11, 13:13,
    13:13, 28:2
located 4:7, 5:1, 21:23
log 23:18, 23:19, 23:24
logged 23:21
long 7:7, 8:7, 27:4, 27:6
look 10:5, 17:11, 21:4,
    23:14, 23:24, 39:5
looked 23:2, 23:13, 26:23,
    27:16, 27:19, 32:5
looking 10:17, 12:22,
    13:22, 27:15, 29:8
looks 12:2, 12:25, 16:3,
    22:15, 24:22, 28:17
lose 34:23
loss 30:18
lot 8:15, 16:22, 16:23,
    17:5, 23:25, 40:25
lying 39:16, 39:19

                M

made 14:22, 21:15, 26:8,
    32:23, 35:24
made-up 33:14
main 8:12, 21:6
majority 21:7
make 8:2, 8:4, 18:3, 18:4,
    18:19, 20:17, 21:16,
    29:2, 34:10, 35:25,
    41:7
makes 8:4, 16:22
making 18:20
many 7:17, 9:8, 11:17,
    13:10, 19:16

Exhibit "G" at 000048

marathon 7:7
marcus 22:15, 22:17,
    22:19, 22:23, 23:5,
    23:6, 24:12, 25:3,
    27:23, 31:13, 33:9,
    34:3, 34:6, 34:7, 34:9,
    35:4, 35:5, 38:17
mark 18:1
matters 30:17
may 5:1, 6:22, 7:4, 13:11,
    15:14, 16:11, 16:19,
    19:17, 22:17, 25:6,
    30:12, 41:21
maybe 17:2, 23:14, 27:13,
    27:18, 29:23
mdccp 35:2
mdcps 4:21, 18:8, 30:20,
    39:8
mean 21:24, 28:2, 28:8,
    37:6
meaning 33:8, 37:6
meant 29:25
medical 9:13
meeting 22:15, 22:19,
    25:14, 31:16, 32:13,
    33:10, 34:7, 38:24,
    38:24, 39:1, 40:15
melanie 4:3, 6:24, 9:23,
    31:19, 34:14, 34:17,
    36:20, 37:13, 37:16
mentioned 7:5, 14:25
mentions 12:3, 14:22
met 22:4, 31:13, 32:17,
    32:25
microsoft 10:22, 12:9
middle 11:15
midway 38:4
might 5:19, 5:22, 23:5
mind 10:5, 18:20, 22:13,
    24:20, 25:19, 33:15,
    40:8
mine 10:25
minor 7:21
minutes 11:12, 11:20,
    29:14
mis 30:1
missing 27:18
mississippi 4:4, 4:21,
    5:7, 6:12, 8:6, 9:5,
    9:13, 22:3, 25:10,
    25:23, 29:13, 33:11,
    35:1, 36:18, 36:22,
    38:8, 39:13
mistype 30:1, 30:3
modified 12:4, 12:16,
    12:17, 16:4, 16:4,
    19:25
morning 32:21, 33:2
mr 5:9, 5:14, 6:13, 6:17,
    6:24, 13:22, 17:24,
    19:7, 20:13, 30:11,
    30:12, 32:8, 32:13,
    36:2, 37:1, 37:19,

    39:10, 42:6
ms 10:12, 10:12, 13:2,
    13:5, 20:9, 20:9,
    20:18, 20:18, 21:11,
    21:14, 22:10, 22:10,
    22:10, 22:11, 22:23,
    23:20, 24:16, 24:17,
    25:6, 25:6, 25:13,
    25:13, 25:14, 25:17,
    26:8, 26:11, 26:12,
    26:16, 26:20, 27:19,
    27:22, 27:24, 27:25,
    28:4, 28:6, 28:8,
    28:10, 28:20, 29:6,
    29:11, 29:11, 29:12,
    31:16, 34:13, 34:16,
    37:19, 38:19, 38:19,
    38:22, 38:23, 38:23,
    38:25, 39:4, 39:10,
    39:13, 39:13, 39:16,
    39:18, 40:4, 40:6,
    40:17, 40:17, 40:20,
    40:21, 40:21, 40:21
much 14:7, 27:5, 37:12
murphy 25:14, 33:17,
    33:20, 39:1, 40:3,
    40:12, 40:14, 40:16

## N

n-o-r-r-i-s 4:13
nail 40:23
name 4:6, 4:11, 4:12,
    4:16, 4:19, 5:5, 5:7,
    8:21
natasha 17:18, 21:8, 22:2,
    32:19, 34:5, 35:3,
    36:2, 38:25, 41:4
native 11:3, 12:1, 12:12,
    18:11, 19:19
nature 24:1, 25:11, 30:19
necessary 7:17, 30:25
need 7:8, 30:5, 42:3,
    42:4, 42:8
needed 22:5, 37:13
negotiations 9:20
never 31:22, 32:1, 32:3,
    34:1, 34:2
new 13:16, 23:12
nick 4:12, 6:24, 18:5,
    36:6
nine 27:17
ninth 16:15
nodding 8:3
none 17:7
norris 4:6, 4:12, 6:24,
    17:24, 20:13, 42:6
north 22:2, 25:23, 34:2
notary 4:6
nothing 6:19, 17:8, 29:8,
    29:19, 37:12, 42:9
number 4:5, 6:13, 18:6

## O

o'clock 33:11
oath 4:24
object 39:25
occurred 10:1
offended 7:20
office 7:4, 8:18, 8:20,
    23:25, 24:5, 24:7,
    24:17, 24:19, 24:24,
    26:6, 26:17, 31:19,
    31:22, 31:25, 32:1,
    32:3, 32:18, 32:18,
    39:2
officer 9:12
oig 8:25
okay 6:3, 6:6, 6:10, 7:11,
    7:12, 7:17, 7:18, 8:11,
    8:23, 9:6, 10:24,
    11:14, 11:17, 11:19,
    12:6, 12:8, 12:9,
    12:15, 13:12, 14:3,
    14:9, 15:5, 15:20,
    15:22, 16:2, 16:17,
    17:13, 17:16, 18:9,
    18:23, 19:1, 19:4,
    19:10, 19:13, 19:20,
    19:21, 19:22, 21:18,
    23:5, 24:25, 25:2,
    25:24, 26:2, 26:5,
    28:17, 28:25, 30:1,
    30:2, 30:7, 30:13,
    33:19, 34:20, 35:5,
    36:4, 36:6, 36:9,
    37:22, 38:11, 41:19,
    41:20, 41:25
old 23:15, 27:2, 27:5
on-the-job 30:23
one 6:24, 8:12, 8:21,
    8:24, 10:3, 10:9,
    10:11, 10:12, 11:18,
    13:10, 13:19, 14:1,
    15:14, 15:15, 15:19,
    15:23, 15:24, 15:25,
    19:17, 19:19, 20:6,
    20:7, 20:7, 20:20,
    21:4, 23:20, 26:25,
    29:17, 34:15, 34:22,
    37:5, 37:24, 39:5,
    40:18, 41:20
one-day 27:11
onedrive 14:6, 14:7, 14:7,
    14:15, 14:17, 14:18,
    14:19, 15:1, 15:3
ones 8:25, 19:23
open 11:9, 13:20, 23:10
opened 13:17
opinion 21:25, 31:5,
    36:17, 36:20
options 5:18
ordered 41:23
orders 42:1
original 13:7, 13:14,

Exhibit "G" at 000049

13:15, 13:23
others 9:21, 41:9, 41:10
outcome 26:24
outs 23:13
outside 8:18, 23:25, 24:5,
    24:6

**P**

page 29:23, 32:5
paper 20:23
paperwork 20:16, 33:1
part 12:24, 18:21, 36:4,
    39:8
particular 9:22, 24:4
particularly 13:2, 14:25
parties 4:23, 35:19
parts 12:25
pause 28:12
people 14:22, 19:23
perform 30:25
permission 25:5
person 21:25, 27:3
personal 21:25, 26:17,
    28:19, 28:21, 28:21,
    31:25
phone 21:24, 35:8, 39:2,
    40:11
phones 24:1
photo 5:10
physically 4:25
place 19:17, 34:1
plaintiff 4:10, 4:13,
    4:17, 42:2
please 5:4, 5:9, 6:11,
    6:13, 6:17, 7:14, 7:19,
    34:15, 41:21
pllc 4:6
point 7:7, 7:14, 8:4,
    11:2, 32:1, 39:12
police 9:5, 9:8, 9:10,
    9:12
portion 18:15
present 4:3, 4:25, 32:23,
    34:13
pretty 28:8, 37:12
primary 8:13
print 15:13, 15:17
printed 12:17, 15:11,
    15:15, 16:1, 16:5,
    16:9, 16:11, 16:11,
    16:13, 16:19, 20:4,
    20:6, 20:6, 20:7
printing 16:7
prior 9:4, 9:10, 20:18,
    20:21, 21:1, 21:5
pro 14:10, 14:13, 22:18
probably 14:17, 15:18,
    15:18, 16:13, 20:24,
    24:3, 28:1, 28:5
problem 18:22, 19:5, 29:4,
    29:15
problems 22:6

proceed 6:22
produced 22:9, 22:9
promote 40:2
promoted 39:21, 39:22
protect 11:9
protection 4:4, 4:21, 8:6
protective 5:7
provide 30:24
provided 6:12
public 4:6
pull 10:18, 10:20, 17:22,
    23:6, 28:15
pulled 12:10, 19:7, 19:9,
    23:6, 23:6, 27:23
put 5:14, 10:15, 14:10,
    19:2, 27:16, 28:5,
    28:20, 29:25, 39:5

**Q**

question 7:10, 7:13, 7:14,
    29:17, 32:18, 34:15,
    37:12
questioned 22:16, 34:7
questioning 6:22, 34:6
questions 7:19, 30:11,
    30:15, 41:13, 41:17
quick 22:19, 31:8, 36:2,
    37:1, 41:21
quickly 27:12

**R**

raise 6:17
read 6:13, 38:14, 41:22,
    41:24, 41:25
reading 22:19
ready 6:22
real 22:19, 31:8, 36:2,
    37:1, 41:21
really 14:16, 14:17,
    15:21, 17:7, 20:15,
    21:19, 24:12, 27:2,
    29:12, 29:21, 34:11
reason 12:1, 12:25, 16:8,
    16:10, 27:19, 31:21,
    33:5, 34:24
recall 12:21, 12:24, 13:9,
    15:14, 15:21, 16:6,
    20:3, 20:8, 20:23,
    21:16, 22:16, 23:1,
    23:23, 26:5, 26:23,
    26:24, 27:4, 27:14,
    28:3, 28:3, 32:24,
    32:25, 33:15
receive 30:21
received 12:13, 39:2,
    40:11, 40:11
receives 40:12
record 4:1, 4:3, 4:11,
    4:19, 5:5, 23:22, 30:5,
    30:9, 30:10, 37:6,

42:10
recorded 22:22, 22:23,
    32:25, 41:5, 41:8
recording 17:15, 17:18,
    21:14, 21:15, 21:18,
    42:4
recordings 14:22, 15:4,
    17:8, 17:21, 22:9,
    28:9, 40:25, 41:7
records 23:21, 36:17,
    36:21
refer 22:13, 24:20, 25:19,
    28:12, 40:8
reference 22:21, 23:2,
    29:24
referenced 20:17
references 13:2
referring 23:3, 33:13
refers 18:15
regard 21:3, 21:3, 22:11,
    28:10, 29:11
regarding 9:23, 20:19,
    22:8, 26:12
related 9:24, 11:8, 12:14
relevant 24:19
remember 9:21, 20:4,
    24:12, 25:4, 26:8,
    26:10, 26:22, 26:23,
    26:25, 27:2, 27:4,
    27:8, 27:13, 33:18,
    34:9
remotely 4:24
remove 5:13, 5:14
repeat 34:15
rephrase 7:17
report 13:2, 13:10, 13:14,
    13:15, 13:17, 13:20,
    14:1, 14:13, 14:21,
    15:18, 16:5, 17:11,
    17:17, 17:20, 17:24,
    18:3, 18:21, 18:23,
    19:7, 19:14, 19:18,
    19:22, 20:25, 21:6,
    22:11, 22:13, 22:15,
    22:18, 22:21, 23:2,
    24:16, 24:17, 24:19,
    24:20, 24:22, 25:21,
    26:6, 26:11, 27:10,
    27:15, 27:16, 28:5,
    28:17, 29:6, 29:12,
    29:17, 29:21, 29:23,
    31:3, 31:3, 32:18,
    37:2, 38:3, 38:5,
    38:14, 38:15, 40:6,
    40:8, 40:17, 40:19
reporter 4:7, 4:25, 18:22
reports 12:21, 15:6, 15:8
reprimanded 39:18
requested 39:1
response 31:22
result 21:1, 35:17
retrieved 26:16
right 6:18, 6:21, 7:5,

Exhibit "G" at 000050

8:16, 9:25, 10:4, 11:7,
11:9, 11:24, 12:19,
13:24, 14:23, 14:24,
15:2, 16:3, 20:2,
20:10, 21:5, 21:13,
24:8, 25:15, 26:3,
28:6, 28:22, 29:3,
31:14, 31:19, 31:22,
32:1, 32:2, 32:3, 32:4,
32:15, 32:19, 33:3,
33:6, 33:11, 33:21,
33:22, 33:23, 34:24,
35:3, 35:7, 35:8,
35:11, 35:12, 35:14,
35:18, 35:24, 37:3,
37:17, 39:14, 39:15,
39:17, 40:4, 40:5,
41:19, 42:2, 42:8
**role** 4:24

**S**

**said** 10:14, 13:9, 14:10,
15:8, 19:16, 21:18,
25:13, 25:21, 27:4,
32:6, 32:14, 32:19,
33:20, 34:9, 34:12,
35:13, 38:5, 38:10,
38:23, 41:10
**salt** 4:9
**save** 27:6
**saved** 15:6
**saving** 14:18, 15:8
**savvy** 5:15, 10:25
**saw** 13:21, 22:21, 23:2
**say** 16:13, 16:15, 18:14,
22:24, 34:22, 40:6,
40:17
**saying** 41:1, 42:7
**says** 5:23, 11:12, 12:3,
16:11, 29:18, 31:13,
31:17, 31:24, 32:13,
32:17, 33:8, 33:19
**scheduled** 31:19
**school** 9:16, 9:18
**screen** 5:10, 11:7, 11:15,
12:5, 15:24, 18:10,
19:20, 31:8
**second** 5:16, 10:10, 10:11,
10:20, 21:4, 21:15,
22:11, 28:12, 29:23,
31:11, 32:5, 39:7
**see** 5:20, 6:12, 7:5, 11:5,
11:7, 12:7, 12:9, 12:9,
13:6, 14:20, 15:7,
19:20, 19:23, 22:4,
22:21, 23:11, 23:12,
25:25, 26:12, 26:22,
27:15, 27:18, 27:21,
27:24, 28:9, 29:21,
31:8, 31:9, 31:22,
37:19, 37:23
**seeing** 29:16

**seems** 25:1, 26:11, 27:11
**seen** 17:8, 25:12
**select** 11:15
**send** 15:16, 18:21
**sense** 16:22
**sent** 13:5, 35:4, 35:5
**separation** 27:11
**september** 12:2, 12:4,
12:19, 16:3, 16:16,
20:9, 20:12, 27:10,
27:10, 29:7, 29:19,
29:19, 29:24, 29:25,
33:2, 35:3, 35:11
**sergeant** 9:7
**server** 23:21
**services** 4:5, 4:22, 5:7,
8:6
**session** 7:7, 7:13
**seven** 27:7
**several** 8:12, 8:25, 9:21,
14:22, 31:21
**shannon** 15:15, 16:5, 16:8,
16:12, 20:5, 20:7,
20:21, 35:16, 35:18,
35:19, 37:4, 37:8,
37:15, 38:3, 38:3,
38:9, 38:12, 38:13,
38:16, 38:17, 38:22,
39:3, 39:11, 39:12,
39:20, 41:10
**share** 12:5, 15:24, 29:1,
31:8, 37:4, 38:3, 38:4
**shared** 37:2, 37:8, 38:2,
38:8
**sheet** 26:16, 26:17, 27:9
**sheets** 24:3, 38:16
**short** 27:12
**show** 14:1, 19:19
**showed** 18:4, 18:10, 36:3,
38:16, 38:16
**showing** 15:25, 24:18,
24:22, 26:16, 39:7
**shows** 11:9, 11:15, 12:16,
12:17, 13:21, 15:25,
28:17, 32:5
**si** 30:23
**side** 11:4, 11:7, 11:9
**since** 8:8, 14:4, 30:20
**sir** 9:3, 10:8, 10:15,
10:19, 22:14, 25:16,
26:4, 28:16, 29:16,
31:1, 31:12, 32:10,
32:16, 32:16, 32:20,
35:9, 35:18, 35:18,
35:25, 36:13, 36:16,
40:9, 41:14
**sit** 13:13
**skills** 30:25
**somebody** 15:12
**somehow** 9:24
**someone** 23:23, 39:24
**something** 7:16, 11:7,
19:18, 21:17, 24:13,

27:21, 28:4
**sometimes** 7:15, 15:16,
23:10, 24:10
**soon** 21:15
**sooner** 28:2
**sorry** 17:22, 19:4, 36:1
**sort** 33:14
**sound** 12:18, 16:3, 20:1,
20:10, 25:15
**sounds** 21:24, 21:24
**speak** 23:1, 37:24, 41:10
**speaking** 33:16
**specialist** 25:25, 26:1
**specifies** 29:6, 40:16
**specify** 17:9
**spell** 4:10, 4:19, 5:5
**spelled** 4:12
**spoke** 22:23, 34:3, 37:23,
37:24
**squared** 22:7
**staff** 37:10, 37:10
**staffed** 25:22, 25:22,
25:25, 32:19
**staffing** 32:14, 33:21,
33:23, 34:1, 34:6,
34:7, 40:13, 40:14
**stamp** 18:5, 18:11
**stamped** 18:13, 39:8
**start** 12:21, 19:17
**started** 7:1, 12:19, 12:23,
12:24, 13:3, 14:7,
14:16, 14:14, 14:18,
30:20, 33:9, 34:22,
34:24
**state** 25:10, 29:2, 29:12,
32:18, 35:1, 36:18,
36:21, 38:8, 39:2,
39:13
**stated** 25:22, 29:4, 31:17,
38:23, 40:11, 40:14,
40:14
**statement** 35:7, 40:22,
41:1
**statements** 32:23
**states** 17:17
**stating** 28:19, 29:4,
33:10, 40:12
**stay** 27:5
**steal** 25:10
**still** 13:25, 14:5
**stipulate** 4:23
**stole** 36:17, 36:21
**stop** 19:18, 31:21
**story** 33:19, 34:8, 40:11
**strange** 25:15, 25:17,
26:7, 33:10
**stringham** 4:9
**stuff** 14:18, 18:13, 26:12
**sued** 7:23
**suite** 4:9
**supervisor** 9:20, 24:9,
24:11, 24:14, 24:23,
28:19, 35:23, 35:24

**supervisors** 29:1
**supposed** 23:9
**sure** 8:2, 8:4, 8:15, 9:17, 17:11, 20:24, 24:13, 25:20, 28:14, 29:15, 34:10, 34:11, 39:7, 39:20, 41:7
**swear** 6:18
**swipe** 23:5, 23:7
**swipes** 23:6, 27:19, 27:21
**swiping** 24:18
**system** 23:11, 23:14, 23:15, 23:15, 23:22, 24:3, 27:2, 27:5

## T

**table** 7:10
**take** 6:25, 7:5, 7:8, 7:10, 10:5, 28:21, 29:18, 30:5
**taking** 16:8
**talk** 22:5, 22:10, 22:20, 30:5, 39:20, 39:24
**talked** 21:2, 21:18, 28:9, 37:16, 39:12
**talking** 11:5, 12:7, 12:14, 16:7, 19:11, 19:12, 21:22, 22:17, 22:18, 23:23, 26:1, 26:3, 26:13, 27:9, 27:11, 33:13, 37:1, 37:19, 38:19
**talks** 26:15
**task** 8:22
**telephone** 33:9, 34:12, 34:16
**telework** 24:10
**tell** 6:18, 12:4, 16:14, 19:14, 21:19, 23:25, 27:5, 28:12, 30:4, 33:21, 34:5, 34:5, 35:16, 38:13, 38:22, 40:13, 40:16
**telling** 33:20, 34:24, 34:24
**ten** 27:17
**terminate** 35:24
**terminated** 20:9, 20:16, 21:8
**termination** 20:18, 20:22, 21:1
**terms** 7:15
**testifying** 40:20
**texted** 31:25
**thank** 4:15, 4:18, 4:23, 5:9, 6:17, 6:21, 8:2, 30:8, 30:11, 30:13, 30:15, 41:13, 41:16, 41:18, 41:18
**thanks** 7:18
**thing** 11:16, 13:8, 13:17, 13:19, 17:3, 20:4,

21:7, 34:22, 38:7, 38:12
**things** 8:15, 11:3, 13:10, 13:14, 14:5, 15:16, 15:25, 19:16, 22:3, 24:1, 25:11, 28:9, 30:19
**think** 7:7, 10:3, 10:17, 22:16, 23:13, 23:22, 23:23, 24:2, 24:12, 24:24, 25:13, 26:11, 32:25, 33:16, 34:9, 35:2, 36:11
**thirty-two** 11:20
**though** 14:14, 20:16
**three** 7:19, 14:4
**time** 4:2, 9:1, 10:15, 10:16, 10:16, 12:3, 12:18, 15:13, 15:24, 16:19, 23:4, 23:12, 23:16, 24:24, 26:15, 26:17, 27:9, 30:9, 30:10, 30:12, 31:17, 31:17, 34:15, 35:11, 35:14, 35:16, 36:17, 36:18, 36:21, 36:21, 38:16, 41:14, 42:1
**timecard** 28:18
**times** 7:17, 27:17
**timesheet** 31:16
**timesheets** 31:14
**tip** 24:23
**title** 8:9, 9:1, 10:7
**titles** 8:12
**today** 4:1, 6:25, 7:5, 8:9
**today's** 4:7, 41:22
**told** 20:25, 25:14, 33:5, 34:7, 35:21, 37:9, 38:9, 38:13, 38:15, 38:17, 38:23, 38:25, 39:3
**took** 16:5, 20:4, 34:1
**top** 11:4
**totaling** 29:20
**towards** 26:12
**track** 24:2
**traffic** 7:21, 9:7
**trained** 30:23
**training** 30:21, 30:23
**transcript** 8:4, 8:5, 41:22, 42:1, 42:4, 42:5
**transcripts** 41:25
**travel** 25:11
**traveled** 22:2, 34:2
**trick** 7:13
**tried** 22:6, 25:10, 34:14, 38:7
**truth** 6:18, 6:19, 6:19, 36:14, 38:25, 40:16
**truthful** 28:11
**try** 7:19, 7:20, 23:14, 33:15

**trying** 5:12, 5:21, 13:6, 34:10, 38:2
**tuesday** 4:2
**tupelo** 22:3, 25:15, 25:25, 26:1, 33:10, 37:25
**tupelo's** 40:12
**two** 9:23, 9:24, 10:1, 10:1, 22:4, 25:22, 34:25, 37:14, 37:25, 38:7, 38:18, 38:19, 40:21, 41:7
**type** 10:25, 13:8, 13:13, 17:2, 33:16
**typed** 13:7, 13:17
**types** 30:22, 30:25
**typing** 12:19

## U

**umc** 9:12, 9:12
**uncheck** 5:23
**uncover** 36:14
**understand** 7:14, 7:16, 29:10
**understanding** 4:25, 9:23, 10:11, 13:4, 23:17, 24:5, 24:16, 28:20, 35:21, 39:9, 39:12, 39:16, 39:21
**unit** 22:7
**units** 8:21
**university** 9:13
**upper** 37:10
**us** 7:4, 22:5, 27:6
**use** 7:15, 14:5, 14:16, 23:17, 24:1
**used** 14:19, 23:11, 27:5
**using** 6:1, 10:15, 14:7, 14:15, 14:18, 15:3, 26:17
**utah** 4:9

## V

**valid** 5:10, 6:13
**verbal** 8:3, 8:4
**verbally** 38:8, 38:17
**verify** 5:11, 28:4, 34:8
**version** 11:10, 11:11, 11:12, 11:13, 11:15, 11:16, 11:17, 11:18, 11:21, 13:21, 13:23, 16:9
**versions** 13:21, 13:23, 14:1
**versus** 4:4
**via** 33:9
**video** 6:4, 8:3, 26:23, 26:23, 27:1, 27:12, 27:13, 27:15, 27:16
**violation** 10:9, 10:10, 10:11, 10:20, 17:2, 18:3, 21:3, 22:8,

Exhibit "G" at 000052

```
        22:12, 30:16, 31:2
violations  7:21
virginia  21:8, 21:9,
    32:19, 34:5
virtual  5:18
```

---

## W

```
w-a-t-s-o-n  4:16
waive  41:22
walk  15:17
walked  15:19, 15:23,
    16:14, 16:14
wanna  17:11, 22:24
want  7:2, 7:4, 18:18,
    23:1, 29:17, 29:22,
    38:14, 41:7, 42:3
wanted  14:21, 16:24,
    18:19, 34:1, 40:15,
    41:11
watson  4:5, 4:16
way  13:23, 17:9, 23:24,
    24:2, 28:1, 40:23
weeks  14:19
well  8:25, 13:9, 13:16,
    14:16, 14:21, 18:23,
    22:2, 22:4, 26:22,
    27:13, 27:15, 28:1,
    29:1, 33:19, 35:5,
    37:7, 37:16, 39:24
went  26:24, 28:18, 31:16,
    35:11, 35:16, 35:18,
    35:19, 35:22, 37:14,
    38:7, 38:8, 38:16,
    39:11
whatever  16:18
whenever  6:21
whether  20:25, 24:5,
    26:20, 27:25, 28:4
whole  6:18, 11:18, 38:14,
    42:4
witness  5:4, 6:12, 41:21
witnesses  38:10
word  10:22, 10:23, 10:25,
    11:4, 12:9, 13:15,
    13:17, 18:11, 18:14
work  4:8, 8:19, 9:4, 9:8,
    9:11, 10:3, 10:9,
    10:13, 16:25, 17:6,
    17:12, 18:22, 19:14,
    20:19, 24:6, 24:10,
    24:11, 24:13, 24:14,
    24:25, 25:1, 25:3,
    25:5, 25:6, 27:25,
    28:21, 29:4, 29:5,
    29:7, 31:19
worked  9:5, 23:25, 24:5,
    26:18, 26:21, 27:3,
    28:11, 29:20
workers  23:25
working  9:10, 10:14,
    24:23, 24:24
workplace  17:22
```

```
world  7:16
worst  38:7
would  5:4, 13:22, 15:13,
    16:8, 18:1, 18:23,
    20:1, 23:10, 23:10,
    23:20, 24:24, 24:25,
    25:1, 27:16, 27:17,
    28:5, 28:7, 31:21,
    31:22, 32:1, 32:21,
    32:21, 32:24, 41:24
write  14:13
written  35:7
wrote  14:1
```

---

## Y

```
yeah  5:12, 5:25, 7:3,
    8:14, 10:6, 10:9, 18:3,
    18:7, 18:12, 18:17,
    18:20, 18:25, 19:5,
    19:9, 19:12, 20:15,
    20:17, 24:21, 24:21,
    25:20, 27:17, 34:16,
    35:4, 35:5, 35:6, 35:6,
    36:5, 36:7, 39:23
years  9:8, 9:9
yes  4:20, 5:2, 6:20, 9:3,
    9:14, 10:2, 10:5, 10:8,
    10:15, 10:19, 10:21,
    11:6, 12:11, 15:4,
    15:10, 15:13, 17:6,
    17:25, 19:13, 20:20,
    21:2, 21:2, 21:10,
    21:22, 22:14, 23:19,
    24:9, 25:8, 25:16,
    26:4, 26:5, 26:14,
    26:19, 27:23, 28:7,
    28:7, 28:16, 31:4,
    31:7, 31:10, 31:12,
    31:15, 31:20, 32:7,
    32:10, 32:10, 32:12,
    32:16, 32:16, 32:20,
    32:22, 33:4, 33:4,
    33:12, 34:3, 35:6,
    35:9, 35:9, 35:15,
    35:18, 35:18, 35:25,
    36:16, 37:4, 37:4,
    38:21, 39:11, 40:9,
    41:6, 41:6
yet  29:8
young  4:3, 6:25, 9:23,
    10:12, 20:9, 20:18,
    22:10, 22:11, 23:20,
    24:5, 24:17, 25:6,
    26:12, 26:20, 27:19,
    27:24, 27:25, 28:4,
    28:10, 28:20, 29:6,
    29:11, 29:12, 29:18,
    29:25, 31:19, 32:1,
    34:14, 34:17, 34:21,
    34:25, 34:25, 36:21,
    37:19, 38:7, 39:13,
    40:4, 40:7, 40:17,
```

```
    40:21
young's  26:16
```

---

## Z

```
zoom  33:11, 33:13, 33:14,
    33:16
```

Exhibit "G" at 000053

EXHIBIT 1
Plaintiff's Exhibit

Exhibit "G" at 000054

**To:** Shannon Rushton, Deputy Administrator of Human Capitol

**From:** Jason Hulitt, Investigator, Human Resource

**Date:** 09-14-21

**RE:** Violation of Ethics

On 09-13-21, Human Resource (HR), Investigator Jason Hulitt met with, Deputy Director of Permanency (DD), Marcus Davenport in reference to discrepancies with, Bureau Director (BD), Ashley Falgout's timesheet for the pay period ending 09-15-21 (See Exhibit 01). Falgout's timesheet indicated that she worked eight (8) regular hours 09-01-21, eight (8) regular hours 09-02-21, five regular (5) plus three (3) hours 09-03-21 for administrative leave, eight (8) holiday hours 09-06-21, eight (8) regular hours 09-07-21, eight (8) regular hours 09-08-21, eight (8) regular hours 09-09-21, eight (8) regular hours 09-10-21, eight (8) personal leave hours 08-13-21, eight (8) regular leave hours 09-14-21, and eight (8) regular hours 09-15-21. Davenport stated that during the time while he was out on leave several individuals brought to his attention that Falgout and her Division Director, Melanie Young were not in the office during their scheduled workdays. Davenport then stated that he would have different individuals stop by their office and knock on the door to see if they would get a response. The individual would then report back to Davenport that there was no answer, and the door was locked to Falgout and Young's office. Davenport stated that on 08-31-21 Deputy Commissioner of Child Welfare, Kimberly Wheaton, stopped by Falgout's office to retrieve information for Commissioner Sanders' media event to find out, no one was in the secured office. On 08-31-21 Falgout texted Davenport indicating that she would be out of the office using personal leave and Young would be her person of contact while she was dealing with storm damage to her residence. Davenport stated that his contact had already notified him that Young had not arrived at the office. Davenport stated that once he returned from leave, he began his investigation by retrieving Falgout's card activity history. Davenport then stated that there was no history located for Falgout's entering the building from 09-01-21 to 09-03-21. Davenport then stated that he checked Falgout's calendar for her

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00706

Exhibit "G" at 000055

daily activity, and the calendar indicated Falgout was out in the field on 09-02-21 staffing with an employee in one (1) North and one (1) south (See Exhibit 2&3). Falgout's calendar did not indicate she would be out for 09-012 or 09-03-21. Hulitt advised Davenport to call a meeting with Falgout and have her explain to him in detail about her staffing with the one (1) North and one (1) South employees. Hulitt also advised Davenport to question Falgout in reference to why there was no card activity history at the state office for 09-01-21 to 09-03-21 (See Exhibit 4, 5, 6, & 7. Davenport then met with Falgout on 09-14-21 in his office at the state office, and she was questioned in reference to her card history report and the staffing with her two (2) employees. Falgout stated on record that she does not know why there is no card activity history and she stated that she staffed with Tupelo's Child/Family Protection Specialist Natasha Ivory, and Tupelo's Child/Family Protection Specialist, Virginia Lambert. Hulitt and Davenport returned to his office to contact the two (2) employees Falgout allegedly staffed with on 09-02-21. Hulitt and Davenport contacted Ivory, via telephone, she started by stating that she did have a meeting at Strange Brew Coffeehouse in Tupelo, Mississippi and that she had a zoom call at 1 o'clock. While on the call with Ivory she decided to change her story and stated that she received a call from, Tupelo's Division Director, Gregory Murphree stating that if she receives a call from anyone asking if she had staffing on 09-02-21, to tell them that she had staffing on that date. Ivory also stated that Murphree stated that if she wanted, she could add the meeting to her calendar. Ivory stated that Murphree went on to talk with her about frontline workers. Ivory also stated that Murphree told her that Marcus and Ashley are at odds because Ashley should have been working on 09-13-21 but she wasn't at the office. The conversation between Davenport, Ivory, and Hulitt was recorded. The recording will be held in OneDrive and see Ivory's attached written statement (See Exhibit 1). Hulitt and Davenport then contacted Lambert, via telephone. Lambert stated that on 09-02-21 at 1130 she and Natasha met with Ashley and Greg for staffing at Strange Brew Coffeehouse in Tupelo, Mississippi. Lambert then stated they discussed the Hud Program that is getting started up that would major around their region. Lambert also stated that during the staffing they discussed Youth Appraisals. The conversation between Davenport, Lambert, and Hulitt was recorded. The recording will be held in OneDrive and see Lambert's attached written statement. In Lambert's written statement she decided to change her statement from the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00707

Exhibit "G" at 000056

recorded statement (See Exhibit 2). Hulitt retrieved a copy of Young's timesheet for the pay period ending 09-15-21 (See Exhibit 1).  Young and Falgout were under investigation for defrauding the State of Mississippi for listing fraudulent hours on their timesheet claiming they were working when evidence was found they were not at the Mississippi Department of Child Protection Services (MDCPD) or in the field doing work for MDCPS. Young's calendar was retrieved from Falgout's calendar, and the calendar indicated that Young was out of the office using personal leave, but her timesheet indicated that on 09-13-21 Young worked eight (8) regular hours on that date (See Exhibit 2, 3). The calendar also indicated Falgout accepting Young's request

### Findings:

- Falgout and Young are defrauding the State of Mississippi
- Murphree does not have the heart to supervise employees
- Murphree, Falgout, and Young did not have plans for MDCPS in their best interest
- Unable to trust Murphree, Young, Lambert, and Falgout
- After completing the investigation, it was determined that Falgout fraudulent entered hours for 09-01-21 to 09-03-21 totaling 21 hours during this investigation that claimed she worked. Falgout also approved fraudulent time for her subordinate DD, Melanie Young.
- Young was determined to have entered fraudulent hours for 09-01-21 to 09-03-21 totaling 24 hours during this investigation that she claimed she worked.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00708

Exhibit "G" at 000057





**Monday, September 13, 2021**

🗑 **Ashley Falgout**

**Exhibit 2**

13 Mon

AF out of office Ashley Falgout
Out of Office Melanie Young
Time Sheets Due Ashley Falgout

9AM

9AM

1AM

MDCPS + FPFY
https://firstplaceforyouth.zoom.us/j/82523958971
Michelle Zajac

2PM

1PM

2PM

3PM

4PM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00710

Exhibit "G" at 000059



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00711

61



Exhibit "G" at 000061

Exhibit 2



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00713



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00714

64



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00715

Exhibit "G" at 000064



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00716

Exhibit "G" at 000065



**Exhibit 6**

Activity History Report
9/10/2021 9:00:52 AM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00717

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00718

**Fwd: Phone Update**

**Exhibit 1**

**Statements**

Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>

Tue 09/14/21 10:55 AM

To: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>; Shannon Rushton <shannon.rushton@mdcps.ms.gov>

---

**From:** Natasha Ivory <Natasha.Ivory@mdcps.ms.gov>
**Sent:** Tuesday, September 14, 2021 10:53 AM
**To:** Marcus Davenport
**Subject:** Phone Update

Received a call from Marcus, he wanted to know what schedule for Sept 2. I asked morning or afternoon. Discussed my zoom meeting with teen present for the meeting the teen, counselor Ben and myself.

Then Marcus inquired about the morning... I stated we had a meeting at Strange Brew... I become emotional.. Marcus inquired about we...I said I am not good about lying...

I told Marcus that Greg called me earlier stating that if anyone asked if we had a meeting on Sept 2nd say yes.... Marcus said call is being recorded... Marcus or the other guy asked for more detail about the call with Greg...Greg mentioned how Ashley has missed days from work something about Marcus and Ashley not getting along. The guy wanted to know if I put the meeting at Strange Brew on my calendar and I said no. He stated good...

Greg talked about seeing Carrier Coggins, I told him I haven't seen her in a while. He mentioned that she said she was stressed. I told him front line is stressful. I told him about the situation that occurred yesterday with a teen and her stepdad while I was visiting.

I asked who I was speaking with...someone with MBI....I asked if phone is bugged he stated no...He said Greg might have had Ashley and Melaine on the there, but the phones are not bugged.

I was told not to mention the call with anyone

Natasha Ivory,
**Child/Family Protection Specialist**
Mississippi Department of Child Protection Services
Lee County CPS
220 S. Industrial Street
Tupelo, Mississippi 38802

MAIN: (662) 841-9737
DIRECT: (769) 257-1804

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00719

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499
MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00720

**Re: Follow Up to 9/14/21 Conversation**

**Exhibit 2**

Virginia Lambert <Virginia.Lambert@mdcps.ms.gov>

Tue 09/14/21 4:38 PM

To: Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Cc: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>

I received a phone call this morning regarding a meeting which was not held on September 2nd...and I told you we had a meeting which was untrue. I did not see or talk to Ashley on that day and do not know where she was or what she was doing. I thought I was helping someone when in fact it was anything but .

My activities for that day include the following:

Emails sent to the following:

8:20 email from John Moore (foster success) regarding updated information for Makayla Wyers ETV

10:56 a.m. COR Artisha Pomerlee regarding youth appraisal completed with youth Alyssa Jones on 9/01/21 with information to be used to develop IL/TL plans in MACWIS, information regarding stipends for Alyssa, and of Alyssa sharing she was needing school computer for assignments but unable to receive the new school computer as her old one is at her mom's and needs turned in before she can get the new one.

3:15 email to Lena Parker cc'd Greg regarding stipend on tickler being denied for Rachel Michaels GED

3:16 email to Tina Burnett with cc to Greg regarding Aundavin Cook Senior Year stipend

3:24 email to Teresa with cc to Greg regarding Enayallullah Wadju PE stipend which was not listed on spreadsheet.

3:34 email to Patricia Ann Smith and Greg regarding Jayvion Mayes Pandemic stipend request having different name as provider.

3:39 email to Jacqueline Potters and Greg regarding Lequila Miskell IL stipend which was no on spreadsheet.

3:45 email to D'Andrea and Greg regarding Cheyenne Webb PE stipend not on spreadsheet

3:52 email to Jaszmen and Greg regarding Sannizya Biggs Start Up stipend no on spreadsheet.

Text 2:09 from Caitlin Dean asking when her money would be in as she had called Tippah office and was told it had not come yet.

Stipend Approval for following youth in MACWIS:

Calvin Thompson- online skills
Christina Freeman- online skills
Sabrina Dixon- PE denied due to being previously approved by Greg on 9/01/21
Helen Porter - PE pandemic funds 1200
Yasmin Harris- Pandemic funds 2000
Adreanna Ard- Pandemic funds 3500
Addason Ard Pandemic funds 3500
Lester Losell Pandemic funds 1200
Amber Quillen - Pandemic funds 1200

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00721

Joel Gunter- Pandemic funds 2000
Ashley Johnson- Pandemic funds 1200
Laketha Lewis Pandemic funds 2500
Joshua Jones- Pandemic funds 2000
Asa Hopson- Pandemic funds 600
Shanta Bentley - Pandemic funds 1200
Cassidy Brown- Pandemic funds 1200
Nicholas Carpenter- Pandemic funds 1200
Forrest Allen - Pandemic funds 1200
Aundavin Cook- Senior year 600 denied with explanation sent
Rachel Michaels- Graduation stipend 200 denied with email sent
Jamiesun Vaughn- request on tickler with no information showing
Enayalullah Wadju - PE for tutoring - email sent as not on tickler
Jayvion Mayes- Pandemic funds- email sent as Johnny Mays was listed as Provider
Lequia Miskell- IL skills denied with email explanation sent
Cheyenne Webb- PE stipend for ID denied with email sent
Sannizya Biggs- Start Up stipend email sent as not listed on Stipend Spreadsheet


Thank you


---

**From:** Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
**Sent:** Tuesday, September 14, 2021 2:40 PM
**To:** Virginia Lambert <Virginia.Lambert@mdcps.ms.gov>
**Cc:** Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>
**Subject:** Follow Up to 9/14/21 Conversation

Ginger,

Please reply to this email with the information you provided to me and Investigator Hulitt today by
phone. We need a detailed account of your workday on Thursday, September 2, 2021. All meetings,
specific times, locations, attendees, and etc. must be included. This information is due by 5 pm today.

Let me know if you have questions.

Marcus


**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4408    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00722

MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Virginia Lambert,**
**Child/Family Protection Specialist**
Mississippi Department of Child Protection Services
Lee County CPS
220 S. Industrial Street
Tupelo, Mississippi 38802

MAIN: (662) 841-9737
DIRECT: (662) 701-8419

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00723

Exhibit "G" at 000072

EXHIBIT 2
Plaintiff's Exhibit

Exhibit "G" at 000073

**Internal Investigation**

**Youth Transition support Services**

**Investigator Jason Hulitt**


**Deputy Direction:** Marcus Davenport – Permanency Support Services

**Bureau Director:** Ashley Falgout

**Division Director:** Melanie Young

**Program Administrator, Senior:** Cynthia Moore-Hardy

**Projects Officer:** LaTasha Holt


**Complaint:**   Hostile Work Environment

Violation of Ethics


**Interview 1**

**Cynthia Moore – Hardy: 07-26-2021**

On the above date, Moore-Hardy met with Investigator Jason Hulitt, along with Lauri Smith in room Eight Twenty-Two (822) on the Eight (8th) floor at Mississippi Department of Child Protection Services (MDCPS) located at 750 North State Street – Jackson, Mississippi. Moore – Hardy stated that she is assigned to Youth Transition Support Services (YTSS) as Program Administrator, Senior. She stated that Melanie Young was promote in April 2021 to Division Director (DD) from Educational Liaison who then became her supervisor. Moore – Hardy stated that she did not have much interaction with Young before she was promoted because

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00327

Exhibit "G" at 000074

Moore-Hardy was supervised by Ashley Falgout who is now the Bureau Director. Moore-Hardy stated, "All of last year, or for lack of better words was a complete disaster!" "Her time here has never been more uncomfortable than it was from October 2019 until!" Then Moore-Hardy stated, "It got a little bit better between the time she had Falgout and Young as a supervisor, but prior to that the entire time in the unit it had been a disaster." (Note: Moore-Hardy got emotional. Her eyes became red, and tears formed in her eyes.) Moore-Hardy stated that going back through this is a little disheartening because she must relive everything. Moore-Hardy stated that she thought she and Melanie would be off to a great start. She then stated that she thought they would establish a good working relationship. Moore-Hardy stated that on June 15, 2021, they returned to the office from working remotely. Moore-Hardy stated prior to returning to the office she and Young's interactions were not good. Moore-Hardy stated that her first meeting with Young included another employee who is supervised by Young, and during the meeting, Young came across as hostile. Moore-Hardy also stated that it wasn't what she was saying, it was her tone and delivery. A virtual meeting was requested with Moore-Hardy by Young, and it included Ashley Falgout, Bureau Director (BD). Moore-Hardy stated that Young was pointing her finger at her on the screen and badgering her while on the virtual call. Moore-Hardy then gave an example of what the virtual call was about; Young had an issue with how she requested leave, she needed to do a calendar invite when requesting time off, (something implemented within the unit). Moore-Hardy stated that she advised Young that she wasn't familiar with adding personal leave requests to the calendar invite because nobody has ever told her to do such. Moore-Hardy then stated that Young stated (in an escalated tone), "How long you been here; you been here 10, 12, 14, and you should know this!" Moore-Hardy stated that she then apologized to Young and stated that from this day forward, I will do a calendar invite. Moore-Hardy stated that Young continued with her, and she stopped Young and stated, "I'm going to respect your position, and you need to respect mine." Then the second thing Young brought to Moore-Hardy's attention was that the information about the federal reporting she turned in was wrong, and she could not get into contact her because she was out on leave. Moore-Hardy stated that she then told Young, in the future, if there is something that she needed to know that has something to do with MSA requirements or something that we must get turned in just go ahead and contact her because she can answer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00328

if there is something she need to answer. Moore-Hardy then asked, "What was it that you needed an answer to, but she never gave Moore-Hardy an answer. Moore-Hardy stated that all these were triggers for her and reminded her of how things were when the old supervisor, Mario Johnson, was supervisor. Moore-Hardy then stated that her problems started when Johnson (before Falgout) was BD. Moore-Hardy stated that she wanted to come to Human Resources (HR), but she felt like that she had nowhere to go. She just recently (a week or two ago) felt like she had somewhere to go, and she has just been holding all kinds of things inside. Moore-Hardy stated that she and Young ended their meeting stating, "If you need something just let me know!" Moore-Hardy stated that in the next meeting Young started to badger her about turning in a medical excuse. Young sent an email to her while she was on medical leave, and copied Vicki Dodd, Marcus Davenport, and Ashley Falgout stating, "You need to turn in your medical excuse to let her know when she was scheduled to return back to work." Moore-Hardy stated that she was encouraged to talk with Young and when she tried to do so, Moore-Hardy stated that Young was very disrespectful, condescending, very hostile and she decided not to talk with Young anymore. Marcus Davenport requested that he facilitate a meeting between Moore-Hardy and Young. Moore-Hardy stated that she was very reluctant, and she did not want to do it, but she did it because Davenport stated that they needed to meet. Moore-Hardy stated that the meeting was a disaster. During the meeting she stated that she probably only said two or three words because Young continued to cut her off and told her what she was going to do and what she wasn't going to do. Moore-Hardy stated that Davenport would ask Young questions, and she would tell him that she is not about to do this, and sometimes she would ignore Davenport's questions. Moore-Hardy then stated that Young stated, "You have a choice; you can either leave if you don't like it or not, I'm your supervisor and this is how we are going to do it." Moore-Hardy stated that she requested to be dismissed from the meeting. Davenport gave her permission to be dismissed and Young told her that she could she has not been dismissed and sit down! Moore-Hardy stated that because of all the problems from her prior supervisor, Johnson, and what she is going through now she must see a therapist twice a week for Anxiety. (Moore-Hardy became emotional, red eyes, and tears formed) Moore-Hardy stated also during the meeting Young stated to Davenport that Moore-Hardy had not been turning in her work. Moore-Hardy stated that she proved that was incorrect because she

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00329

sent all the emails to Davenport showing where the work was turned in to Young. Moore-Hardy then stated that the next day Young and Falgout requested to meet with her, and she stated that she was reluctant to meet with the two (2). Moore-Hardy stated that during the meeting Falgout apologized first and Young apologized. Moore-Hardy stated that Young stated that she had been using a global management approach. Moore-Hardy stated that now she does not have much contact with Young, and when she sends Young emails, she does not get a response. When Moore-Hardy asked Young about not receiving responses to her emails, Young told her it's her responsibility to follow up with her about the email sent. Investigator Hulitt asked Moore-Hardy if/does Falgout attempt to step in and keep peace in the unit. Moore-Hardy started by saying, all that's going on is Falgout fault. Moore-Hardy also stated that Falgout was part of the problem when she was having issues with Johnson. Moore-Hardy states Falgout walks the unit checking on all employees, and she's not sure what's going on, but she never sees Young. Moore-Hardy also brought to my attention that Young is friends with Falgout's sister, and that's how they know each other. Moore-Hardy stated that several years ago she was looking for an educational liaison to assist in their unit, and two (2) individuals who applied for the job were friends with Falgout, and the other person was friends with Johnson who was already employed with MDCPS. Moore-Hardy stated that when it was time to interview the two (2) applicants she advised Johnson that Falgout did not need to attend the interviews because she was friends with one (1) of the applicants. Johnson stated that it was fine, and when Moore-Hardy did not recommend them for hire they all stop talking to her including the individuals who did not get the position. Moore-Hardy stated that remembered a time when Young approached her desk and issued her task to complete with 10 minutes remaining of her shift. Moore-Hardy stated that at 3:50 pm Young ordered her to complete this task when she is scheduled to leave at 4:00 pm. Moore-Hardy stated that she stayed until 5:30 pm to complete the task she was assigned. Moore-Hardy also stated that the medical excuse that Young was emailing her about while she was off for medical leave, 20 minutes later Young brought the excuse back to Moore-Hardy stating that she did not need it she just wanted to see proof that she was off. Moore-Hardy stated that she kept the excuse in her bag because so is afraid that Young will say she never gave her the excuse. The interview was concluded. The interview was digitally recorded, and the recording will be held in Hulitt's possession.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00330

Exhibit "G" at 000077

**Key Points:**

-Moore-Hardy has requested ADA Accommodation to preform telework at home

-Moore-Hardy has also used FMLA

## Interview 2

### LaTasha Holt: 07-26-2021

LaTasha Holt met with Investigator Jason Hulitt along with Lauri Smith on the above date in room Eight Twenty-Two (822) on the Eight (8th) floor of the Mississippi Department of Child Protection Services (MDCPS) located at 750 North State Street – Jackson, Mississippi. Holt stated that she was hired in October 2020 and assigned to Youth Transition Support Services (YTSS) as a Project Officer. Holt then stated that at the time of her hiring Ashley Falgout was her immediate supervisor. Holt stated Young became her supervisor in April 2021. Holt stated that before Young was promoted, they were co-workers. Holt stated that she has not had much contact with Young since they returned to the office in June 2021. Holt stated that she and Falgout has a great relationship. Holt stated that she has no issues with either supervisor. Holt provided information that she has heard that Young was friends with Falgout's sister and that's how they know each other. Holt stated that Young and Falgout share an office, so they are always together. Holt then stated that it could be that they share an office the reason they are always together. Holt stated that she has not had any problems with Young, but several of her educational point of contact has complained to her about Young's attitude. Holt stated that one of her contacts from a school contacted her stating Young was rude to her, and then she stated that a contact in Grenada, Mississippi stated that it was Young's tone, the way she spoke to her. Holt stated that the contact stated that Young attempted to quote a law, and she misquoted the law. Holt then stated that when Young first got promoted, she advised Holt that she may have to rely on her because she was trying to perform both jobs. Holt then stated that Young sent her an email to contact the point person, and when she

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00331

Exhibit "G" at 000078

did made contact with the point of contact, she was very rude to her. Holt then stated that she could not figure out why that person was being so rude, but later she found out it was because Young had been rude to the contact at the school district. Holt stated that if she needs to speak with a supervisor, she will always go to Falgout. Holt stated that Falgout is always out on the floor checking on them, and she see Falgout several times throughout the day. Holt stated that the only reason for dealing with Falgout was because she has dealt with her a lot longer than Young.  The interview was concluded. The interview was digitally recorded, and the recording will be held in Hulitt's possession.

## Interview 3

### Melanie Young: 07-30-2021

Investigator Hulitt along with, Human Resource (HR), Director, Vicki Dodd met with Melanie Young, Division Director (DD) of Youth Transition Support Services (YTSS). We met in room 822 on the 8th floor of the Mississippi Department of Child Protection Services (MDCPS) located at 750 North State Street - Jackson, Mississippi. Hulitt requested that Young introduce herself, and she stated that she was hired at MDCPS on 10-01-20 as Educational Liaison. Young then stated that at or around six (6) months of her working at MDCPS, she applied for DD over YTSS, and on 02-01-21, she was hired for the position. Hulitt then asked Young about the number of employees she supervised, and she stated that there were two (2) employees under her supervision. Hulitt then asked who they were, and Young stated that one (1) employee being Latasha Holt, Educational Liaison, and the second (2) employee being Cynthia Moore-Hardy would be serving as the third Educational Liaison in the near future. Young stated they are getting ready to hire another employee who will also be an Educational Liaison, essentially Hardy will be taking over what Young was doing, Educational Liaison. Young also stated that now Hardy is doing federal reporting. When Hulitt attempted to clarify the structure of Young's staff, (Note: Young's voice elevated). Young then stated that we will have three (3) Educational Liaisons, and we are hiring separate individuals to do the federal reporting. While Young was explaining to Hulitt about the functions of her unit, she left out the Pandemic Relief Fund Grant. Hulitt had to ask Young about the Pandemic Relief Fund Grant, and who deals with the grant.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00332

Exhibit "G" at 000079

Young then stated that her department does deal with the federal grant. Young then stated that she has been assisting the unit with the grant some, the Bureau Director (BD), Ashley Falgout, and Latasha have been working on the federal grant. Young then stated that her department has two (2) temp staffs who has been answering the phones. (Note: Young added this language after the above sentence; along with a laugh, then she stated, For lack of better terms). Hulitt then requested for Young to explain her job description/duties, which she stated that coming into the unit they have been building education from the ground up because education has not received the priority that it has needed. Young then stated that her role has been meeting with leadership, with the Mississippi Department of Education (MDE) leadership, and joint guidance. Young stated that it's been lots of meetings and going to the drawing board. Young stated that she has been in the planning phase. Hulitt then asked Young what type of relationship does she and Falgout has or did they know each other outside of MDCPS. Young stated that they have a great working relationship, and they do not know each other outside of MDCPS. Young continued to state that Falgout and the Deputy Director (DD) Marcus Davenport have been great mentors they have shown her a lot. Hulitt then questioned Young about her relationship with her subordinates she stated that she has not had the time to sit and bond because they had just returned to the office on 06-14-21. Young then stated that everything has been about business because so much has been happening. Hulitt asked Young about she and Moore-Hardy's relationship in the office, Young stated at first what came off to her was that Cynthia displayed some pushback, and she was not understanding why. Young stated that she thought she and Cynthia got off to a fine start until she noticed some insubordination. Young stated that it wasn't anything major, she would have to tell Cynthia to get her timesheet turned in, call her if she was not going to be at work, and let her know if she wasn't going to be available. Hulitt attempted to get some clarity of what Young was meaning about insubordination. (Note: Hulitt never received a clear understanding of where the insubordination was displayed.) Young then stated that Cynthia's work performance and she would contact her after the fact to let her know that she wasn't going to make it to work that day along with some other things that lead her to believe that Cynthia was displaying insubordination (Note: Hulitt felt there were other things Young wasn't coming forward with to make the story understandable.) Then Young stated that insubordination was a pattern of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00333

Exhibit "G" at 000080

behavior, and she stated that one of the issues was that Cynthia would not contact her to advise her that she wasn't coming into work. (Note: Again, Hulitt was confused by the information Young was providing because she was all over the place with her story). Hulitt asked Young, so she just would not arrive for work, and Young stated, "No, No, she would not call in an advance to let me know that she wasn't going to make it into work that day." Young also stated that another issue was if she was going to be late for work, she would not let her know. Young stated that they were having a big meeting with an outside group, and Cynthia wasn't there at the time she was scheduled to arrive. Young stated that she attempted Cynthia on her cellular phone multiple times with no answer, and before the nine-thirty (9:30) meeting; Cynthia arrived for work. Young stated that little things Moore-Hardy was doing made her feel like it was all a challenge or test. Young then stated that she met with Falgout, and then she and Falgout met with Davenport to address the problems and find out what she needed to do and how she needed to move forward about the ongoing insubordination in the unit. (Note: For some reason, Young then stated, " I'm sure you have the rest of the story there in front of you, or I can just fill in the rest of the blanks for you".) Hulitt then stated, "Just tell me". Young stated, "Okay, I went to Marcus!", "Marcus said this is what I want, this is what is going to happen, she needs to come into the office every day, you and Ashley need to meet with her rediscuss your expectations, and all this other stuff Blah, Blah, Blah, you know, your typical traditional supervisor you know direct report. (Note: the above sentence is from Young). Young stated that they had the meeting with Cynthia, and they received a little pushback, asking questions, she then took off work without them knowing that she was going to be off work. Hulitt stated, who is authorizing her to miss work. Young then stated that she did not have the authorization to miss work. Young then stated that Cynthia sent an email to her in reference to the discussion of the insufficient work for federal reporting, and the request was in the email. (Note: Young must have failed to completely read the entire email, and she missed the request to be off for work.) Young stated that she typed up in writing what the standards/expectations were going to be and that the agency takes being absent without approved leave very seriously and we all need to report directly to our supervisors if we are not going to report to work or be available to do our assigned jobs/duties when you are expected to be. Young stated that she emailed it to Latasha and Cynthia and requested an email back that they read the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00334

email and understood. Young then stated that Cynthia went directly to Davenport, before speaking with her or Falgout, requesting a meeting when she returned to work. Young stated that all that was done without advising her that there were issues or that Moore-Hardy was having problems. Young stated that when Cynthia returned to work; they met with Davenport. Young stated that the meeting did not go well; the communication that transpired was not done right and that the whole situation was done wrong. Hulitt then asked Young by who, and she stated, "Marcus". Young stated that Davenport should have redirected Cynthia back to them or at least to Ashley because Cynthia was going through whatever she was going through and operating under an assumption. Young stated that she is being Cynthia's direct supervisor did not know that she needed to operate any differently. Young then stated whatever Cynthia was going through and she stated that she expressed this to Davenport; it was something that she should have been in on, but not necessarily the details. Young therefore stated that otherwise it looked like what she thought it was, insubordination. Young stated that she and Ashley scheduled a meeting with just Cynthia after their last meeting. They all got a great understanding of each other. Young stated that they were all able to discuss things openly and Cynthia was able to come forward with some of the things she had been dealing with and what was going on with her personally. Young stated that they were able to work out some arrangements to accommodate some of those things with Cynthia. Young stated they all felt better about everything after the meeting, and they hated that it had to come to this point, and if communication had been better, it would not have come to that point. Young stated since they sat down and got everything out on the table, they all have come to an understanding and that Cynthia admitted that she did not handle things properly and she was going to correct those things. Young stated that she advised Cynthia that if she ever needed anyone to talk to, she was there for her, and she did not have to tell her any of her personal things. She then stated that Cynthia applied for an ADA accommodation, a request to work from home, which was denied. Young then stated that Cynthia asked her if she had a problem if she worked one (1) day from home, and Young stated that she did not have a problem with that if it would help her situation. Cynthia also leaves one (1) hour early one (1) day a week for whatever reason. Young stated that Davenport approved that Cynthia could work one (1) day a week from home to assist in her situation. Hulitt asked if they do face-to-face meetings, to which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00335

Exhibit "G" at 000082

she replied, they do not do meetings yet. Hulitt asked Young how she and Davenport communicates, and she stated that it's not formal. Hulitt then asked Young what kind of training did MDCPS put in place for her or if she has been a supervisor in the past? Young stated that she supervised two assistances at her last employment. Hulitt then asked Young again, did MDCPS provide her with any supervisory classes, or did she feel like she needed any training? Young replied, "That MDCPS did not provide her with training, and she did not feel like she needed any training." Then she stated that she has an advanced degree in "Leadership", then she corrected her last statement to, a master's degree in "Leadership." Hulitt then asked Young, having a degree make you a great supervisor, and she stated that neither does training. While discussing how training will assist in day-to-day operation of being a supervisor, Young stated that she has a degree in sociology. Then Young wanted to question Hulitt about what this interview was for, and I stated that I want to get an understanding of what her department does daily. Young then stated, (with an elevated voice), that it's hard to explain, I think the best way to do, is to come down to her office and job shadow to get an understanding. Hulitt then concluded the interview with Young. The interview was digitally recorded, and the recording will be held in Hulitt's possession.

### Interview 4

### Ashley Falgout: 08-04-2021

Investigator Hulitt along with, Human Resource (HR), Director, Vicki Dodd met with Ashley Falgout, Bureau Director (BD) of Youth Transition Support Services (YTSS). We met in room 822 on the 8th floor at Mississippi Department of Child Protection Services (MDCPS) located at 750 North State Street - Jackson, Mississippi. Hulitt requested that Falgout introduce herself, and she stated that she was hired at MDCPS in 2009 as a Program Administrator in Independent Living. Falgout then stated that in 2017 she was promoted to Division Director (DD) in Independent Living, and then on October 2020 Falgout was promoted to BD over YTSS. Hulitt then allowed Falgout to explain her unit's and their responsibilities and how many personnel she supervises. Falgout stated that she has two (2) DD, twelve (12) Transition Navigators, and two (2) Educational

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00336

Exhibit "G" at 000083

Liaisons. Falgout stated that DD Greg Murphree's office is in Tupelo, Mississippi, and her other DD Melanie Young and her office is at the State Office in Jackson, Mississippi. (Note: Falgout and Young share an office in the building) Hulitt asked Falgout to him a little about Young. At first, Falgout pretended that she did not understand the question. Then Hulitt stated, what kind of supervisor is she. Falgout stated that in her mind she's great, just like Greg is great. Falgout then stated that because a lot of what Young does are things she had taught/teaching her to do and things Young has seen. Falgout then stated that Young's approach is black and white, for example, they have a job to do, this is the job, these are the expectations, and you just need to do your work. Falgout stated that her approach is compassion, kindness, and that's what she expects her two DDs to initiate in their units. Hulitt then asked about the relationship with the two (2) employees who work out of the same building with her and Young. Falgout stated that there were no problems with the Educational Liaison, Latasha Holt. Falgout stated that Young and Holt were hired in October 2019, and they worked together as Educational Liaisons before Young was promoted to a DD. Falgout stated there was a second (2nd) employee, Project Administrator, Senior, Cynthia Moore-Hardy. Falgout had a lot to state about Moore-Hardy. She stated that Moore-Hardy has been employed at MDCPS for about the same amount of time that she has been employed at said location. Falgout stated that in 2019 some things changed at MDCPS, Falgout stated that the ex-Bureau Director, Mario Johnson, and Moore-Hardy had some issues. Falgout stated that she was not aware of what kind of issues and Moore-Hardy had voiced that she felt there were some hostilities in the workplace. Falgout stated that she doesn't think Moore-Hardy went to HR about the problem, but she did speak with the state personnel board about the issue. Falgout stated that in November 2019 Moore-Hardy, and the Mississippi Department of Education were doing a statewide educational training for school districts and Child Protection Services (CPS) staff. Falgout stated that because it involved CPS staff they went for support. Falgout also stated that midway through the training Moore-Hardy left and went out on medical leave for about six (6) months. Falgout then stated that while Moore-Hardy was out some changes took place in the unit, and she took over the education work. Falgout further stated that Moore-Hardy then returned to work a week after Johnson left MDCPS, and then they received word that they would be returning to the office after covid. Falgout stated that while she and Davenport

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00337

were cleaning out Johnson's office, she came across paperwork written by Johnson address to Davenport to terminate Moore-Hardy. Falgout stated that she then asked Davenport, "What to do with the letter, Davenport stated that he did not do anything with the paperwork because he did not agree with it when Johnson gave it to him, and we will shred it, and all he asks of her is to give Moore-Hardy a second chance. Falgout stated that she did not mind giving Moore-Hardy a second chance because the things that were going on were between her and Johnson. Falgout stated that after covid, she returned back to the office several days before everyone else. Falgout then stated that the plan was to allow Moore-Hardy, and Holt continue telework from home, but Davenport decided to bring them back into the office. Falgout then stated that she heard that Moore-Hardy had gone to HR in reference to an ADA accommodation to work from home and from her understanding, Davenport denied the request. Falgout did express that all this information was second-hand information. Falgout then stated that Moore-Hardy was sent to Davenport because he denied the ADA request. Faalgout stated that after that Davenport contacted both supervisors stating Moore-Hardy came to him with some complainants that he believed were valid. Falgout stated that Davenport never told them what the complaints were in reference to, and Davenport told them that Moore-Hardy was supposed to reach out to her and Young to meet. Falgout stated that Moore-Hardy never contacted her and Young. Falgout then stated that the next thing she knows she received an email from Davenport stating that she, Young, and Moore-Hardy needed to report to his office because they all were going to talk. Falgout stated that they all meet in Davenport's office, and the meeting went terrible. Falgout stated that the meeting turned into a finger-pointing meeting, and she wasn't happy with the things that were said and how the whole thing was handled. Falgout also stated that she expressed that to Davenport, and as a supervisor, she would not have handled the situation like it was handled. Falgout stated that she and Young were blindsided by the meeting they had no idea what they were walking into other than, from Davenport, Moore-Hardy came to him and talked. Falgout stated that they were all sitting at a round table with Young across from Moore-Hardy and Davenport stated that there were some concerns, who wants to start off first. Falgout then stated that Moore-Hardy began to blame Young for several things, and Young began to defend herself. Falgout stated that things in the meeting did escalate, and Moore-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00338

Hardy left the meeting. Falgout then stated that at the end of the meeting Davenport stated that this between Moore-Hardy and Young was not going to work, so Moore-Hardy will need to go somewhere else. Falgout stated that she contacted Davenport stating that she did not necessarily think that relocating Moore-Hardy would be the solution. She then stated that she told Davenport some of this could be salvaged, she stated that she told Davenport that this was not handled right, and she would like the opportunity to address this problem. Falgout stated that she, Young, and Moore-Hardy met the next day in the conference room. She stated that they talked about everything, and she expressed that she did not like what occurred in the meeting, and she did not like any of their responses to anything in the meeting. During the conversation, Moore-Hardy stated that she wasn't okay. Falgout stated that Moore-Hardy and Young had a conversation about some of their previous interactions and Moore-Hardy stated that she thought she was walking back into the same situation she left from when she first went home sick in 2020.  Falgout then stated that Moore-Hardy admitted in the meeting to Young that she did not give her a fair chance, and her interaction was not fair. Falgout also stated that Moore-Hardy stated that she would like to start over their relationship, and after the last meeting with Moore-Hardy there have not been any problems. Falgout stated that they just had returned to work on June 14, 2021, from covid, and two (2) days later they found out there was a problem. Falgout stated that what started the Young and Moore-Hardy interaction was, the first (1st) MSA report for the first (1st) quarter that was due in April 2021. Moore-Hardy submitted her report to Young and in the same report, Moore-Hardy advised Young that she would be off work Thursday and Friday. Falgout stated that she and Young had to spend a weekend on zoom correcting the report because it was incorrect. Falgout admitted that they missed the part in the email about Moore-Hardy taking off work which was in the middle of the email. Falgout stated that she and Young went to Davenport because it was such a weird thing about the request being in the middle of an email. Falgout then stated that Davenport told them that Moore-Hardy could not do that, and they needed to put this infraction in writing. Falgout stated that Moore-Hardy did not tell Young that she was not coming into work until later, and Young reached out Moore-Hardy asking her for a doctor's excuse. Falgout stated that during all the conversations with Moore-Hardy, she was also in contact with Davenport without them being made aware. Falgout stated that because of what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00339

the email was about, Falgout admitted that Young did not open the email until the next day. Falgout stated that a meeting with Moore-Hardy about taking off work without approval was held, and she admitted that she should have sent it in as a separate email. During the interview Falgout brought up the fact that Moore-Hardy was also talking to Davenport, HR, and sending documents to HR without knowledge. Falgout stated that Davenport requested all their documentation that Young had been keeping on Moore-Hardy because he was going to forward it to Human Resources, Shannon Rushton. The next conversation was when Falgout stated that both supervisors found out that Moore-Hardy was talking with Davenport. Falgout she stated that in the first meeting that she and Young had with Moore-Hardy, she stated that in an email she told Davenport that she did not want a meeting, but they ended up going forward with the meeting. Falgout stated that she honestly believes whatever went wrong between Moore-Hardy and Johnson was before they left the building because of covid, she thinks it was hurtful. Falgout stated that she knew Moore-Hardy and Johnson were friends outside of the building. Falgout stated that Moore-Hardy and Holt will start being out in the field working out of the county offices. Hulitt then concluded the interview with Falgout. The interview was digitally recorded, and the recording will be held in Hulitt's possession.

## Interview 5

### Marcus Davenport: 08-10-2021

On 08-10-21, Mississippi Department of Child Protection Services (MDCPS) Investigator Hulitt met with Marcus Davenport, Deputy Director of Permanency. The meeting took place in room 822 on the 8th floor of the MDCPS located at 750 North State Street - Jackson, Mississippi. Hulitt requested that Davenport introduce himself, and he stated that his tender at MDCPS began in February 2016. Davenport stated that he was hired as a Division Director (DD) for Adoption, within one (1) year he was promoted to Bureau Director (BD) for Permanency Support Services, and approximately within one (1) year, he was promoted to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00340

Exhibit "G" at 000087

Deputy Director. Hulitt asked Davenport how many employees he supervised; Davenport stated that he directly supervised six (6) individuals at MDCPS, Ashley Falgout being (1) one of those individuals, to whom this investigation is involving. Davenport stated that he promoted Falgout to BD in the fall of 2020.  Davenport stated that Falgout interviewed well for the position, and he thought it would have been a good decision at the time to promote Falgout to BD. Davenport then stated that he felt Falgout did not have the characteristics of a BD, but she had the knowledge about the program. Davenport stated that since promoting Falgout to the position of BD it has been several teachable moments/one on ones with Falgout. Davenport then stated that those moments consisted of appropriateness, how to deal with the staff, and the dress code. Davenport stated that he struggles with Falgout to meet deadlines.  Davenport also stated that he provided information to his supervisor that the program would not be where it is today if he had to depend on Falgout. Davenport stated that he felt like the whole unit is used to being laid back toxic culture. Davenport then stated that when he tried to implement some standard operating procedures in place, he would receive pushback from Falgout, which she stated the pushback was coming from her staff. Davenport stated that he started having weekly staffing (meeting) with Falgout to make her a better BD, but he continues to have issues with her. Davenport stated as an example; On 08-05-21, in the weekly staffing with Falgout, he gave her deadlines for several projects they discussed in the staffing. Davenport stated that he then followed up with Falgout like he always would after the staffing's with an email referencing the things they discussed in the staffing's. Davenport stated as of 08-10-21, Falgout had not responded to the follow-up email that he sent her about the things they discussed in the staffing, and Falgout has already missed several of those deadlines. Davenport stated that he was in the office belonging to the two (2) temp staff, and the two (2) MDCPS employees. One of the temp staff advised Davenport that they needed some information to do their job. Davenport stated that he advised Falgout to make sure that information was provided to the temp staff because it will help the employees to effectively do their jobs.  Davenport stated once the meeting was completed with Falgout, she entered the office where the temp staff were and stated, "Do not trust Marcus, he told me something about you not having information, you can't trust him"! Davenport stated that he found out what was said by another employee who shares the office with the temps. Hulitt asked

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00341

Exhibit "G" at 000088

Davenport how Falgout respond to him being the supervisor over the unit? Davenport stated that she uses a friend-like approach with him. He stated that she uses profanity sometimes, and when she come to his office; she would knock on the door and enter. Davenport stated that during the mornings he make rounds throughout the unit greeting and speaking to the staff. He stated that while doing so, he was stopped by Cynthia Moore-Hardy in reference to a new form they were starting to implement. Davenport stated that while he was assisting Moore-Hardy with the form, Falgout approached. He stated that he immediately included Falgout into their conversation, and once he left the room Moore-Hardy advised him that Falgout was questing her about the reason he was in the office. Davenport then stated that he learned from Moore-Hardy that Falgout stated that he was trying to bully Moore-Hardy. Davenport stated that in their weekly staffing Falgout stated to Davenport every time he reaches out to her staff it causes confusion.  Davenport stated that he asked Falgout how it causes confusion and he stated that she could not answer the question. Davenport stated that he does not confront Falgout with several of the things that Moore-Hardy brings to his attention that comes from Falgout. Davenport advised that he does not want to cause problems for Moore-Hardy because of the things she is dealing with personally. Davenport stated that he knows that if Falgout found out that Moore-Hardy was relaying the information from her, he does not know what type of retaliation Falgout and Young would bring forth towards Moore-Hardy. Davenport stated that Moore-Hardy alerted him of some personal things that were being caused at work. Davenport stated that he met with Young and Falgout on two (2) different occasions about personal issues Moore-Hardy was dealing with. Davenport stated he, not divulging too much information about the personal concerns, advised the two (2) supervisors what his plan was to assist Moore-Hardy's concerns.  Davenport stated that he told both supervisors that he was going to meet with them again later to advised them of the next step. Davenport then stated that is when Young became disrespectful to him. Davenport stated Young, with an elevated voice, stated, "Why?" "You are telling me that I can't supervise my staff!" Davenport stated that Young continued the disrespect in front of her supervisor, Falgout. Davenport stated afterward, he asked Falgout did she think it was Okay for her subordinate to talk to her supervisor that way? Davenport stated that Falgout told him that he was getting back what he had put out. Davenport advised on the morning before all three (3)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00342

Exhibit "G" at 000089

met with Moore-Hardy he went into Young and Falgout's office and advised them
not to enter the meeting with attitudes or preconceived notions. Davenport
stated that when they entered the meeting Young was disrespectful to Moore-
Hardy by raising her voice, staring Moore-Hardy, and her body language.
Davenport stated that it came off to him that Young was trying to challenge
Moore-Hardy to a physical fight. Davenport stated that when he tried to calm the
situation down, Young showed disrespect towards Davenport by overtalking him
and shouting out, "Marcus don't you do that, don't you be validating what she
says when she keeps looking over there at you!" Davenport then stated that
throughout the entire meeting Young and Falgout continued looking at each other
while Young was being disrespectful. Davenport stated that he asked Falgout her
thoughts about how Young had spoken to him, and he stated that Falgout told
him that this is a teachable moment. Davenport also stated that Falgout told him
that she has spoken to Young about her attitude. Davenport stated that he
questions the relationship between Falgout and Young because he has had
problems in the past with Falgout trying to hire her friends. He states that Falgout
assures him they only know one another on a work level but he's no sure about
that. Davenport stated that if Falgout is out of the office, she advises him to see
Young if he has any questions or anything he might need. Davenport states that
he advises Falgout to put a point person in charge who can provide him with the
information he could need if she is out of the office. Davenport states that when
he advises Falgout to put the point person in charge it's always Young never
Division Director Gregory Murphree, and most of the questions are about
Independent Living Young oversees Educational Liaison. With all the problems
Davenport states he has with both of his supervisors; I asked him why he chose
Young for his DD? He stated that it was his interaction with Young early on, her
knowledge of the educational process in Mississippi. Davenport then stated that
the educational unit needs more attention than he could give it, and he needed
someone who could understand the DEA, and all the Legislation that applied to
education, and all the other things that went with the unit. Davenport then stated
that at that time he felt Young was the best person for that unit not knowing all
the problems that came with her. Hulitt asked Davenport how credible is Moore-
Hardy? Davenport stated that he questions Moore-Hardy because she has had
issues with every supervisor in the unit. He stated that sometimes he wonders if
its Moore-Hardy, but he knows that unit is so toxic. Davenport stated that when

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00343

he sits down and talks with Moore-Hardy he doesn't sense any problems with her. Hulitt asked Davenport what are the first things that need to be done to get his department to function properly? Davenport stated that he would like to see Independent Living go because it's going to take a lot of energy to maintain the departments. Davenport also stated that he's not for sure about Independent Living because he has invested in the work, and he wants to see it succeed. He then stated that would need to get a good BD in place who he could trust and provide him with accurate information. Davenport stated that spoke with one (1) of the Educational Liaison Latasha Holt to valid date Moore-Hardy's perception of Young. Holt stated that there is very little communication with Young and she mainly deals with Falgout. Holt also stated to Davenport that she does not see Young as much and she also advised Davenport of an issue with the point of contact in the schools stating they do not want to deal with Young because of her attitude and how she deals with the contact. Davenport also stated that Holt told him that someone made a complaint to MDEE about Young's attitude. Hulitt asked Davenport if there have been any discrepancies on Falgout or Young's timesheets? Davenport stated that he pays close attention to Falgout's timesheet and Holt advised him that sometime last week Young wasn't at work. Davenport then stated that he needed to pull Young's timesheet. Hulitt then concluded the interview with Davenport. The interview was digitally recorded, and the recording will be held in Hulitt's possession. Hulitt and Davenport both walked back downstairs to the seventh (7th) floor for Hulitt to see how the two (2) supervisors means of operation. Hulitt first noticed that the door to their office was closed with their cellphone numbers and names posted on the door. Hulitt could hear them laughing outside the door down the hallway. Davenport continued to introduce Hulitt to the other staff members along the hallway and showed Hulitt his office. Hulitt and Davenport then walked back to Young and Falgout's office. Hulitt knocked and made entry into their office, and both supervisors were inside the same office. Falgout was leaning against a bookshelf and Young was sitting at her desk. Hulitt addressed both parties, and Falgout stated that they were discussing what was for lunch and then she walked back to her office Hulitt stated to Young, "You have not gotten back in touch to schedule the job shadowing time as we discussed in the meeting." Young then stated that she has been busy.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00344

**Note:**

The Deputy Director, Marcus Davenport, allowed the unit to fall apart. He was aware of the attitudes and aggressiveness of the DD, Melanie Young, and the BD, Ashley Falgout. If Davenport had documented the in-subordination actions of Young and Falgout the problems would not have developed and continued for this length of time. Davenport failing to supervise or document the action of his employees left MDCPS in place to have been in legal trouble. Davenport admitted that there was a lot of responsibility in carrying that unit and making sure that it functioned properly.

**Findings:**

Investigator Hulitt received information from Human Resources (HR) that in the department of Youth Transition Support Services (YTSS) an employee is complaining of a possible hostile work environment. Hulitt started an investigation in reference to the complaint by meeting with Cynthia Moore-Hardy, Senior Project Administrator, Latasha Holt, Project Officer, Melanie Young, Division Director, Ashley Falgout, Bureau Director, and Marcus Davenport, Officer Director.  A total of five (5) interviews were conducted with current staff in the YTSS unit. The interviews were used to determine if the hostile work environment could be linked to poor management/supervision. It has been determined by Investigator Hulitt that there are sufficient findings to **substantiate** that Bureau Director Ashley Falgout and Division Director Melanie Young have established a hostile work environment through their vendetta, and dislike towards Moore-Hardy.

**Key Points:**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00345

Exhibit "G" at 000092

-Young telling Moore-Hardy to "sit down", after Davenport gave her permission to leave the room (The body language Young displayed in the meeting; "staring at Moore-hardy while moving her neck from side to side"; as described by Davenport)

-Young staring at Moore-Hardy in the meeting with Davenport to cause intimidation

-Young telling Davenport, Marcus, don't you do that, don't you be validating what she says when she keeps looking over there at you

- Young telling Davenport, why? You are telling me that, I can't supervise my staff

-Falgout telling Davenport, he was getting back what he had put out

- Falgout making excuses for Young's unprofessional behavior

-Door closed to Falgout and Young's office with their name and number posted on the door

## Findings:

Investigator Hulitt continued looking into the complaint of the hostile work environment. Hulitt requested timesheets for Melanie Young and Ashley Falgout. Marcus Davenport is Falgout direct supervisor, and he stated that he would thoroughly check her timesheet for discrepancies because he did not trust Falgout. With help from Davenport, we retrieved Young's timesheets from 06-01-21 to 08-31-21 (Exhibit 01), and the information received from Latasha Holt that Young was not at work on 07-21-21. Holt forwarded Davenport a conversation Falgout and she were having, via text message (Exhibit 02), on 07-21-21. Falgout texted Holt advising her, that she would be off on 07-21-21. Holt then returned a message asking Falgout if Melanie was in the office. Falgout then answered Holt's message stating that Young was not in the office, and she had a meeting. Davenport checked Falgout's calendar, and he could not find any record that Young had a scheduled meeting on the date in question. Davenport also emailed the travel unit verifying if Young had submitted any travel, which they stated there were no record of Young submitting travel (Exhibit 03). After reviewing Young's timesheet and noticed that she had indicated eight (8) hours of regular

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00346

hours worked on the 07-21-21 (Exhibit 01), I requested that Davenport retrieve the information from Young's badge access to the building. Once Hulitt received that information and noticed several discrepancies where Young would have missing dates, meaning it appeared Young was not entering the building through any of the doors (Exhibit 04). Hulitt then requested all of Young's emails from the IT department, and while searching her emails for any discrepancies, I checked in with Davenport about how things was going in YTSS. Davenport informed me that Young and Falgout had been out for possible exposure to covid. Hulitt advised Davenport to check for Young's timesheet for the pay period ending 08-31-21 to see if she try to claim regular hours worked. While waiting for the timesheet, Davenport forwarded the emails between he and Falgout with Young cc'd instructing her they are not approved to telework, and they are to use personal leave for being off work (Exhibit 05). Once Hulitt and Davenport received Young's timesheet it indicated she was claiming 16 hours of regular hours worked on 08-19-21, and 08-20-21 (Exhibit 01). On 08-13-21 Hulitt received information that he approved for Falgout to leave at 12 noon. Davenport stated that when Falgout was leaving he observed Young enter onto the elevator with Falgout. Hulitt reviewed video surveillance and noticed Young exit the build with Falgout and she did not return claiming she worked eight (8) regular hours on the 08-13-21. Hulitt reviewed footage from 12 noon to the end of her shift 4 pm. Due to the lost of trust and dishonest of these two (2) supervisors they no longer should be allowed to represent the Mississippi Department of Child Protection Services (MDCPS).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00347

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00348

Exhibit "G" at 000095




## Fw: COVID Exposure OUT OF OFFICE

Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>

Tue 08/24/21 10:43 AM

To: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>

This is the email I referenced in my previous email. See the first line. We'll see if her timesheet matches.

Marcus

---

**From:** Ashley Falgout <Ashley.Falgout@mdcps.ms.gov>
**Sent:** Thursday, August 19, 2021 10:39 AM
**To:** Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
**Cc:** Gregory Murphree <Gregory.Murphree@mdcps.ms.gov>; Melanie Young <Melanie.Young@mdcps.ms.gov>
**Subject:** COVID Exposure OUT OF OFFICE

Marcus,

Melanie and I will be out on personal leave due to a potential COVID-19 exposure and Greg will be the assigned contact person if something arises since telework is not approved for myself and Melanie.

Melanie and I have rescheduled the meetings we had planned for today and tomorrow.

I have a COVID test scheduled for this weekend, which was the earliest available. I will provide my results.

Greg will be on the call with the TRVHA tomorrow.

I was given a deadline of Friday August 20, 2021, to provide the spreadsheets for the Pandemic Funds transfers and approvals. They are attached to this email so we can discuss when I return to the office.

The Weekly Pandemic Report and Appraisal Completion numbers will be sent to you by the Friday at noon deadline.

I have notified the YTSS team of our potential exposure resulting in our absence from work and that Greg is the contact person in our absence.

Thanks!!


**Ashley Falgout,**
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4874
MOBILE: (769) 798-9077

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00349

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Ashley Falgout,**
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4874

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499
MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00350

Exhibit "G" at 000097



## Fw: COVID-19 Exposure

Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Tue 08/24/21 10:47 AM
To: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>

See below for the request and my response.

From: Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Sent: Thursday, August 19, 2021 8:22 AM
To: Ashley Falgout <Ashley.Falgout@mdcps.ms.gov>
Subject: Re: COVID-19 Exposure

Thank you! I will not be approving telework at this time. You and Melanie will need to use your personal leave for every day you all are out of the office, notifying me daily. Please identify someone to take the lead while you and Melanie are out of the office on personal leave. You will need to notify your staff, temp staff, and me of who you've identified.

You mentioned in our phone conversation that you could not get tested until possibly the weekend. Please send me a couple of those results when you receive them, and we can re-evaluate the situation at that time.

Marcus

From: Ashley Falgout <Ashley.Falgout@mdcps.ms.gov>
Sent: Thursday, August 19, 2021 8:11 AM
To: Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Subject: Re: COVID-19 Exposure

I was informed via phone call.

Ashley Falgout
Director, Youth Transition Support Services
MDCPS
769-798-9077

From: Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Sent: Thursday, August 19, 2021 8:09:15 AM
To: Ashley Falgout <Ashley.Falgout@mdcps.ms.gov>
Subject: Re: COVID-19 Exposure

Good morning, Ashley,

How were you notified of this potential exposure? Can you provide copies of any emails, text messages, etc. that may have been exchanged regarding this potential exposure?

Marcus

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00351



**From:** Ashley Falgout <Ashley.Falgout@mdcps.ms.gov>
**Sent:** Thursday, August 19, 2021 7:32 AM
**To:** Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
**Subject:** COVID-19 Exposure

Marcus,
I was exposed to COVID-19 during a meeting on Tuesday, August 17, 2021. PPE was worn at the beginning of the meeting, but was removed.I am not vaccinated and cannot receive the vaccination. Melanie was in the office with me all day yesterday creating potential exposure as well.

Please advise. Thank you!

Ashley Falgout
Director, Youth Transition Support Services
MDCPS
769-798-9077


Ashley Falgout,
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4874
MOBILE: (769) 798-9077

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


Ashley Falgout,
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4874

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


Marcus Davenport,
Deputy Director of Permanency CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00352

Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499
MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Ashley Falgout,**
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4874
MOBILE: (769) 798-9077

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Ashley Falgout,**
**Bureau Director**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00353

Exhibit "G" at 000100

DIRECT: (601) 359-4874

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499
MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00354

Exhibit "G" at 000101

'On Aug 19, 2021, at 10:44 AM, Ashley Falgout
<Ashley.Falgout@mdcps.ms.gov> wrote:

Hello Team!!!

I have had a possible COVID-19 exposure and in
turn exposed Melanie since we are in the same
office. Marcus did not approve for either of us to
telework, so we will be out on personal leave today
and tomorrow while I wait to be tested over the
weekend.

In our absence, Greg will be your contact person if
anything comes up.

Have a great rest of the week!!!

**Ashley Falgout,**
**Bureau Director**
Mississippi Department of Child Protection
Services
750 North State Street

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00355

Exhibit "G" at 000102



DocuSign Envelope ID: 467140B38-37C7-44CB-A7E6-024889305CDA

# TIME RECORD CARD

Melanie Young

Pay Period Ending June 15, 2021

SS# XXX-XX-5213   PIN 1056   Agency 0662   Location State Office

| Leave Codes | 1 16 | 2 17 | 3 18 | 5 20 | 6 21 | 22 | 8 23 | 9 24 | 25 | 11 26 | 12 27 | 13 28 | 14 29 | 15 30 | 31 | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RGSH | 8 | 8 | 8 | | | | 8 | 8 | | 8 | | | 8 | 8 | | 88.00 |
| ERLV | | | | | | | | | | | | | | | | 0.00 |
| LMED | | | | | | | | | | | | | | | | 0.00 |
| EXTWK | | | | | | | | | | | | | | | | 0.00 |
| HOLIDAY | | | | | | | | | | | | | | | | 0.00 |
| HOLFL | | | | | | | | | | | | | | | | 0.00 |
| HOLFT | | | | | | | | | | | | | | | | 0.00 |
| CPTFL | | | | | | | | | | | | | | | | 0.00 |
| CPTM | | | | | | | | | | | | | | | | 0.00 |
| Grant OJR | | | | | | | | | | | | | | | | 0.00 |
| odes | | | | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | | | | 88.00 |
| Daily Hours | 8.00 | 8.00 | 8.00 | 0.00 | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 0.00 | 8.00 | 8.00 | 0.00 | |

EMPLOYEE'S SIGNATURE

SUPERVISOR'S SIGNATURE

DocuSigned by: [signature]

DATE 6/14/2021 | 9:56 AM CDT

HOURS WORKED

CODES          EXPLANATION
RGSH           REGULAR HOURS WORKED
EEGSH          ADDITIONAL HOURS WORKED
EXTWK          HOURS WORKED ON HOLIDAY
HOLFL          EXTRA HOURS WORKED FOR
KATRA          HURRICANE KATRINA

LEAVE TAKEN

CODES          EXPLANATION
PERLV          PERSONAL LEAVE
MJMED          MAJOR MEDICAL OR SICK LEAVE
UUWOP          LEAVE WITHOUT PAY
JURY           JURY LEAVE
CPTFL          FLSA COMP LEAVE
CPTM           NON FLSA COMP LEAVE
ADMIN          ADMINISTRATIVE LEAVE
MLIT           MILITARY LEAVE
HOLID          HOLIDAY
HOLFT          FLOATING HOLIDAY
DONLV          DONATED LEAVE
UMLWP          MILITARY LEAVE WITHOUT PAY

FMLA

CODES          EXPLANATION
PLFAM          PERSONAL LEAVE
MLFAM          MEDICAL LEAVE
UFMLA          LEAVE WITHOUT PAY
DNFAM          DONATED / FMLA LEAVE

BLOOD / DONOR

CODES          EXPLANATION
DLORG          ORGAN DONOR LEAVE
DLBMW          BONE MARROW DONOR LEAVE
DLBLD          BLOOD DONOR LEAVE
DLBPT          BLOOD PLATELETS DONOR LEAVE
DLBMO          FMLA ORGAN DONOR LEAVE
DLBMF          FMLA BONE MARROW DONOR LEAVE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00356



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00357

105



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00358

Exhibit "G" at 000105



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00359



DocuSign Envelope ID: 4E8C1EE4-7C18-4569-A650-D9EA9E7B491B

## TIME RECORD CARD

Pay Period Ending 08/15/2021

Melanie Young

SS # XXX-XX-5213    PIN 1056    Agency 0662    Location State Office

| Leave Codes | 1 16 | 2 17 | 3 18 | 4 19 | 5 20 | 6 21 | 7 22 | 8 23 | 9 24 | 10 25 | 11 26 | 12 27 | 13 28 | 14 29 | 15 30 | 31 | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REGSH | | | | | | | | | | | | | | | | | 72.00 |
| BERLV | | | | | | | | | | | | | | | | | 0.00 |
| MLMED | | | | | | | | | | | | | | | | | 0.00 |
| EXTWK | | | | | | | | | | | | | | | | | 0.00 |
| HOLFL | | | | | | | | | | | | | | | | | 0.00 |
| HOLFT | | | | | | | | | | | | | | | | | 0.00 |
| OPTFL | | | | | | | | | | | | | | | | | 0.00 |
| OPTIM | | 8 | | | | | | | | | | | | | | | 8.00 |
| Grant O/R | | | | | | | | | | | | | | | | | 0.00 |
| Codes | | | | | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | | | | | 0.00 |
| | | | | | | | | | | | | | | | | | 0.00 |
| Daily Hours | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 80.00 |

EMPLOYEE'S SIGNATURE  _Melanie Young_ (DocuSigned by)    SUPERVISOR'S SIGNATURE

DATE

**HOURS WORKED**
CODES    EXPLANATION
REGSH    REGULAR HOURS WORKED
REGSH    ADDITIONAL HOURS WORKED
EXTWK    HOURS WORKED ON HOLIDAY
HOLFL    EXTRA HOURS WORKED FOR
KATRX    HURRICANE KATRINA

**LEAVE TAKEN**
CODES    EXPLANATION
PERLV    PERSONAL LEAVE
NLMED    MAJOR MEDICAL OR SICK LEAVE
LLWOP    LEAVE WITHOUT PAY
JURY     JURY LEAVE
OPTFL    FLSA COMP LEAVE
OPTIM    NON FLSA COMP LEAVE
ADMIN    ADMINISTRATIVE LEAVE
MLIT     MILITARY LEAVE
HOLID    HOLIDAY
HOLFT    FLOATING HOLIDAY
CONLV    DONATED LEAVE
LMLWP    MILITARY LEAVE WITHOUT PAY

**FMLA**
CODES    EXPLANATION
PLFAM    PERSONAL LEAVE
MLFAM    MEDICAL LEAVE
UPMLA    LEAVE WITHOUT PAY
DHFAM    DONATED / FMLA LEAVE

**BLOOD / DONOR**
CODES    EXPLANATION
DLORG    ORGAN DONOR LEAVE
DLBMW    BONE MARROW DONOR LEAVE
DLBLD    BLOOD DONOR LEAVE
DLBPT    BLOOD PLATELETS DONOR LEAVE
DLORF    FMLA ORGAN DONOR LEAVE
DLBMF    FMLA BONE MARROW DONOR LEAVE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00360



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    MDCPS 00361



TIME RECORD CARD

DocuSign Envelope ID: 67818577-02TD-4522-8BF7-AEF278J47E0C

Melanie Young

Pay Period Ending 08/31/2021

SS # XXX-XX-5213   PIN 1056   Agency 0662   Location   State office

EMPLOYEE'S SIGNATURE   SUPERVISOR'S SIGNATURE   DATE

GRAND TOTAL 96.00

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00362

110



Was out because she was exposed to Covid

**TIME RECORD CARD**

Melanie Young

DocuSign Envelope ID: 67B18577-027D-4522-8BF7-AEF27BA87E0C

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00363

Exhibit "G" at 000110



Card Activity History Report

Exhibit 04

| Date/Time | Reader Name | Name | Department | Event Type |
|---|---|---|---|---|
| 6/1/2021 7:16:51AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/2/2021 7:13:56AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/3/2021 7:16:19AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/4/2021 7:18:51AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/8/2021 7:18:38AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/10/2021 7:17:54AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/14/2021 7:11:11AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/14/2021 7:11:43AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/15/2021 7:01:16AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/15/2021 6:57:28AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/16/2021 7:01:42AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/17/2021 7:04:52AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/24/2021 7:08:13AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/24/2021 7:07:02AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/25/2021 6:59:01AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/28/2021 7:03:58AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/29/2021 7:02:55AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/29/2021 6:59:47AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/30/2021 11:14:50AM | 1st Floor Lobby Employee Door (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/30/2021 11:15:00AM | 1st Floor Lobby Employee Door (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/30/2021 11:17:08AM | 1st Floor Lobby Employee Door (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 6/30/2021 11:17:08AM | 1st Floor Lobby Employee Door (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/1/2021 7:01:07AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/2/2021 7:02:39AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/6/2021 7:06:49AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/7/2021 7:01:02AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/8/2021 7:01:02AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/9/2021 7:01:42AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/12/2021 7:01:57AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/13/2021 7:47:16PM | 2nd Floor Double Metal Patio (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/14/2021 7:09:34AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/14/2021 3:46:42PM | 2nd Floor Gym (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/15/2021 7:04:57AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/16/2021 6:57:55AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/19/2021 6:57:12AM | 2nd Floor Gym (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/19/2021 3:32:35PM | 2nd Floor Double Metal Patio (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 7/20/2021 7:01:02AM | 2nd Floor Double Metal Patio (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |

8/11/2021 10:05:26AM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00364



Card Activity History Report

| Date/Time | Reader Name | Name | Department | Event Type |
|---|---|---|---|---|

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER MDCPS 00365



## Card Activity History Report

8/16/2021 2:28:56PM

| Date/Time | Reader Name | Name | Department | Event Type |
|---|---|---|---|---|
| 8/11/2021 6:59:10AM | 2nd Floor Double Meal Pass (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 8/11/2021 6:59:58AM | 2nd Floor Double Meal Pass (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 8/11/2021 3:31:43PM | 2nd Floor Double Meal Pass (Out) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 8/12/2021 6:59:31AM | 2nd Floor Double Meal Pass (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 8/12/2021 6:59:32AM | 2nd Floor Double Meal Pass (In) | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |
| 8/12/2021 | 2nd Floor Counter | YOUNG, MELANIE (Card 1) | 00 MDCPS | Valid Access |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00366

114



## Re: Melanie Young

Karley Bobbett <Karley.Bobbett@mdhs.ms.gov>
Mon 08/16/21 10:18 AM
To: Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
Cc: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>

Ok. Thanks, Marcus.

Karley Bobbett

---

**From:** Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
**Sent:** Monday, August 16, 2021 9:30 AM
**To:** Karley Bobbett <Karley.Bobbett@mdhs.ms.gov>
**Cc:** Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>
**Subject:** Re: Melanie Young

Good morning Karley,

Thank you for checking for me! No, it is very likely that you wouldn't have any. I just wanted to double-check.

Marcus

---

**From:** Karley Bobbett <Karley.Bobbett@mdhs.ms.gov>
**Sent:** Monday, August 16, 2021 9:27 AM
**To:** Marcus Davenport <Marcus.Davenport@mdcps.ms.gov>
**Subject:** Melanie Young

Good Morning Marcus,

The travel unit doesn't have any records in spahrs or our email of Melanie submitting travel. Are we supposed to? Please advise.

Thanks,

Karley Bobbett

**Karley Bobbett**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00367

Exhibit "G" at 000114

CONFIDENTIALITY STATEMENT: The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499
MOBILE: (601) 906-2370

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

**Marcus Davenport,**
**Deputy Director of Permanency**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT: (601) 359-4499

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

WARNING: This email originated outside of MDHS.
DO NOT CLICK links or attachments unless you recognize the sender and know the content is safe.

**Karley Bobbett**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00368

Exhibit "G" at 000115



Exhibit 02

10:51

New iMessage          Cancel

To: Ashley?

— Blue is Holt
— White is Falgout

Wed, Jul 21, 10:47 AM

Hey! I'll be out today, just an FYI!   — Ashley Falgout

Yes ma'am   — Latasha Holt
Is Mel here?   — Latasha Holt

I don't think so, she has a meeting   — Ashley Falgout

Ok I don't wanna bother y'all if you are not here 😭

I know if I need you I can text you but if I can wait I will

1 Reply

iMessage

q w e r t y u i o p
a s d f g h j k l
z x c v b n m
123   space   @   .   return

11:17

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00369



**New iMessage**                    Cancel

To: **Ashley**

I know if I need you I can text you but if I can wait I will

1 Reply

Make sure when you are verifying, that the youth left care after age 14 and that they are not 27.

I know if I need you I can text you but if I can wait I will

That is fine, but of course you can always call!

That got by me but I am on it

YOU ARE DOING AN AWESOME JOB!!!!!!!

Thank you but I hate to make a mistake 🙈

Well, I mean you are human

iMessage

**Jason Hulitt,**
**Director, Human Resources**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00370

118

MAIN: (601) 359-4368
DIRECT:
MOBILE: (769) 245-6277

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov


**Jason Hulitt,**
**Director, Human Resources**
Mississippi Department of Child Protection Services
750 North State Street
Jackson, Mississippi 39202

MAIN: (601) 359-4368
DIRECT:

Child Abuse & Neglect Hotline: 1-800-222-8000
www.mdcps.ms.gov

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00371

Exhibit "G" at 000118

(No subject)

Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>
Mon 08/16/21 3:03 PM
To: Jason Hulitt <Jason.Hulitt@mdcps.ms.gov>

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER MDCPS 00372