**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **MELANIE YOUNG AND ASHLEY FALGOUT** | **PLAINTIFFS** |
| **v.** | **CIVIL ACTION NO.: 3:24-cv-615-CWR-ASH** |
| **MISSISSIPPI DEPARTMENT OF CHILD PROTECTION SERVICES** | **DEFENDANT** |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

**I.    Introduction**

Plaintiffs Melanie Young and Ashley Falgout ("Plaintiffs"), by and through counsel, submit

this Memorandum Brief in opposition to Defendant Mississippi Department of Child Protection

Services' ("MDCPS") or ("Defendant") Motion for Summary Judgment, and would show onto

the Court the following:

**II.    Background Facts**

Plaintiffs Young and Falgout claim that they were terminated in retaliation for reporting

serious legal violations within the agency. According to Plaintiffs, they discovered two major

problems. The first is that MDCPS staff members were improperly assuming the role of special

educational decision makers for children under their supervision, specifically signing off as a

parent on Individualized Education Plans ("IEPs"), which violates federal law under the

Individuals with Disabilities Education Act ("IDEA"). *See* Exhibit "A", Affidavit of Ashley

Falgout, at 2; *See* Exhibit "B", Affidavit of Melanie Young, at 2. Second, the agency was also

submitting falsified IEP data in connection with federal Chafee Grant funding. *See* Exhibit "A"

at 3; *See* Exhibit "B" at 2.

**A.  IEDA, The Chafee Program, and Fiscal Funding**

The central issue here concerns IEPs and their corresponding legal document, the IEP, which is a legally binding document that is developed for each public-school child who requires special education services mandated by the IDEA. The public agency proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability cannot legally conduct an evaluation or implement an IEP without obtaining informed parental consent. *See* 34 CFR §300.300(b)(1). The Federal Regulations also require agencies to ensure that parents are present or are allowed to participate in each IEP Team meeting. *See* 34 CFR §300.322.

The IDEA states that biological and legal parents of children are in custody of a State Child Welfare Agency and classified as wards of the state retain their special education decision maker rights unless it is determined by the Court to not be in the child's best interest or if parental rights are terminated. *See* 20 U.S.C. §1415(b)(2); *See* 34 C.F.R. §§ 300.30, 300.519. Agencies are required to make all reasonable efforts to ensure biological parents/legal parents are afforded every opportunity to exercise their rights by participating in the development, review, revision, and implementation of the child's IEP. *See* 42 U.S.C. §671(a)(15); 34 CFR §§300.322, 300.30(b)(2). Federal regulations are precise in defining who may serve as the special education decision-maker (the IDEA parent) for children in state custody. This precision is intended to safeguard the rights of the biological/legal parents as well as the child's best interests. To protect this right, federal regulations are specific about who may serve as a "parent" for IEP purposes, particularly for a child who is a "ward of the State." *See* 34 CFR §300.45. The legal definition of "parent" explicitly prohibits the State from acting as the parent for the purpose of making educational decisions if the child is a ward of the state. *See* 34 CFR §300.30. In these situations, the agency must appoint a surrogate parent. *See* 34 CFR §300.519. A critical component of this safeguard is the prevention of conflicts of interest, as federal regulations explicitly prohibit an

employee of any agency involved in the education or care of the child from serving as a surrogate parent. *See* 34 CFR §300.519(d)(2)(i).

The John H. Chafee Foster Care Program for Successful Transition to Adulthood ("Chafee Grant") provides funding to promote and support youth who have experienced foster care at age 14 or older in their transition to adulthood. *See* Exhibit "I", Child and Family Services Plan Annual Progress Service Report, at 122. This program is funded through formula grants awarded to State Child Welfare Agencies to support a successful transition to adulthood.[1] MDCPS' Chafee Grant is managed by and administered through the Youth Transition Support Services ("YTSS"). *See* Exhibit "I" at 123. Within MDCPS, the YTSS unit employs an Education Director and Education Liaisons who are responsible for the educational stability of children in custody. *Id.* at 124. These liaisons are designated as the agency's subject matter experts and are explicitly tasked to participate in the development of an education plan, review of education records, and the revisions of IEPs of children placed in Foster Care and to provide agency-wide educational services training, including the roles and responsibilities of MDCPS as it relates to IEPs for youth in foster care as outlined specifically in the IDEA. *Id.* at 125.

ACF awards funds to MDCPS through a structured grant process under Title IV-E and the Chafee Grant. *See* Exhibit "C", Letter to Commissioner Sanders. This exchange creates a direct legal contract between the Federal Government and MDCPS. Under Title IV-E Section 477 of the Social Security Act, MDCPS receives federal money directly and is solely accountable to the U.S. Department of Health and Human Services' Administration for Children and Families. *See* Exhibit "D," Chafee Foster Care Program Supplemental Terms and

---

[1] Admin. for Child. & Fams., *John H. Chafee Foster Care Program for Successful Transition to Adulthood*, https://acf.gov/cb/grant-funding/john-h-chafee-foster-care-independence-program (last updated Sept. 30, 2025).

Conditions, at Sec. 1; Exhibit "I" at 130. When MDCPS submits its CFSP, it includes long-term

goals and objectives and an Annual Progress and Service Report ("APSR") that details

accomplishments and future activities aligned with the submitted and approved CFSP. *See*

Exhibit "D" at Sec. 11.

One integral part of this plan is the Adoption and Foster Care Analysis and Reporting

System ("AFCARS") which collects case-level child-specific information on all children that are

served by the state's foster care system and those who have been adopted with Title IV-E

involvement.[2] This data is compiled and sent to ACF as evidence of compliance with the Title

VI-E and Chafee Grant requirements as well as the implementation of services outlined in the

CFSP. *See* Exhibit "D" at Sec. 11. MDCPS is required to report if each child has an IEP, if the

child is receiving any sort of special education services, and the qualifying diagnosis as a

condition of their funding. *See* 85 FR 28410; 45 CFR §1355.44 (AFCARS data elements #48-49,

56-61). MDCPS is also required to submit case level (child specific) data files to the National

Youth in Transition Database ("NYTD") simi-annually to track the services provided to youth

through the John H. Chafee Grant and their outcomes after leaving foster care, which also

requires MDCPS to report if each child served under the Chafee Grant has an IEP. *See* Exhibit

"D" at Sec. 12; 45 CFR §1356.83 (g)(19). The agency confirms that it submitted its NYTD files

for the 2019, 2020, and 2021 reporting periods and that this data is presented to agency

leadership and community partners. Exhibit "I" at 135. MDCPS must also submit an annual SF-

425 Federal Financial Report to account for all expenditures of the Title IV-E grants awarded.

Exhibit "D" at Sec. 8. Ultimately, the submission of any false documentation in connection with

---

[2] Admin. for Child. & Fams., CHILDREN'S BUREAU, *Adoption & Foster Care Analysis & Reporting System (AFCARS)*, https://acf.gov/cb/research-data-technology/statistics-research/afcars, (last visited Oct. 20, 2025).

a federal award constitutes a violation of federal grant policies, and such is the case here with Defendant's submissions of IEPs within its AFCARS report and NYTD data. *Id.* at Sec. 11.

The general terms and conditions for the Chafee Grant establish rules against fraud and outline consequences for non-compliance. Any agency receiving federal funds must comply with these regulations. Grant recipients such as MDCPS are legally required to disclose any violations of Federal criminal law involving fraud, bribery, or gratuities that could affect federal funds awards. *See* Exhibit "E", *General Terms and Conditions for Mandatory Grant Programs*, at 3b. Moreover, failure to comply with the terms can lead to a range of penalties, including disallowance of costs, restricted access to funds, withholding of future awards, and even government-wide debarment and suspension from receiving any federal assistance. *Id.* at p. 1 & Sec. 3b.

### B. Plaintiffs' Background Facts

Plaintiffs are former employees of Defendant MDCPS. Falgout was hired on July 1, 2009, as the Program Administrator for the Chafee Grant, and was promoted to Division Director II in August 2015 and later to Bureau Director II on October 1, 2020, by Deputy Director of Permanency Marcus Davenport.  *See* Exhibit "A" at 1. During Falgout's employment with MDCPS, she was responsible for the overseeing of the development and implementation of MDCPS' NYTD reporting system and co-developed MDCPS' Chafee Grant program known as YTSS. *Id.* at 2. When Falgout was promoted to Bureau Director II, Young was hired as a Special Projects Officer IV / Education Liaison by Marcus Davenport. *See* Exhibit "B" at 1. In April of 2021, Young was promoted to Division Director II, Education Director by Davenport and she took on responsibilities embedded within her former and new position, and Falgout became her immediate supervisor. *Id.* at 3. In her role as Education Director, Young was responsible for

ensuring the educational stability for youth in foster care as required by Title IV-E and the Chafee Grant as outlined in MDCPS' CFSP. *See* Exhibit "I" at 124. In October of 2020, Davenport initiated a personal relationship with Falgout outside of the workplace setting. Exhibit "A" at 2.

In early 2021, Young discovered that MDCPS officials were routinely signing IEPs as the Special Education Decision Maker/Surrogate Parent for children in foster care. *See* Exhibit "B" at 2; *See* Exhibit "A" at 2. This practice violates the federal IDEA, which prohibits agencies involved in a child's care from serving as the legal parent for special education purposes. *See* 20 U.S.C. §1415(b)(2)(A). To confirm her understanding, Young emailed the agency's legal counsel and asked whether MDCPS could legally serve as the IDEA parent. *See* Exhibit "B" at 3; *See* Exhibit "A" at 4. Ms. Kimberly Gore, who served as the Strategy and Policy Attorney, replied to Young's inquiry and told her "No". *See* Exhibit "B" at 3; *See* Exhibit "A" at 4. Moreover, this illegal practice impacts children who receive and are in need of special education services across the state. In fact, MDCPS' policy to this day remains non-compliant with the IDEA. *See* Exhibit "F" Foster Care Policy 2025, at p. 80.

Beginning February of 2021, Plaintiffs repeatedly attempted to address these violations with Davenport. *See* Exhibit "B" at 4; *See* Exhibit "A" at 5. These efforts culminated into a meeting on June 3, 2021, in which Plaintiffs presented Davenport with a document entitled "YTSS Education Plan" to address the policy and practice concerns identified by Young. Exhibit "B" at 4; Exhibit "A" at 5. The plan explicitly stated that MDCPS employees cannot serve in the role as parents for IEP purposes per federal law. Exhibit "B" at 4; Exhibit "A" at 5. Additionally, the plan stated that until the issue is addressed, the validity of each child/youth's IEP is compromised, the services they are to receive may be interrupted, MDCPS employees' ability to

effectively advocate on behalf of the child/youth is diminished, and the Agency is positioned to

experience legal repercussions. Exhibit "B" at 4; Exhibit "A" at 5. In addition to this plan,

Plaintiffs also provided an extensive list of additional ongoing federal violations, including:

- Not enrolling children/youth in school in accordance with federal and state compulsory school laws
- Not creating educational plans for children/ youth as required by the Every Student Succeeds Act ("ESSA"), Fostering Connections Act, Title IV-E, and the Chafee Grant
- Not creating Transitional Living Plans for youth age 17 and older per Title IV-E and the Chafee Grant
- Not providing housing support for youth age 18 and older per Title IV-E and the Chafee Grant
- MDCPS employees signing IEPs for youth in foster care as the Special Education Decision Maker/Surrogate and denying them the legal protections for students with disabilities under IDEA
- Not coordinating with MDE or the local school districts to ensure the educational stability mandated by ESSA and Fostering Connections, as well as Title IV-E and the Chafee Grant.
- Not allowing youth to remain in their school of origin as ordered by ESSA
- Not allowing biological parents/guardians to participate in the special educational decisions for youth in foster care as stated in IDEA and ESSA
- Not collecting educational data required by ACF, Title IV-E, NYTD and the Chafee Grant
- Reporting fraudulent data to the federal government surrounding services provided under the Chafee Grant
- Denying children and youth FAPE as guaranteed by IDEA

See Exhibit "B" at 5-6; See Exhibit "A" at 5-6. Upon this submission of Plaintiffs concerns,

Davenport was dismissive and explicitly said that "education isn't a priority for me" and

instructed Plaintiffs to "continue doing like we have always done, because there haven't been

any problems – per Kimberly Wheaton." See Exhibit "B" at 6; See Exhibit "A" at 6-7. When

Plaintiffs refused to knowingly participate in or instruct other MDCPS employees to conduct

illegal practices and requested Davenport's directive to be reduced to writing, he denied the

request and stated to Young that she did not have the agency's best interest in mind. See Exhibit

"B" at 6; See Exhibit "A" at 7. Davenport then ordered Young to immediately stop all

collaborative work with the Mississippi Department of Education ("MDE") and the American

Bar Association ("ABA") as required by ESSA and the Fostering Connections Act, effectively preventing her from performing essential job functions. *See* Exhibit "B" at 7; *See* Exhibit "A" at 7.

Following the confrontation, Davenport allegedly initiated a campaign of retaliation against Plaintiffs. He abruptly ended his personal relationship with Falgout and began interfering with her work by bypassing her to question her staff directly about routine work, which undermined her authority as the Bureau Director of YTSS. *See* Exhibit "A" at 8; *See* Exhibit "B" at 8. Davenport contacted community partners as the representative for YTSS without Falgout's knowledge, and he also began negotiating direct service contracts to be paid out of the Chafee Grant budget without Falgout or Young's knowledge, consent, or input. *See* Exhibit "A" at 8-9; *See* Exhibit "B" at 8.  The situation continued to escalate when Cynthia Moore-Hardy, the former Director of Education who was reassigned to federal reporting under Young by Davenport, filed a hostile work environment complaint against Young in July 2021. *See* Exhibit "A" at 10; *See* Exhibit "B" at 10. Neither Plaintiff knew about this hostile work environment investigation until depositions in this matter. *See* Exhibit "A" at 10; *See* Exhibit "B" at 10. Notably, Davenport had previously supported terminating Moore-Hardy for performance issues and requested Young to compile and submit documentation of Moore-Hardy's insubordination and poor work performance to him. *See* Exhibit "A" at 10; *See* Exhibit "B" at 9. However, in July 2021, Davenport shifted his position. In a meeting called by Davenport to allow Moore-Hardy to address her concerns with Falgout and Young, Davenport berated Young for attempting to defend herself, telling her that as a Division Director she was "not allowed to respond." Exhibit "B" at 10; Exhibit "A" at 10.

Subsequently, a new HR investigator, Jason Hulitt, conducted what Plaintiffs describe as interrogating interviews with Falgout and Young, disguising the interview as a routine employee engagement interview. *See* Exhibit "A" at 11; *See* Exhibit "B" at 10.  Hulitt questioned Plaintiffs qualifications, relationships outside of work with MDCPS staff, their relationships with the agency, and what their jobs entailed. Both Plaintiffs remained unaware that an official investigation into the hostile work environment was underway until their depositions in this matter. Exhibit "A" at 11; Exhibit "B" at 10-11.

The firing of Young and Falgout by MDCPS was not about a legitimate workplace violation; rather, it was the end result of a rushed, manufactured investigation used as cover to retaliate against two employees who had raised concerns about serious violations of the federal IDEA by allowing MDCPS staff to sign IEPs for youth in foster care as the Special Education Decision Maker/ Surrogate Parent, putting MDCPS at risk of losing federal grant money. The way the falsified timecard investigation commenced is suspicious on its own. It did not begin with someone reporting time theft; instead, it grew out of a separate hostile work environment complaint filed in July 2021 by Cynthia Moore-Hardy, an employee Young had job performance problems with and had been told to document said performance problems. *See* Exhibit "B" at 9.

Both Young and Falgout were responsible for the statewide implementation and supervision of services under Title IV-E and the Chafee Grant. *See* Exhibit "A" at 2; *See* Exhibit "B" at 3. Falgout supervised 17 staff members located across the state of Mississippi, and Young was serving dual roles as Education Director and Education Liaison. *See* Exhibit "A" at 1; *See* Exhibit "B" at 3. Moreover, such supervision often took Plaintiffs away from their desks for staff meetings, IEP meetings, MDCPS county staff training, community partner meetings, court, staff supervision, data meetings, contact provider meetings, federal reporter meetings, service

provider recruitment amongst many other things. *See* Exhibit "B" at 2; *See* Exhibit "A" at 1-2. In addition, to maintain confidentiality requirements under IDEA, HIPPA, and Title IV-E, Plaintiffs frequently kept their office door closed and locked or had to conduct the calls out of office in conference rooms. Exhibit "B" at 12; Exhibit "A" at 12.

Looking at the timeline, the investigation concerning absences during September 1-3 2021, was far from thorough and was completed without reviewing all evidence. On the morning of September 14, 2021, Davenport called Falgout into his office to inquire about her timecard and calendar discrepancies for September 1-3 2021. *See* Exhibit "A" at 13. Falgout told Davenport that she was in the office on September 1, worked remotely on September 2 because the scheduled meeting in Tupelo on that day had been cancelled, and was present in her office on September 3. *See* Exhibit "A" at 13. At the conclusion of the meeting, Davenport stated that he was going to look at the cameras to verify Falgout's statement.

The Defendant alleged timecard discrepancies involving Plaintiffs Falgout and Young, yet Hulitt's deposition indicates there was no camera footage to support contentions of their absences. *See* Exhibit "G" at 23. Plaintiffs contend that the only meeting they each had with Hulitt was the employee engagement interview, and both assert that Hulitt never questioned them directly about the specific timecard issues, indicating the investigation was rushed and not thorough. *See* Exhibit "A" at 13; Exhibit "B" at 12; Exhibit "G" at 22. Davenport likewise did not question Young about her timecard discrepancies. See Exhibit "B" at 12.

During the investigation, Hulitt called two staff members, Natasha Ivory and Virginia Lambert, to verify a meeting in Tupelo that Falgout had previously told Davenport had not occurred. *See* Exhibit "A" at 13; Exhibit "G" at 28. Both Ivory and Lambert initially confirmed the meeting had taken place under the direction of Falgout; however, an email sent by Ivory

before Plaintiffs were terminated admitted that Ivory's direct supervisor, Greg Murphree, had instructed her to lie if anyone asked about the September 2, 2021 meeting. *See* Exhibit "H" at 1-3.

The timeline of September 14, 2021, reveals critical contradictions in Defendant's actions. That morning, Hulitt gave Rushton, the Deputy Commissioner of Human Capital, a verbal briefing indicating that Falgout and Young had attempted to have other staff members lie for them about their whereabouts. [Doc. 30-4 at 15]. Based solely on this verbal report, which was given to Rushton by Hulitt long before Hulitt's investigation was formally written or finalized, Rushton recommended firing both Young and Falgout based on the evidence. *Id*. at 16. Around 11:00 a.m., right before Plaintiffs were terminated, Ivory emailed Davenport retracting her statement and admitting that Murphree told her to lie about Falgout's whereabouts, which Davenport forwarded to Hulitt a minute later. *See* Exhibit "H" at 1. Despite this retraction, Rushton was not briefed on this retraction by Hulitt, and Plaintiffs were terminated around noon and such termination was entered into Defendant's system around 3:00 p.m. *See* Exhibit "B" at p. 11; Exhibit "A" at p. 12; [30-10 at 3]; [30-11 at 3]; *See* Exhibit "H" at 6-7. Later at 4:38 p.m., Lambert also admitted in an email to Davenport and Hulitt that she had lied and stated she did not speak with Falgout about her whereabouts that day, further indicating that Falgout did not instruct her to lie about her whereabouts. *Id*. at 3. The metadata shows the final report was submitted long after Plaintiffs were terminated on September 20, 2021, and subsequently backdated to appear as if completed the day of termination, which is intentionally misleading. [Doc. 30-7 at 33-53]; *See also* Exhibit "L," Metadata of Hulitt's Investigation Report.

Defendant's stated reasons for termination directly contradict the evidence. In Rushton's 30(b)(6) deposition, Defendant claimed it terminated Plaintiffs because Ivory and Lambert

confirmed that Plaintiffs had lied about their whereabouts. [Doc. 30-4 at 14]. However, when Plaintiffs were terminated, Defendant was already aware that Ivory had admitted Murphree told her to lie about Falgout being in Tupelo, contradicting Lambert's non-retracted statement at the time. *See generally* Exhibit "H;" [Doc. 30-4 at 14-15]. This reveals that Murphree, notably not Falgout or Young, had instructed Ivory to lie, directly contradicting Rushton's deposition testimony that the reason for Plaintiffs termination was that they had instructed other staff to lie for them. [Doc. 30-4 at 15]. Both Young and Falgout were terminated without ever getting a chance to address the specific allegations or present their own evidence to Hulitt. [Doc. 30-4 at 15-16]; Exhibit "G" at 22.

Young and Falgout maintain their time was recorded correctly. Young states that for the days in question, two had been approved for remote work, and she was physically in the office on the third day, making work calls and attending meetings. *See* Exhibit "B" at 12. Falgout claims she worked remotely the day she canceled her Tupelo meeting and was in the state office on the other two days she was alleged to be absent. *See* Exhibit "A" at 13. Hulitt admitted in his deposition that his final report contained no physical evidence proving Young was absent on any of the days, basing his conclusion only on a calendar entry for personal leave that Young had not actually taken. *See* Exhibit "G" at 13-14. He also acknowledged a major typo that mistakenly applied dates related to Falgout's absence to Young. *Id*. at 14. Moreover, both Falgout and Young received their full salaried pay for the September 1-15, 2021 pay period as well as payment for their unused personal leave. *See* Exhibit "A" at 13; Exhibit "B" at 13. This flawed investigation, carried out in a matter of hours and lacking basic fairness, was pretext for illegal retaliation.

### III.    Legal Standard

District courts may properly grant summary judgment only if, viewing the facts in the light most favorable to the non-movant, the movant shows that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When reviewing all of the evidence in the record, the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555, 110 S.Ct. 1331 (1990); *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.* at 255. In essence, the inquiry under summary judgment is the same as a judgment as a matter of law: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Liberty Lobby,* 477 U.S. at 251-52.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. *Hampton v. Gannett Co.*, Inc., 296 F.Supp.2d 716, 719 (S.D. Miss., 2003). It is improper for the district court to "resolve factual disputes by weighing conflicting evidence… since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is also improper where the Court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc*., 305 F.2d 647, 651 (5th Cir. 1962).

## IV.    Argument

Genuine issues of material fact exist as to each of Plaintiffs' claims, precluding summary judgment under Federal Rule of Civil Procedure 56.

### A. False Claims Act

In general, the False Claims Act prohibits: (1) knowingly present[ing], or caus[ing] to be presented, to an office or employee of the Unites States Government… a false or fraudulent claim for payment or approval; (2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. §3729(a).  In order to establish a violation of the False Claims Act, a plaintiff must show by preponderance of the evidence that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or forfeit moneys due (i.e. that involved a claim). *U.S., ex rel. Jamison v. McKesson Corp*., 784 F. Supp. 2d 664, 675 (N.D. Miss. 2011) (citing *United States ex rel. Longhi v. Lithium Power Tech. Inc.,* 575 F.3d 458, 467 (5th Cir.2009)).

The submission of a false claim is the sine qua non of a False Claims Act violation. *Id.* (citing *Hopper v. Solvay Pharms., Inc.,* 588 F.3d 1318, 1328 (11th Cir.2009)) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1311 (11th Cir.2002)). The statute is "aimed at false claims" and defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property" made to someone, including the Government itself, who will at least in part use government money or property to pay it. *Id.* (citing *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 674 (5th Cir.2003) (quoting 31 U.S.C. § 3729(c)). Thus, "whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it." *Id.* "It is only those claims for money or property to which a defendant is not entitled that are

'false' for purposes of the False Claims Act." *Id.* (referencing *Southland Mgmt. Corp.*, 326 F.3d at 674–75 (citing *Costner v. URS Consultants, Inc.,* 153 F.3d 667, 677 (8th Cir.1998)).

### a. Plaintiffs have established a *prima facie* case for Retaliation under the False Claims Act

Generally, the whistleblower provision of the False Claims Act prevents the harassment, retaliation, or threatening of employees who assist in or bring *qui tam* actions. *Robertson v. Bell Helicopter Textron, Inc*., 32 F.3d 948, 951 (5th Cir. 1994). The Fifth Circuit applies the *McDonnell Douglas* framework to the False Claim Act's anti-retaliation provision. *Garcia v. Pro. Cont. Servs., Inc*., 938 F.3d 236, 240 (5th Cir. 2019). Under this framework, the employee must first establish a *prima facie* case of retaliation by showing: (1) that they engaged in protected activity with respect to the False Claims Act; (2) that the employer knew about the protected activity; and (3) retaliation because of the protected activity. *Id.* at 241; *See also Thomas v. ITT Educ. Servs., Inc.,* 517 F. App'x 259, 262 (5th Cir. 2013).

### 1. Protected Activity

For internal complaints to constitute protected activity in furtherance of a *qui tam* action, the complaints must concern false or fraudulent claims for payment submitted to the government. *U.S. ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 372 (5th Cir. 2011) (referencing *Robertson*, 32 F.3d at 952). The Fifth Circuit recognizes internal complaints that concern false or fraudulent claims for payment submitted to the government as protected activity under the Act but requires that the complaints raise concerns about fraud. *McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss. 2014).

Defendant argues that no underlying false claim exists because MDCPS does not receive federal funds and therefore made no fraudulent certifications. This argument is contradicted by evidence in the record showing that MDCPS directly receives federal funds through Title IV-E

15

and The Chafee Foster Care Program for Successful Transition to Adulthood, which is administered by the U.S. Department of Health and Human Services' Administration for Children and Families. [Doc. 31 at 13-18]. More importantly, Defendant's argument misunderstands the legal framework that governs federal funding. Entities that receive federal funds are held accountable through required reports, including those detailing the number of IEPs for children in foster care. When an agency submits false information in these reports, it violates the FCA regardless of whether it is the direct recipient or an intermediary in the funding chain. The record establishes a genuine issue of material fact regarding whether Plaintiffs engaged in protected activity. Plaintiffs' internal complaints specifically addressed false or fraudulent claims for payment submitted to the government. They raised concerns about MDCPS' improper practices regarding IEP surrogate parents, which resulted in false compliance certifications for federal funds under the Chafee and other related grants. [Doc. 30-1 at 78-79, 87]; [Doc. 30-2 at 84-98]; [Doc. 30-5 at 29]; [Doc. 30-12]; [Doc. 30-13]. Unlike the situation in *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259 (5th Cir. 2013), where no pre-termination notice of fraud was provided, Plaintiffs informed their supervisors about the illegality and potential fraud before they were terminated. [Doc. 30-1, Ex. 27-28]; [Doc. 30-1 at 174-175]; [Doc. 30-2 at 104-119]; [Doc. 30-2 at Ex. 14-15]; [Doc. 30-5 at 28].

Federal regulations do not allow MDCPS employees to serve as surrogate parents for IEP purposes. 34 C.F.R. § 300.519(d)(2)(i) provides that a surrogate parent may not be "an employee of the SEA, the LEA, or any other agency that is involved in the education or care of the child." This prohibition has direct implications for Title IV-E and The Chafee Grants. When MDCPS fails to comply with these requirements, it makes false certifications in grant submissions that require reporting the number of IEPs for foster youth under the Adoption and Foster Care

Analysis and Reporting System (AFCARS) and the National Youth in Transition Database (NYTD). Such false reporting constitutes fraud under the FCA. Plaintiffs' complaints were motivated by concerns over precisely this type of fraud, thereby satisfying the protected activity element. [Doc. 30-1 at 180].

Deposition testimony from Steel confirms MDCPS' critical role in coordinating IEPs and appointing surrogate parents, which is essential to these certifications. [Doc. 30-5 at 28-29, 41-42, 49-50]. Plaintiffs' complaints explicitly highlighted this noncompliance, noting that MDCPS caseworkers who acted as agency employees were signing IEPs as the Special Education Decision Maker/Surrogate Parent, thereby rendering the certifications false under federal law and regulations. [Doc. 30-1 at 172-175]; [Doc. 30-2 at 78-84]. Furthermore, these violations point to The Chafee Grant because the program's general terms require compliance with 45 C.F.R. Part 84 which authorizes nondiscrimination on the basis of disability and procedural safeguards in educational decisions. These protections are undermined when agencies improperly appoint surrogate parents as special education decision makers. *See generally*, Exhibit "I"; *See generally* Exhibit "D"; *See generally* Exhibit "E".  Defendant contends that Plaintiffs' complaints were merely routine policy inquiries within their job duties. This characterization ignores evidence showing that the complaints exceeded ordinary responsibilities and expressly identified fraudulent claims to the government. [Doc. 31 at 12-15].

Emails and testimony demonstrate that Plaintiffs raised specific concerns about fraudulent certifications for Title IV-E and Chafee Grant funds. Falgout testified that these reports were driven by fraud against the government. [Doc. 30-1 at Ex. 27-28]; [Doc. 30-2 at Ex. 14-15]; [Doc. 30-1 at 180]. After Young had reported the issue, Davenport directed her to stop all coordination efforts with MDCPS, MDE, and the American Bar Association on the issue,

further underscoring that this was recognized as a serious interagency compliance matter and that Davenport intentionally tried to frustrate Plaintiffs efforts to correct the issue. *See* Exhibit "A" at 7; Exhibit "B" at 7. The complaints therefore satisfy the requisite nexus to fraud. A reasonable jury could conclude that reporting fraudulent statements to the government constitutes protected activity under the FCA. Accordingly, a genuine issue of material fact exists on this element.

### 2. Employer Knowledge

The employer must have knowledge of the protected activity to establish liability under the FCA's anti-retaliation provision. *Thomas v. ITT Educ. Servs., Inc*., 517 Fed. Appx. 259, 263 (5th Cir. 2013); *Jamison v. Fluor Federal Solutions, L.L.C.*, 787 Fed. Appx 241 (2019). Plaintiffs have submitted evidence demonstrating that MDCPS was fully aware of their protected activities well before any retaliatory actions were taken, further creating a genuine issue of material fact that MDCPS possessed this knowledge well before taking any retaliatory action.

In early 2021, Plaintiffs discovered that MDCPS employees were signing IEPs as the Special Education Decision Maker/Surrogate Parent for foster children, a practice that violates federal regulations under the IDEA. To confirm the legal issue, Young emailed MDCPS' Strategy and Policy Attorney, Kim Gore, asking whether MDCPS could legally serve as the IDEA parent. Gore's response was an unequivocal: "No." *See* Exhibit "B" at 3; Exhibit "A" at 4; [Doc. 30-6 at 16-17]. This email exchange alone put MDCPS on clear notice of the compliance problem.  Beginning in February 2021, Plaintiffs repeatedly brought these concerns to Davenport. They emphasized not only the illegality of the practice, but also the potential for fraudulent reporting in federal grant submissions, including those under the Chafee Foster Care Program and related systems like AFCARS and NYTD. *See* Exhibit "B" at 5-6; Exhibit "A" at 5-6.

These efforts came to a head on June 3, 2021, when Plaintiffs met with Davenport and presented him with a document titled "YTSS Education Plan." *See* Exhibit "B" at 4; Exhibit "A" at 4. The plan explicitly stated that MDCPS employees cannot serve as parents for IEP purposes under federal law and references 34 C.F.R. § 300.519(d)(2)(i) to support such contention. It warned that this practice compromised IEP validity, diminished the agency's ability to advocate for children, and exposed MDCPS to legal repercussions.

Plaintiffs also provided Davenport with a detailed list of additional federal violations, including: (1) reporting fraudulent data to the federal government surrounding services provided under the Chafee Grant; and (2) denying children a Free Appropriate Public Education (FAPE) as guaranteed by IDEA. *See* Exhibit "B" at 5-6; Exhibit "A" at 5-6; [Doc. 30-1 at 172-175, 180]; [Doc. 30-2 at 78-84, 104-119]. Davenport's response to these concerns demonstrates that he clearly understood what Plaintiffs were reporting. He dismissed their concerns, stating "education isn't a priority for me" and instructing Plaintiffs to "continue doing like we have always done." *See* Exhibit "B" at 6; Exhibit "A" at 6-7. When Plaintiffs refused to participate in illegal practices and requested his directive in writing, Davenport denied the request. He then ordered Young to immediately cease collaborative work with the Mississippi Department of Education (MDE) and the American Bar Association (ABA), further evidencing his knowledge and intent to suppress the issue. *See* Exhibit "B" at 7; *See* Exhibit "A" at 7; [Doc. 30-1 at 142-143]; [Doc. 30-2 at Ex. 14-15].

The timing and nature of subsequent events further support that MDCPS leadership knew about Plaintiffs' fraud reporting. Shortly after the June meeting, in July 2021, Cynthia Moore-Hardy, who was a subordinate that had been reassigned to report to Young as a federal reporter,

filed a hostile work environment complaint against Young. This triggered an investigation by HR investigator Jason Hulitt. *See* Exhibit "A" at 10.

The investigation quickly escalated to another rushed investigation into Plaintiffs' timecards, culminating in both Plaintiffs being terminated on September 14, 2021. *See* Exhibit "G" at p. 20, 28. Rushton also has confirmed that she was briefed on the investigations following Plaintiffs' complaints but was never given a written report of Hulitt's findings pre-termination. [Doc. 30-4 at 11-17]. Gore's testimony also acknowledges the agency's awareness of the federal compliance risks posed by the IEP practices. [Doc. 30-6 at 16-17].

Additionally, Steel's testimony reveals MDCPS' integral role in IEP coordination and awareness of surrogate parent assignment issues. This testimony shows institutional knowledge that the agency's practices contradicted both its own policies and federal requirements. [Doc. 30-5 at 28-29, 41-42, 49-50]; *see also* Exhibit "F" at 80 (noting ongoing non-compliance after Plaintiffs complaints). Ultimately, the defendant's argument that the employer had no knowledge of the protected activity is disputed by genuine issues of material fact. The evidence demonstrates that MDCPS leadership was informed directly and remained aware of Plaintiffs' fraud allegations through key personnel such as Davenport, Gore, Hulitt, and Rushton. A reasonable jury could therefore conclude that MDCPS knew about the protected activity and chose to retaliate rather than address the concerns.

### 3.   Retaliation Because of Protected Activity

This element focuses on whether the Plaintiffs' terminations were caused by their reports of alleged fraud related to the MDCPS' non-compliance with the IDEA, rather than some other reason. Here, to survive summary judgment, Plaintiffs must point to evidence creating a genuine issue of material fact that their complaints were the but-for cause of their terminations. *United*

*States ex rel. King v. Solvay Pharmaceuticals, Inc.*, 871 F.3d 318, 333 (5th Cir. 2017). Generally, temporal proximity alone is insufficient to prove but-for causation. *Id.* at 334 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). However, the combination of suspicious timing with other evidence of pretext can be sufficient to survive summary judgment. *Id.* This standard can be met when the plaintiffs show that they had highly positive performance reviews up until the complaint was levelled up against the company and then suffered a sharp decline in treatment immediately after the protected conduct occurred. *Id.* at 334; (citing *Khalfani v. Balfour Beatty Communities, L.L.C.*, 595 Fed. Appx. 363, 366 (5th Cir. 2014)). The record, when viewed in the light most favorable to the plaintiffs, reveals genuine disputes of material fact regarding causation, necessitating denial of the Defendant's motion for summary judgment.

Plaintiffs' protected activity began in early 2021 when they identified MDCPS' practice of allowing agency employees to sign IEPs as the Special Education Decision Maker/ Surrogate Parent for foster children, a violation of federal regulations under the IDEA. *See* Exhibit "B", at 2; Exhibit "A", at 3. Young confirmed this noncompliance by emailing MDCPS' Strategy and Policy Attorney, Kim Gore, who responded that MDCPS could not legally serve as the IDEA parent. *See* Exhibit "B" at 4; Exhibit "A" at 5; [Doc. 30-6 at 16-17]. From February 2021 onward, Plaintiffs repeatedly raised these concerns with Davenport, emphasizing both the illegality of the practice and the risks of fraudulent reporting in federal grant submissions, including those under Title IV-E and the Chafee Foster Care Program via the Adoption and Foster Care Analysis and Reporting System (AFCARS) and also the National Youth in Transition Database (NYTD). *See* Exhibit "B" at 4; Exhibit "A" at 4; [Doc. 30-1 at 172-175, 180]; [Doc. 30-2 at 78-84].

These efforts culminated in a June 3, 2021, meeting where Plaintiffs presented Davenport with the "YTSS Education Plan." The plan explicitly stated that MDCPS employees could not serve as surrogate parents for IEP purposes under 34 C.F.R. § 300.519(d)(2)(i), and warned of compromised IEP validity, diminished advocacy for children, and potential legal repercussions. *See* Exhibit "B" at 4; Exhibit "A" at 4. Plaintiffs also submitted a detailed list of federal violations, including reporting fraudulent data to the federal government regarding services provided under the Chafee Grant and denying children a Free Appropriate Public Education (FAPE) as guaranteed by IDEA. *See* Exhibit "B" at 5-6; Exhibit "A" at 5-6; [Doc. 30-2 at 104-119, Ex. 14-15].  These concerns directly implicated federal grants. The U.S. Department of Education's FY 2021 IDEA approval letter conditioned funding on state assurances of compliance, which MDCPS supported through IEP data submissions. [Doc. 30-13 at 1]; [Doc. 30-12 at 1]; *See also* Exhibit "K" at p. 6. Steel's deposition testimony further corroborates MDCPS' awareness of these compliance issues in IEP coordination. [Doc. 30-5 at 28-29, 41-42, 49-50].

Moreover, the proximity in time between Plaintiffs' reports and their terminations is significant. Approximately four months passed between the serious email reporting and Plaintiffs terminations. *See* Exhibit "A" at 4; [Doc. 30-10]; [Doc. 30-11]. This falls well within the Fifth Circuit's threshold for supporting an inference of causation when coupled with evidence of pretext. *See Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243-44 (5th Cir. 2019).

Prior to their reports, both Plaintiffs had strong performance records. Falgout was hired in 2009 and received multiple promotions through hard work and recognition. She co-developed the Youth Transition Support Services (YTSS) program in 2017 that directly dealt with the Chafee Grant. *See* Exhibit "A" at 1-2. Moreover, she also worked as the Interim Bureau Director

for YTSS in June 2020. *Id.* Additionally, Young was hired in October 2020 and was promoted to Division Director II in April 2021. *See* Exhibit "A" at 1-2; Exhibit "B" at 2. Her performance reviews also were never lower than a score of 3, indicating that she was successful in her position during her employment at MDCPS. *See generally* Exhibit "J", Performance Evaluations of both Plaintiff Young and Falgout, at 1, 10, 19, 30, 41, 69, 78, 87, and 104. Moreover, it is important to note that in the performance reviews, there are two separate reports with a score of zero. *See* Exhibit "J" at 50, 56, and 88. Falgout contends that when one is promoted, they leave the performance review open to indicate that individuals have transitioned into a new position. *See* Exhibit "A" at 8. Here, it is clear that such "0" designated in 2017 indicated that Plaintiff had been promoted to a new position, where her annual review eventually scored her a 3.5, which is classified as a successful rating. *See* Exhibit "J" at 10.  Moreover, the one review received by Young during her employment gave her a 3.6, which is classified as a successful rating. *See* Exhibit "J" at 97.

Following their reports, Plaintiffs experienced noticeably different treatment. Davenport dismissed their concerns and told Plaintiffs that "education isn't a priority for me" and instructed them to "continue doing like we have always done," all despite the identified violations. *See* Exhibit "B" at 5-6; Exhibit "A" at 6. When Plaintiffs refused to participate in illegal practices and requested a written directive, Davenport denied the request and ordered Young to cease collaborations with the Mississippi Department of Education (MDE) and the American Bar Association (ABA), effectively preventing her from performing her job functions. *See* Exhibit "B" at 6; Exhibit "A" at 6-7; [Doc. 30-1 at 142-143]. The situation escalated in July 2021, when Cynthia Moore-Hardy filed a complaint alleging a hostile work environment against Young. Moore-Hardy was a subordinate who had been reassigned to report to Young, and Davenport had

previously supported terminating her for performance issues. *See* Exhibit "B" at 10; Exhibit "A" at 10.

This complaint triggered an investigation by Hulitt, who conducted aggressive interviews that focused on Plaintiffs' qualifications and relationships rather than substantive issues. *See* Exhibit "B" at 11; Exhibit "A" at 11; [Doc. 30-4 at 12]. Significantly, Moore-Hardy's role as a Federal Reporter involved gathering IEP data directly tied to the violations Plaintiffs had reported. Gore's deposition acknowledges the agency's awareness of audit risks for IDEA funds, suggesting a motive to silence Plaintiffs. [Doc. 30-6 at 16-17]. In sum, a reasonable jury could assess these actions and posit that such were retaliatory because Plaintiffs complained about the improper IEP practices. As such, summary judgment should be denied.

### b. Defendant's Legitimate Reason Is Pretext for Retaliation

Defendant MDCPS asserts time fraud and falsification of time records as its legitimate, non-retaliatory reason for terminating Plaintiffs on September 14, 2021, relying on Investigator Hulitt's findings and the Plaintiffs' time cards for the pay period ending September 15, 2021. [Doc. 31 at 18-20]; [Doc. 30-7 at 33-35]; [Doc. 30-8 at 1-3]; [Doc. 30-9 at 1-3]; [Doc. 30-4 at 14-15].. MDCPS contends that the investigation was independent and thorough, resulting in the uncovering theft of state time, and asserts no evidence of pretext. [Doc. 31 at 18-20]. However, the record reveals substantial disputes undermining this reason, including admissions of investigative flaws, lack of prior discipline, inconsistencies in the time records, and ties to the underlying complaints. All of these issues demonstrate that the Defendant's proffered reason is false and that retaliation for the Plaintiffs' protected activity was the true motive. *McCollum v. Jacobs Eng'g Grp., Inc.*, 992 F. Supp. 2d 680, 688 (S.D. Miss. 2014). At summary judgment, all

inferences must be drawn in the non-movant's favor, and if genuine disputes exist as to pretext, the claim survives. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

It is notable that the combination of suspicious timing with other evidence of pretext can be sufficient to survive summary judgment. *King,* 871 F.3d at 334. This standard can be met when the plaintiffs show that they had highly positive performance reviews up until the complaint was levelled up against the company and then suffered a sharp decline in treatment immediately after the protected conduct occurred. *Id.* at 334; (citing *Khalfani v. Balfour Beatty Communities, L.L.C.*, 595 Fed. Appx. 363, 366 (5th Cir. 2014)). In the present case, Plaintiffs demonstrated highly positive performance prior to their protected activity, as evidenced by Falgout's multiple promotions since 2009, her co-development of the Youth Transition Support Services Program which directly dealt with the Chafee grant, and her appointment as Interim Bureau Director in June 2020. *See* Exhibit "A" at 1-2. Young on the other hand received a promotion to Division Director II in April 2021 shortly after her hiring by Davenport. *See* Exhibit "B" at 3. Following the February 2021 reports of IDEA noncompliance and the June 3, 2021, presentation of the YTSS Education Plan to Davenport, Plaintiffs experienced a sharp decline in treatment, including Davenport's dismissal of their concerns, orders to cease essential collaborations with MDE and ABA, interference in Falgout's authority, and the initiation of a hostile work environment investigation in July 2021 that escalated into a pretextual time fraud probe. *See* Exhibit "B" at 10-11; Exhibit "A" at 10-11; *See also* Exhibit "G" at p. 32-33. This combination of temporal proximity, which spanned approximately over the course of four months from the key confrontation to termination, and evidence of pretext, such as the rushed and flawed investigation lacking Plaintiffs' input, satisfies the standard for surviving summary judgment.

Moreover, the foundation of MDCPS' rationale that the Plaintiffs allegedly falsified timecards collapses under scrutiny. Both Plaintiffs maintain their records were accurate. Falgout states she worked remotely on one day after canceling a planned trip to Tupelo and was physically present in the office on the other two days. She asserts that internal documents corroborate her attendance. Young also contends two days were approved for remote work and that she was in the office on the third day, making work calls and attending meetings. *See* Exhibit "A" at 12-14; Exhibit "B" at 12-13.

MDCPS relies primarily on an investigation conducted by Hulitt, which stemmed from a July 2021 hostile work environment complaint filed by Cynthia Moore-Hardy against Young and later expanded to include time card scrutiny. [Doc. 30-7 at 32-33]; [Doc. 30-4 at 12]. The investigation was rushed and incomplete. Hulitt testified that he provided a verbal briefing to Rushton on the morning of September 14, 2021, immediately after completing key witness interviews, notably without drafting a written report of his findings, and disregarding an email from Ivory retracting the statement that Plaintiffs attempted to have other staff lie for them. *See* Exhibit "G" at 22-23, 34-36; [Doc. 30-4 at 15]. This haste is significant because it means that the decision to terminate was made without a full picture of what had occurred, and contradicts what was claimed by Rushton in her deposition. [Doc. 30-4 at 14-15].

During interviews, staff members Natasha Ivory and Virginia Lambert initially provided false statements about a September 2, 2021, meeting but recanted such statements that implicated Falgout. Emails sent by Ivory before Plaintiffs were terminated and Lambert shortly after Plaintiffs were terminated revealed that Greg Murphree had instructed them to lie, not Falgout or Young. [Doc. 30-7 at 33-35]; Exhibit "H" at 1-3; Exhibit "G" at 33; [Doc. 30-4 at 14-17]. Courts have recognized that investigations relying on one-sided or incomplete information, leading to

26

termination without full context, may support an inference of pretext. *Franklin v. City of Moss Point, Miss.,* 2015 WL 12672706 *6 (S.D. Miss. November 25, 2015) (citing *Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 542 (10th Cir. 2014) (failing to get the plaintiff's side of the story prior to taking an adverse employment action may support an inference of pretext). Most troubling is that Hulitt never interviewed Plaintiffs to obtain their accounts before the termination decision was made. *See* Exhibit "A" at 13; *See* Exhibit "B" at 12.  He also did not interview Murphree, the individual identified as directing the deception, before terminating Plaintiffs, even though Hulitt had received an email from Ivory implicating Murphree as the supervisor who instructed employees to lie about their whereabouts.  Exhibit "H" at 1-3; *see* Exhibit "G" at 22-23. Moreover, Hulitt and Rushton made the decision to terminate Plaintiffs long before a written report was drafted and finalized, and before Hulitt received Lambert's email retracting her statement implicating Falgout in the cover-up. [Doc. 30-4 at 15]; [Doc.30-10]; [Doc. 30-11]; *See* Exhibit "H" at 3; *See* Exhibit "L".

The timeline reveals how predetermined this outcome was. To begin, Falgout claims that Hulitt's position within HR did not exist until he was hired, further allowing a reasonable jury to conclude that Hulitt's hiring was specifically to investigate issues with Plaintiffs. Exhibit "A" at p. 11.  Emails from September 14, 2021, including Ivory's sent at 10:53 a.m. and Lambert's sent at 4:38 p.m., exclusively implicated Murphree, not Falgout or Young. Exhibit "H" at 1-3. Yet, Plaintiffs were terminated around noon that day and such terminations were finalized at 3:06 p.m. and 3:08 p.m.-- long before Lambert's email could even be considered and without giving Plaintiffs any opportunity to address the contradictory allegations with Hulitt. Exhibit "H" at 6-7; Exhibit "G" at 22; Exhibit "A" at 12; Exhibit "B" at 11.

The investigation's sloppiness further undermines its credibility. Hulitt admitted in his deposition that he lacked physical evidence for Young's alleged absence on one day, relying solely on a calendar entry for untaken leave. He also acknowledged a major typographical error in his report that misapplied dates between Plaintiffs. Exhibit "G" at 28-30. Hulitt also could not confirm whether Davenport spoke directly with Falgout about her time, further highlighting the investigation's incompleteness. Exhibit "G" at 22-23. The timing and sequence of events strongly suggest that MDCPS targeted Plaintiffs because of their protected activity, not because of any timecard issues. Such is because Plaintiffs began raising IDEA noncompliance concerns in February 2021, and escalated them in a June 3, 2021, meeting with Davenport. See Exhibit "A" at 2-4; Exhibit "B" at 2-4. Shortly thereafter, in July 2021, Moore-Hardy, who worked as a federal reporter and gathered the IEP information, filed the hostile work environment complaint that initiated Hulitt's involvement. Notably, Moore-Hardy was a subordinate whom Davenport had previously supported terminating for performance issues. Exhibit "B" at 9-10; Exhibit "A" at 10-11; [Doc. 30-4 at 12].

Around the same time, Davenport's attitude towards Falgout changed drastically. Such is because he ended his out-of-work personal relationship with Falgout after the June 2021 meeting. Additionally, Davenport began to undermine Falgout and would keep her out of the loop in communicating with her colleagues and would also negotiate contracts without her say, Exhibit "A" at 8; Exhibit "B" at 8. The proximity between Plaintiffs' protected activity, the July complaint, the timecard investigation, and the September terminations following a rushed and incomplete investigation supports a strong inference of retaliatory motive.

The record indicates that MDCPS made the termination decision before reviewing critical evidence. Rushton testified that she relied on Hulitt's verbal breakdown of the events that

occurred. [Doc. 30-4 at 9-11, 16-18]. However, the chronology tells a different story. The terminations occurred after Ivory had retracted her statement via email to Davenport and Hulitt, before Lambert's exonerating email was sent, and, importantly,  Hulitt could not specify in his deposition when his written report was finalized when metadata reveals it was finalized long after Plaintiffs were terminated. Exhibit "G" at 34-36; Exhibit "H" at 1-3, 6-7; Exhibit "L". This permits the inference that a reasonable jury could conclude that MDCPS predetermined the outcome to terminate Plaintiffs and then document it retroactively.

Davenport's response to Plaintiffs' concerns reveals the real motive behind the terminations. He dismissed their reports, stating "education isn't a priority for me" and instructing them to "continue doing like we have always done, because there haven't been any problems – per Kimberly Wheaton." This came despite Plaintiffs' warnings about fraudulent data reporting that could jeopardize Title IV-E and The Chafee Grant. Exhibit "B" at 6; Exhibit "A" at 6-7; [Doc. 30-1 at 180]; [Doc. 30-13 at 1]; [Doc. 30-12 at 1].

Finally, MDCPS' assertions that it has corrected the IEP issues are contradicted by its own representatives. Although Defendant claims the problems have been resolved, Rushton's Rule 30(b)(6) deposition testimony indicates she was unaware of specific measures taken. [Doc. 31 at 15-18]; [Doc. 30-4 at 15-17]. Steel's Rule 30(b)(6) testimony acknowledges persistent challenges in IEP coordination, documentation, and tracking. [Doc. 30-5 at 28-29, 41-42, 49-50]. Yet, the Mississippi Department of Education has made it known that it is MDCPS' responsibility to do so. *See generally* Exhibit "K", MDE Policy on Educational Stability for Students in Foster Care, at 1. Plaintiffs maintain that no substantive changes occurred because the current Foster Care Policy remains non-compliant, and still allows agency workers to serve as surrogate parents in violation of 34 C.F.R. § 300.519(d)(2)(i). *See* Exhibit "F" at 80. This

discrepancy further undermines Defendant's credibility. Cumulative evidence clearly establishes genuine disputes of material fact and a reasonable jury could find that Defendant's stated reason for termination was pretextual. Accordingly, summary judgment on Plaintiffs' FCA retaliation claim is unwarranted.

### B. Wrongful Termination

Mississippi has long recognized the employment-at-will doctrine. *See Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874 (Miss. 1981). In Mississippi, an at-will employee is precluded from suing for wrongful termination because "an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *Galle v. Island of Capri Casinos Inc.*, 180 So.3d 619, 622 (Miss. 2015).  While Mississippi is an at-will employment state, it is undisputed that there is a narrow public policy exception that permits an employee to sue for wrongful termination if the employee is discharged for refusing to participate in an illegal act or for reporting illegal acts of their employer. *Simmons v. Pac. Bells, L.L.C.*, 787 F. App'x 837, 842 (5th Cir. 2019). The *McArn* analysis focuses on actual criminal Illegality, not what the plaintiff reasonably believed to be illegal. *See Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 403-404 (5th Cir. 2005). As a result, this exception is limited to acts that relate to criminal, not civil, penalties. *See Kyle v. Circus Circus Miss., Inc.*, No.10-60571, 2011 WL 1659514, at *3 (5th Cir. Apr. 28, 2011); *Wheeler,* 425 F.3d at 404.

For the *McArn* exception to apply, Plaintiffs must show that they were terminated for the exception to be applicable. *See Bailey v. Cooper Lighting, Inc.*, No. 5:07-cv-196-DCB-JMR, 2008 WL 1868568, at *2 (S.D. Miss. Apr. 24, 2008) Generally, an employee may sue for wrongful discharge where the employee is terminated because of (1) refusal to participate in

illegal activity or (2) reporting the illegal activity of their employer to the employer or anyone else. *Id.* at 2.  Ultimately, the Supreme Court of Mississippi held that the reporting of illegal acts exception to the at-will employment doctrine has been applied only when the illegal act actually had something to do with the business itself. *Id.* at *3 (citing *Jones v. Fluor Daniel Servs. Corp.*, 959 So.2d 1044, 1047 (Miss. 2007)).

Defendant argues in its Memorandum Brief that Plaintiffs' wrongful termination claim must fail as a matter of law because the alleged conduct, including their concerns about MDCPS' non-compliance with the IDEA does not involve actual criminal illegality; rather, it involves regulatory violations that carry only civil penalties. [Doc. 31 at p. 20-22]. Defendant emphasizes that the *McArn* exception is narrow and limited to acts warranting criminal penalties. Within such argument. Defendant asserts that Plaintiffs' termination was for legitimate reasons unrelated to any illegal activity, as supported by the independent investigation into time fraud and timecard discrepancies. [Doc. 31 at p. 5-7]; [Doc. 30-7 at 33-35]; [Doc. 30-8]; [Doc.30-9].

However, Defendant's position overlooks genuine issues of material fact in which Plaintiffs have presented evidence that their termination was pretextual retaliation for reporting and refusing to participate in criminal fraud. Specifically, MDCPS' submission of false compliance certifications to obtain Title IV-E and Chafee Grant funds. [Doc. 30-12]; [Doc. 30-13]. When viewed in light most favorable to Plaintiffs, this conduct falls within the *McArn* exception, as submitting false claims to the federal government warrants criminal penalties under statutes like 18 U.S.C. §287 and 18 U.S.C. §1001, and relates directly to MDCPS' business of child protection and educational stability for children and youth in foster care.

> **a. Plaintiffs have successfully shown that they have a Wrongful Termination Claim under Mississippi Law.**

Plaintiffs' evidence creates triable issues under the *McArn* exception that preclude summary judgment. Defendant's motion argues that the termination was for time fraud unrelated to any illegality, citing the investigation by Hilitt and timecard discrepancies. [Doc. 31 at p. 5-7, 20-22]; [Doc. 30-7 at 33-35]; [Doc. 30-8]; [Doc. 30-9]. Nonetheless, Plaintiffs have presented substantial evidence via depositions, emails, discovery responses, time records, termination letters, and federal grant documents that dispute this, further showing instead that MDCPS retaliated against them for reporting and refusing to participate in fraudulent certifications for federal funds, which constitutes criminal illegality tied to the agency's core operations. This evidence satisfies the *McArn* standard and warrants denial of summary judgment.

Plaintiffs meet the requirements of the *McArn* exception by demonstrating that they were terminated for reporting and refusing to participate in actual criminal illegality related to MDCPS' federal reporting procedures. The evidence establishes that Plaintiffs discovered serious violations, reported them internally, and were fired in retaliation.

In early 2021, Plaintiffs discovered that MDCPS caseworkers were improperly appointing themselves as the Special Education Decision Maker/Surrogate Parent for IEP certification purposes. This practice violates federal law and leads to false compliance certifications in federal grant applications, including Title IV-E and The Chafee Grant. *See* 20 U.S.C. §1415(b)(2)(A)(i); [Doc. 30-1 at 78-79, 87]; [Doc. 30-2 at 90]; [Doc. 30-3 at 13]; [Doc. 30-5 at 29]; [Doc. 30-6 at 16-17]; [Doc. 30-12 at 3]; [Doc. 30-13].

Falgout specifically brought this issue to light in emails to supervisors on May 18-20, 2021, and discussed about its implications for federal funding. [Doc. 30-1 at 127-139, 180]. Young corroborated this discovery and reporting and further highlighted joint MDE/MDCPS guidance revisions that revealed noncompliance. [Doc. 30-2 at 78-84, 104-119]. Steel's

deposition supports this as well. She discussed the 2018 education policy requiring coordination with MDE for educational stability yet acknowledged that caseworkers continued to improperly serve in IEP Special Education Decision Maker/Surrogate parent roles. [Doc. 30-5 at 29-50]. MDCPS cannot sign as the surrogate parent because, under IDEA regulations, surrogates must be independent and cannot be employees of the agency providing care to the child. This creates a conflict of interest that violates the procedural safeguards required for a free appropriate public education. *See* 34 C.F.R. § 300.519(d)(2)(i).

This practice also violates the Chafee Grant because the general terms mandate compliance with 45 C.F.R. Part 84, which prohibits discrimination based on handicap and requires safeguards for educational decisions. When agency employees act as surrogates, these terms are compromised, leading to fraudulent certification of funds. *See* Exhibit "D"; *See* Exhibit "E". Plaintiffs reported this concern internally, refused to participate in the illegal practice, and sought to correct the issue through policy changes. Instead of addressing the problem, MDCPS resisted Plaintiffs' reform attempts and escalated harassment against them, culminating in a pretextual time fraud investigation initiated in August 2021. [Doc. 30-1 at 127-156, 172]; [Doc. 30-2 at 136-144]; [Doc. 30-4 at 12-13]; [Doc. 30-7 at 33-35].

The timing is suspicious. Hulitt's deposition confirms that his employment with MDCPS began on July 16, 2021, aligning with the timeline of the hostile work environment investigation's initiation shortly after Plaintiffs' complaints. The investigation was initiated by Moore-Hardy, who was in charge of Federal Reporting; ironically, the very area implicated by Plaintiffs' fraud reports. *See* Exhibit "G" at 5; Exhibit "A" at 10; Exhibit "B" at 9.

Moreover, Falgout asserts that Hulitt's specific position did not exist before he was hired, which allows a reasonable jury to conclude that Hulitt was hired specifically to initiate an

33

intentional investigation against Plaintiffs. See Exhibit "F" at 10. Hulitt's own testimony reveals deficiencies in the investigative process because he was unable his inability to recall key details about the investigation, which could allow a jury to conclude that the investigation was rushed or biased. *See* Exhibit "G" at 12, 15, 20-25, 28-30, 36, 37.

Falgout testified that this noncompliance issue risked federal funding fraud and explicitly identified it as a crime. [Doc. 30-1 at 180]. Young also discussed the fraudulent certifications in her deposition, noting that the MDE/MDCPS agreement required compliance that was not being legally met. [Doc. 30-2 at 54-68]. Steel confirmed MDCPS' awareness of the issue and discussed the policy required caseworkers to review education records and coordinate IEPs, yet the improper signing persisted after notice was given, and the policy remains the same to this day. [Doc. 30-5 at 29-50]; *See also* Exhibit "F" at 80.

The federal grant documents confirm that MDCPS certified compliance to receive Title IV-E and Chafee Grant funds despite the known violations. [Doc. 30-12 at 1-3]; [Doc. 30-13 at 1-16]. Submitting false claims for federal funds carries criminal penalties under 18 U.S.C. § 287 and 18 U.S.C. § 1001, satisfying *McArn's* requirement for actual criminal illegality. *See Wheeler*, 415 F.3d at 404 n.4 (exception applies to acts imposing criminal penalties). Furthermore, this illegality directly relates to MDCPS' responsibility to ensure educational stability for children in state custody. [Doc. 30-6 at 16-17]; [Doc. 30-12 at 1-8]; [Doc. 30-13 at 1-16]; [Doc. 30-5 at 50-58]. These facts create genuine disputes of material fact as to whether the termination was for reporting and refusing to participate in criminal fraud, bringing this case within *McArn*. A reasonable jury could find for Plaintiffs on this basis. Therefore, summary judgment is improper.

### C.  Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant acted willfully or wantonly towards the plaintiff by commuting certain described actions; (2) the defendant's acts are ones which evoke outrage or revulsion in civilized society; (3) the acts were directed at, or intended to cause harm to, the plaintiff; (4) the plaintiff suffered severe emotional distress as a direct result of the acts of the defendant; and (5) such resulting emotional distress was foreseeable from the intentional acts of the defendant. *Pointer v. Rite Aid Headquarters Corp.*, 327 So.3d 159, 170 (Miss. Ct. App. 2021). A claim for intentional infliction of emotional distress requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bowden v. Young*, 120 So.3d 971, 980 (Miss. 2013). As a result, "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Montgomery v. CitiMortgage, Inc.*, 955 F.Supp.2d 640, 653 (S.D. Miss. 2013).

Defendant argues in its Memorandum Brief that Plaintiffs' IIED claim must fail as a matter of law because the alleged conduct; namely, their termination for purported time fraud, amounts to nothing more than an ordinary employment dispute insufficient to meet Mississippi's high bar for outrage. Defendant cites cases like *Lee v. Golden Triangle Planning & Development District, Inc.*, 797 So.2d 845, 851 (Miss. 2001), emphasizing that criticism, insults, or termination in the employment context rarely rise to the level of IIED.  However, Defendant's characterization overlooks the genuine issues of material fact in this case, where Plaintiffs have presented evidence that their termination was not a legitimate response to misconduct but a pretextual retaliation for whistleblowing on potential federal fraud involving MDCPS' compliance with the IDEA.

When viewed in light most favorable to Plaintiffs, as required under FRCP 56, such conduct crosses the threshold of outrageousness, particularly in the whistleblower context. This is not mere criticism, but instead is systematic retaliation harming vulnerable children, evoking revulsion.

### a. Plaintiffs have successfully shown that they meet the elements for an Intentional Infliction of Emotional Distress Claim.

Plaintiffs' evidence creates triable issues on each element of IIED, precluding summary judgment. Defendant's motion relies on a self-serving narrative that the termination was justified by an independent investigation into time fraud. [Doc. 31 at p. 5-7]. However, Plaintiffs have presented substantial evidence, via depositions, emails, and discovery responses, disputing this, showing instead a pattern of willful harassment and retaliation designed to silence concerns about MDCPS' non-compliance with federal law.

The first element requires evidence that Defendant acted willfully or wantonly. *Pointer*, 327 So.3d at 170.  Here, Plaintiffs have shown that MDCPS, through actors such as Hulitt, Moore-Hardy, Murphree, Davenport, and Rushton engaged in deliberate actions to undermine and terminate Plaintiffs after they raised IDEA compliance issues. [Doc. 30-1 at 127-156, 172-175]; [Doc. 30-2 at 104-119]; [Doc. 30-4 at 12-13]; [Doc. 30-5 at 12-15]; [Doc. 30-7 at 33-35]; [Doc. 30-10 at 1-3]; [Doc. 30-11 at 1-3]; Exhibit "B" at 2.  In early 2021, Plaintiffs identified that MDCPS caseworkers were improperly signing IEPs as the Special Education Decision Maker/Surrogate parents, violating federal regulations and risking federal funding fraud. *See* 20 U.S.C. §1415 (b)(2)(A); [Doc. 30-1 at 87]; [Doc. 30-2 at 90]; [Doc. 30-5 at 29]; [Doc. 30-12 at 1-8]; [Doc. 30-13 at 1-16]. Plaintiffs both reported this internally, seeking clarification and policy changes to correct the matter. [Doc. 30-1 at Ex. 27-28]; [Doc. 30-2 at 119 Ex. 14]; [Doc.

30-5 at 12-15]. Rather than addressing the concerns, MDCPS resisted reforms and began a campaign of harassment. [Doc. 30-1 at 127-156, 172]; [Doc. 30-2 at 104-119].

Falgout testified that Davenport shut down their efforts, preventing both Plaintiffs from performing IEP related duties and subjected them to hostile treatment, including unwarranted scrutiny. *See* Exhibit "A" at 7-8; *See* Exhibit "B" at 7. This escalated to a pretextual investigation into a hostile work environment initiated in July 2021, and later the time fraud investigation in September 2021, where evidence suggests MDCPS fabricated discrepancies and coerced staff statements. *See* Exhibit "H" at p. 1.  Moreover, Hulitt admitted that staff, particularly Natasha Ivory, were instructed to lie about staffing meetings, pointing instead to evidence of MDCPS pressure, further disputing the fact that Falgout allegedly orchestrated the lie to falsify timecards. [Doc. 30-4 at 14]; Exhibit "G" at 39-40; Exhibit "H" at 1. Hulitt's testimony further reveals investigative deficiencies, including multiple instances where he could not recall key details about interviews or report completion, suggesting a lack of thoroughness to support Plaintiffs' termination. Exhibit "G" at 12, 15, 20-25, 28-30, 36-37; Exhibit "H" at 1.  These actions, spanning from May to September 2021, were not accidental but targeted responses to Plaintiffs' whistleblowing, creating a genuine dispute as to willfulness.

Plaintiffs satisfy the second element of IIED, as the Defendant's acts are ones which evoke outrage or revulsion in civilized society. *Pointer*, 327 So.3d at 170. Defendant dismisses this as routine termination, but Plaintiffs' evidence paints a bigger picture with retaliation at the heart of the landscape. [Doc. 31 at p. 22]. This landscape entails the fabrication of misconduct to fire employees who exposed potential federal fraud all while ignoring the underlying illegality. Mississippi courts have recognized that retaliatory actions in whistleblower contexts can meet this bar when involving deceit or harm to public interest. In *Jones v. Fluor Daniel Services*

*Corp.*, the court reversed summary judgment on an IIED claim where an employer engaged in a pattern of harassment and unequal treatment following the plaintiff's complaints about workplace discrimination, finding such retaliatory conduct potentially egregious. 959 So.2d 1044, 1049-51 (Miss, 2007).

Here, MDCPS' conduct, which includes ignoring federal non-compliance that could defraud U.S. taxpayers of millions of dollars in Title IV-E and the Chafee Grant funds and harm disabled children in custody, then retaliating by exceeding up charges, clearly evokes revulsion. [Doc. 30-1 at 142-143, 170-171]; [Doc. 30-5 at 29-50]; [Doc. 30-6 at 16-17]; [Doc. 30-12 at 1-8]; [Doc. 30-13]. Falgout and Young testified to being prevented from doing their job to protect vulnerable youth, leading to a hostile environment. *See* Exhibit "F" at 6; *See* Exhibit "M" at 6; [Doc. 30-1 at 172]; [Doc. 30-2 at 136-144]; [Doc. 30-6 at 16-17]. The fact that Murphree also coerced lies from subordinates further underscores the outrage, as it corrupted the investigative process and ultimately rushed the termination process without a fair investigation. [Doc. 30-8]; [Doc. 30-9]; Exhibit "G" at 33, 38-40; Exhibit "H" at 1.

The outrageousness is also compounded by violations of Title IV-E and the Chafee Grant, as MDCPS' failure to appoint independent, non-agency employee as Special Education Decision Makers/parents denied disabled foster youth procedural safeguards and equal access to education. This, in turn, directly harmed the vulnerable population the agency is entrusted to protect. A jury could reasonably find this conduct to be beyond the bounds of decency, especially given the public trust in child protection agencies. While a tall order in Mississippi, summary judgment is improper where disputed facts could lead a jury to find the conduct intolerable.

Plaintiffs also meet the third element of IIED, as the acts were directed at, or intended to cause harm to, the Plaintiffs. *Pointer*, 327 So.3d at 170. Evidence shows MDCPS targeted Plaintiffs specifically after their reports. Emails and depositions reveal escalating scrutiny after Plaintiffs made complaints about the IEP process. [Doc. 30-1 at Ex. 29-31]; [Doc. 30-2 at 119 Ex. 15]; [Doc. 30-5 at 29]. Davenport's communications became hostile, and the investigation focused solely on Plaintiffs despite broader office issues. [Doc. 30-4 at 12-18]; Exhibit "H" at 1. The termination notices also confirm direct action against Plaintiffs. [Doc. 30-3 at 1]; [Doc. 30-1 at Ex. 33]; [Doc. 30-10]; [Doc. 30-11]. Intent is inferable from the pretext, as the investigations were not general policy but aimed at silencing Plaintiffs. This element is met because of the harm, which in this case was termination and distress, including financial stress, stress of finding other employment, and the stress of being fired for no legitimate reason, was the foreseeable result of the retaliation. [Doc. 30-1 at 175-177]; [Doc. 30-2 at 131]; [Doc. 30-6 at 16-17].

Plaintiffs establish that they meet the fourth element of IIED, as they both suffered severe emotional distress as a direct result of the acts of the defendant. *Pointer*, 327 So.3d at 170. Here, where the defendant's conduct was "malicious, intentional, or outrageous," the plaintiff need present no further proof of physical injury. *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 743 (Miss. 1999). Both Plaintiffs have testified that this issue has brought about anxiety, insomnia, and financial/emotional strain after they were terminated. [Doc. 30-1 at 175-177]; [Doc. 30-2 at 136-144]; [Doc. 30-3 at 2]. This distress stemmed directly from the retaliatory actions of Defendant, including being shut out from duties, being falsely accused, and fired for whistleblowing. [Doc. 30-1 at 145-146]; [Doc. 30-10]; [Doc. 30-11]; [Doc. 30-8]; [Doc. 30-9]. Falgout described ongoing discourse with Davenport, further causing harm to her ability to perform her job. [Doc. 30-1 at 145-146]. Young similarly expressed emotional toll from being

sidelined and falsely targeted. [Doc. 30-2 at 136-139]. Genuine disputes exist on causation and severity, warranting jury resolution.

Lastly, Plaintiffs satisfy the fifth element of IIED because the resulting emotional distress was a foreseeable result of the Defendant's acts. *Pointer*, 327 So.3d at 170. Retaliatory termination for exposing fraud can foreseeably cause severe distress, especially in public service roles involving child welfare and access to education. [Doc. 30-1 at 180]; [Doc. 30-2 at 132-133]; [Doc. 30-6 at 16-17]. MDCPS knew Plaintiffs' dedication to the agency, as seen in promotions and long tenure and their desire to ensure federal compliance. [Doc. 30-1 at Ex. 23-25]; [Doc. 30-2 at 17-76, Ex. 5-6]. Moreover, Defendant's fabrication of grounds to fire Plaintiffs after they raised compliance issues that potentially endangered federal funds for children, if such corrections were not made, further makes distress predictable. [Doc. 30-1 at 175-177]; [Doc. 30-2 at 136-139]; [Doc. 30-3 at 1-2]; [Doc. 30-12]; [Doc. 30-13]; [Doc. 30-10]; [Doc. 30-11]; Exhibit "G" at 27-30. Also, the rapid escalation of tensions between Plaintiffs and Defendant post-reporting, coupled with the absence of prior documented performance issues, suggests that retaliation was foreseeable. [Doc. 30-1 at Ex. 29-31]; [Doc. 30-4 at 11]. In sum, Plaintiffs have raised triable issues on all elements. Summary judgment must be denied because a reasonable jury could find for Plaintiffs.

## V.    Conclusion

For the above reasons, Plaintiffs submit that Defendant's Motion for Summary Judgment should be denied in its entirety. This is because that the record, when viewed in the light most favorable to Plaintiffs, reveals genuine disputes of material fact regarding each of Plaintiffs claims. Accordingly, Plaintiffs request that this Court deny Defendant's motion and allow these claims to proceed to trial.

THIS the 3rd day of November, 2025.

                            Respectfully submitted,

                            s/ Jane A. Watson
                            JANE A. WATSON (MB# 106877)
                            NICK NORRIS (MB# 101574)
                            LOUIS H. WATSON, JR. (MB# 9053)
                            Attorney for Plaintiff

OF COUNSEL:
WATSON & NORRIS, PLLC
1501 Jackson Avenue W.
STE 113 PMB 101
P: 601-968-0000
F: 601-968-0010
Oxford, Mississippi 38655
jane@watsonnorris.com

## <u>CERTIFICATE OF SERVICE</u>

       I, Jane A. Watson , attorney for Plaintiff, do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading via ECF filing or by United States Mail with postage fully prepaid thereon to all counsel of record.

       SO CERTIFIED, this the 3rd day of November, 2025.

                            s/ Jane A. Watson
                            JANE A. WATSON